No. 20-5113

═══════════════════════════════════════

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

═══════════════════════════════════════

STEPHEN PARMENTER,
*Plaintiff/Appellant,*
v.
CITY OF NOWATA, OKLAHOMA,
*Defendant/Appellee.*

═══════════════════════════════════════

## APPELLANT'S APPENDIX

═══════════════════════════════════════

APPEALED FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
19-CV-431-TCK-JFJ
Honorable Terence C. Kern
*Senior United States District Judge*

═══════════════════════════════════════

Steven R. Hickman, OBA #4172
Frank W Frasier, OBA #17864
FRASIER, FRASIER & HICKMAN, LLP
1700 Southwest Blvd.
Tulsa, OK 74107
Phone: (918) 584-4724
E-mail: frasier@tulsa.com
***Attorneys for Appellant/Plaintiff***

December 6, 2021

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

STEPHEN PARMENTER, )
)
          Plaintiff/Appellant, )
)
v. ) Case No. 20-5113
)
CITY OF NOWATA, OKLAHOMA, )
)
          Defendant/Appellee. )

## <u>INDEX TO APPELLANT'S APPENDIX</u>

**<u>Page</u>**

1.    District Court Docket Sheet. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.    Dkt. No. 2, Complaint, 8/5/19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

3.    Dkt. No. 8, Answer, 8/27/2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

4.    Dkt. No. 23, Motion for Summary Judgment by Defendant, 5/18/20. . . . . 13

5.    Dkt. No. 32, Response to Motion for Summary Judgment, 8/7/20. . . . . . . 70

6.    Dkt. No. 33, Reply to Response to Motion for Summary Judgment
       8/21/20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

7.    Dkt. No. 37, Opinion and Order, 11/4/20. . . . . . . . . . . . . . . . . . . . . . . . 134

8.    Dkt. No. 38, Judgment, 11/4/20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

9.    Dkt. No. 43, Notice of Appeal, 12/4/20. . . . . . . . . . . . . . . . . . . . . . . . . . 142

Respectfully submitted,

FRASIER, FRASIER & HICKMAN, LLP

By:     */s/Steven R. Hickman*
         Steven R. Hickman, OBA #4172
         Frank W Frasier, OBA #17864
         1700 Southwest Blvd.
         Tulsa, OK 74107
         Phone: (918) 584-4724
         Fax: (918) 583-5637
         E-mail: frasier@tulsa.com
         **Attorney for Plaintiff/Appellant**

## CERTIFICATE OF DIGITAL SUBMISSION
## AND PRIVACY REDACTIONS

I hereby certify that a copy of the foregoing Appellant's Appendix, as submitted in Digital Form via the court's ECF system, is an exact copy of the hard copy filed with the Clerk and has been scanned for viruses with the Sophos Anti-Virus, Version 10.8.11.3, updated 6 December, 2021, and, according to the program, it is free of viruses. In addition, I certify all required privacy redactions have been made.

By:    */s/Steven R. Hickman*
            Steven R. Hickman

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Appellant's Appendix was furnished through (ECF) electronic service to the following on this 6th day of December, 2021:

Thomas A. LeBlanc
Emily Wilson
Jessica L. Foutch
*Attorneys for Defendant/Appellee*

By:    */s/Steven R. Hickman*
            Steven R. Hickman

APPEAL,CLOSED,DISCREF,PROTO

# U.S. District Court
## U.S. District Court for the Northern District of Oklahoma (Tulsa)
## CIVIL DOCKET FOR CASE #: <u>4:19–cv–00431–TCK–JFJ</u>

| | |
|---|---|
| Parmenter v. City of Nowata, Oklahoma | Date Filed: 08/05/2019 |
| Assigned to: Judge Terence Kern | Date Terminated: 11/04/2020 |
| Referred to: Magistrate Judge Jodi F Jayne | Jury Demand: Both |
| Demand: $500,000 | Nature of Suit: 442 Civil Rights: Jobs |
| Case in other court:  10th Circuit, 20–05113 (#43) | Jurisdiction: Federal Question |
| Cause: 42:1983 Civil Rights Act | |

**<u>Plaintiff</u>**

**Stephen Parmenter**                    represented by    **Frank W Frasier , III**
                                                           Frasier Frasier & Hickman
                                                           1700 SW BLVD #100
                                                           TULSA, OK 74107
                                                           918–584–4724
                                                           Fax: 918–583–5637
                                                           Email: <u>frasier@tulsa.com</u>
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Steven R Hickman**
                                                           Frasier Frasier & Hickman
                                                           1700 SW BLVD #100
                                                           TULSA, OK 74107
                                                           918–584–4724
                                                           Fax: 918–583–5637
                                                           Email: <u>frasier@tulsa.com</u>
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**City of Nowata, Oklahoma**             represented by    **Emily Wilson**
                                                           Best & Sharp
                                                           One W. 3rd Street
                                                           Suite 900
                                                           Tulsa, OK 74103
                                                           918–582–1234
                                                           Fax: 918–585–9447
                                                           Email: <u>ewilson@bestsharp.com</u>
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Jessica Lee Foutch**
                                                           Best & Sharp

1 W THIRD ST STE 900
TULSA, OK 74103–4225
918–582–1234
Fax: 918–585–9447
Email: jfoutch@bestsharp.com
*TERMINATED: 07/23/2020*
*LEAD ATTORNEY*

**Thomas Adrian LeBlanc**
Best & Sharp
1 W THIRD ST STE 900
TULSA, OK 74103–4225
918–582–1234
Fax: 918–585–9447
Email: tleblanc@bestsharp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 08/05/2019 | 1 | | CIVIL COVER SHEET by Stephen Parmenter (jln, Dpty Clk) (Entered: 08/05/2019) |
| 08/05/2019 | 2 | | COMPLAINT with Jury Demand against City of Nowata, Oklahoma by Stephen Parmenter (jln, Dpty Clk) (Entered: 08/05/2019) |
| 08/05/2019 | 3 | | FILING FEES Paid in Full by Stephen Parmenter (jln, Dpty Clk) (Entered: 08/05/2019) |
| 08/05/2019 | 4 | | SUMMONS Issued by Court Clerk as to City of Nowata, Oklahoma (jln, Dpty Clk) (Entered: 08/05/2019) |
| 08/09/2019 | 5 | | SUMMONS Returned Executed re: City of Nowata, Oklahoma (Re: 2 Complaint ) by Stephen Parmenter (Frasier, Frank) (Entered: 08/09/2019) |
| 08/27/2019 | 6 | | ATTORNEY APPEARANCE by Thomas Adrian LeBlanc on behalf of City of Nowata, Oklahoma [Note: Attorney Thomas Adrian LeBlanc added to party City of Nowata, Oklahoma(pty:dft).] (LeBlanc, Thomas) (Entered: 08/27/2019) |
| 08/27/2019 | 7 | | ATTORNEY APPEARANCE by Jessica Lee Foutch on behalf of City of Nowata, Oklahoma [Note: Attorney Jessica Lee Foutch added to party City of Nowata, Oklahoma(pty:dft).] (Foutch, Jessica) (Entered: 08/27/2019) |
| 08/27/2019 | 8 | | ANSWER with Jury Demand (Re: 2 Complaint ) by City of Nowata, Oklahoma (Foutch, Jessica) (Entered: 08/27/2019) |
| 08/30/2019 | 9 | | ORDER by Judge Terence Kern *for Joint Status Report*, directing parties to file joint status report ( Status Report due by 9/30/2019) (lmc, Chambers) (Entered: 08/30/2019) |
| 09/30/2019 | 10 | | JOINT STATUS REPORT by Stephen Parmenter [Note: Attorney Steven R Hickman added to party Stephen Parmenter(pty:pla).] (Hickman, Steven) (Entered: 09/30/2019) |
| 09/30/2019 | 11 | | |

2

| | | | |
|---|---|---|---|
| | | | SCHEDULING ORDER by Judge Terence Kern , setting/resetting scheduling order date(s): ( Discovery due by 2/3/2020, Dispositive Motions due by 2/18/2020, Proposed Pretrial Order due by 6/2/2020, Pretrial Conference set for 6/9/2020 at 11:00 AM before Judge Terence Kern, Jury Trial set for 7/20/2020 at 09:30 AM before Judge Terence Kern) (srt, Dpty Clk) (Entered: 09/30/2019) |
| 11/19/2019 | 12 | | Joint MOTION for Protective Order by City of Nowata, Oklahoma (Foutch, Jessica) (Entered: 11/19/2019) |
| 11/27/2019 | 13 | | PROTECTIVE ORDER by Magistrate Judge Jodi F Jayne ; granting 12 Motion for Protective Order (sdc, Dpty Clk) (Entered: 11/27/2019) |
| 12/02/2019 | 14 | | SETTLEMENT CONFERENCE ORDER by Magistrate Judge Frank H McCarthy , setting/resetting deadline(s)/hearing(s): ( Settlement Conference set for 2/13/2020 at 01:30 PM before Magistrate Judge Frank H McCarthy) (tjc, Dpty Clk) (Entered: 12/02/2019) |
| 12/05/2019 | 15 | | FINAL EXHIBIT LIST by City of Nowata, Oklahoma (Foutch, Jessica) Modified on 12/6/2019; notified filer that pursuant to FRCvP Rule 5(d)(1) and Local Civil Rule 26.3, discovery material is not to be filed (sac, Dpty Clk). (Entered: 12/05/2019) |
| 12/05/2019 | 16 | | FINAL WITNESS LIST by City of Nowata, Oklahoma (Foutch, Jessica) Modified on 12/6/2019; notified filer that pursuant to FRCvP Rule 5(d)(1) and Local Civil Rule 26.3, discovery material is not to be filed (sac, Dpty Clk). (Entered: 12/05/2019) |
| 12/06/2019 | | | NOTICE of Docket Entry Modification; Error: these are discovery documents; Correction: notified filer that pursuant to FRCvP Rule 5(d)(1) and Local Civil Rule 26.3, discovery material is not to be filed (Re: 16 Final Witness List, 15 Final Exhibit List ) (sac, Dpty Clk) (Entered: 12/06/2019) |
| 02/04/2020 | 17 | | Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 11 Scheduling Order,, Setting/Resetting Scheduling Order Date(s), ) by City of Nowata, Oklahoma (Foutch, Jessica) (Entered: 02/04/2020) |
| 02/04/2020 | 18 | | Unopposed MOTION to Accelerate/Extend/Reset Settlement Deadline(s)/Conference by City of Nowata, Oklahoma (Foutch, Jessica) (Entered: 02/04/2020) |
| 02/04/2020 | 19 | | MINUTE ORDER by Judge Terence Kern – *Joint Motion to Extend Remaining Scheduling Order Deadlines (Doc. 17) is GRANTED. An Amended Scheduling Order will be entered separately.* ; granting 17 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (This entry is the Official Order of the Court. No document is attached.) (lmc, Chambers) (Entered: 02/04/2020) |
| 02/04/2020 | 20 | | MINUTE ORDER by Judge Terence Kern , referring motion(s) to Magistrate Judge McCarthy (Re: 18 Unopposed MOTION to Accelerate/Extend/Reset Settlement Deadline(s)/Conference ) (This entry is the Official Order of the Court. No document is attached.) (lmc, Chambers) (Entered: 02/04/2020) |
| 02/05/2020 | 21 | | SCHEDULING ORDER by Judge Terence Kern *(AMENDED)*, setting/resetting scheduling order date(s): ( Dispositive Motions due by 5/18/2020, Proposed Pretrial Order due by 9/9/2020, Pretrial Conference set for 9/16/2020 at 11:00 AM before Judge Terence Kern, Jury Trial set for |

3

| | | |
|---|---|---|
| | | 10/19/2020 at 09:30 AM before Judge Terence Kern) (srt, Dpty Clk) (Entered: 02/05/2020) |
| 02/06/2020 | 22 | SETTLEMENT CONFERENCE ORDER by Magistrate Judge Frank H McCarthy ; setting/resetting deadline(s)/hearing(s): ( Settlement Conference set for 7/22/2020 at 01:30 PM before Magistrate Judge Frank H McCarthy); granting 18 Motion to Accelerate/Extend/Reset Settlement Deadline(s)/Conference (tjc, Dpty Clk) (Entered: 02/06/2020) |
| 05/18/2020 | 23 | MOTION for Summary Judgment by City of Nowata, Oklahoma (With attachments) (LeBlanc, Thomas) (Entered: 05/18/2020) |
| 06/02/2020 | 24 | Joint MOTION for Extension of Time to Respond to Motion *for Summary Judgment* (Re: 23 MOTION for Summary Judgment ) by Stephen Parmenter (Frasier, Frank) (Entered: 06/02/2020) |
| 06/03/2020 | 25 | MINUTE ORDER by Judge Terence Kern – *Joint Motion for Extension of Time to Respond (Doc. 24) is GRANTED. Plaintiff's response to Defendant's Motion for Summary Judgment (Doc. 23) is due on or before 7/10/2020 and Defendant's reply is due on or before 7/24/2020.* ; setting/resetting deadline(s)/hearing(s): ( Responses due by 7/10/2020, Replies due by 7/24/2020); granting 24 Motion for Extension of Time to Respond to Motion (Re: 23 MOTION for Summary Judgment )  (This entry is the Official Order of the Court. No document is attached.) (lmc, Chambers) (Entered: 06/03/2020) |
| 06/30/2020 | 26 | MINUTE ORDER by Magistrate Judge Frank H McCarthy *(Settlement Conference set for 7/22/2020 at 1:30 p.m. is stricken, to be reset a later time) (See General Order 20–18)*, striking/terminating deadline(s)/Hearing(s) (This entry is the Official Order of the Court. No document is attached.) (tjc, Dpty Clk) (Entered: 06/30/2020) |
| 07/22/2020 | 27 | Unopposed MOTION for Extension of Time to Respond to Motion *for Summary Judgment* (Re: 23 MOTION for Summary Judgment ) by Stephen Parmenter (Frasier, Frank) (Entered: 07/22/2020) |
| 07/23/2020 | 28 | MINUTE ORDER by Judge Terence Kern – *Unopposed Motion for Extension of Time to Respond (Doc. 27) is GRANTED. Plaintiff's response to Defendant's Motion for Summary Judgment (Doc. 23) is extended to 8/7/2020. Defendant's reply is due on or before 8/21/2020.* ; setting/resetting deadline(s)/hearing(s): ( Responses due by 8/7/2020, Replies due by 8/21/2020); granting 27 Motion for Extension of Time to Respond to Motion (Re: 23 MOTION for Summary Judgment )  (This entry is the Official Order of the Court. No document is attached.) (lmc, Chambers) (Entered: 07/23/2020) |
| 07/23/2020 | 29 | MOTION to Withdraw Attorney(s) *Jessica L. Foutch* by City of Nowata, Oklahoma (LeBlanc, Thomas) (Entered: 07/23/2020) |
| 07/23/2020 | 30 | MINUTE ORDER by Judge Terence Kern ; terminating attorney Jessica Lee Foutch ; granting 29 Motion to Withdraw Attorney(s) (lmc, Chambers) (Entered: 07/23/2020) |
| 08/05/2020 | 31 | ATTORNEY APPEARANCE by Emily Wilson on behalf of City of Nowata, Oklahoma [Note: Attorney Emily Wilson added to party City of Nowata, Oklahoma(pty:dft).] (Wilson, Emily) (Entered: 08/05/2020) |
| 08/07/2020 | 32 | |

| | | | |
|---|---|---|---|
| | | | RESPONSE in Opposition to Motion *for Summary Judgment* (Re: 23 MOTION for Summary Judgment ) by Stephen Parmenter ; (With attachments) (Frasier, Frank) (Entered: 08/07/2020) |
| 08/21/2020 | 33 | | REPLY to Response to Motion (Re: 23 MOTION for Summary Judgment ) by City of Nowata, Oklahoma ; (With attachments) (Wilson, Emily) (Entered: 08/21/2020) |
| 08/25/2020 | 34 | | MINUTE ORDER by Magistrate Judge Frank H McCarthy *A Telephone hearing regarding Settlement Conference is scheduled for 8/26/20 at 1:30 p.m.*, setting/resetting deadline(s)/hearing(s): ( Miscellaneous Hearing set for 8/26/2020 at 01:30 PM before Magistrate Judge Frank H McCarthy) (This entry is the Official Order of the Court. No document is attached.) (tjc, Dpty Clk) (Entered: 08/25/2020) |
| 08/26/2020 | 35 | | MINUTE ORDER by Judge Terence Kern – *The Scheduling Order deadlines including the Pretrial Conference set for 9/16/2020 and Jury Trial set for 10/19/2020 are hereby stricken to be reset, if necessary, at a later date.*, striking/terminating deadline(s)/Hearing(s) (Re: 21 Scheduling Order,, Setting/Resetting Scheduling Order Date(s), )  (This entry is the Official Order of the Court. No document is attached.) (lmc, Chambers) (Entered: 08/26/2020) |
| 08/26/2020 | 36 | | MINUTES of Proceedings – held before Magistrate Judge Frank H McCarthy: Miscellaneous Hearing held on 8/26/2020 , striking/terminating deadline(s)/Hearing(s) (Court Reporter: no recording) (tjc, Dpty Clk) (Entered: 08/26/2020) |
| 11/04/2020 | 37 | | OPINION AND ORDER by Judge Terence Kern ; granting 23 Motion for Summary Judgment (lmc, Chambers) (Entered: 11/04/2020) |
| 11/04/2020 | 38 | | JUDGMENT by Judge Terence Kern , entering judgment in favor of Defendant against Plaintiff (terminates case) (lmc, Chambers) (Entered: 11/04/2020) |
| 11/04/2020 | | | ***Civil Case Terminated (see document number 38 ) (sac, Dpty Clk) (Entered: 11/05/2020) |
| 11/11/2020 | 39 | | BILL OF COSTS by City of Nowata, Oklahoma (LeBlanc, Thomas) (Entered: 11/11/2020) |
| 11/11/2020 | 40 | | BRIEF *in Support* (Re: 39 Bill of Costs ) by City of Nowata, Oklahoma (With attachments) (LeBlanc, Thomas) (Entered: 11/11/2020) |
| 11/12/2020 | 41 | | ORDER by Court Clerk , setting/resetting deadline(s)/hearing(s): ( Cost Hearing set for 12/29/2020 at 10:00 AM before Court Clerk) (eaw, Dpty Clk) (Entered: 11/12/2020) |
| 12/02/2020 | 42 | | OBJECTION to Bill of Costs (Re: 39 Bill of Costs ) by Stephen Parmenter (Frasier, Frank) (Entered: 12/02/2020) |
| 12/04/2020 | 43 | | NOTICE OF APPEAL to Circuit Court (paid $505 appeal fee; receipt number AOKNDC–2313171) (Re: 38 Judgment, Entering Judgment, 37 Opinion and Order, Ruling on Motion for Summary Judgment ) by Stephen Parmenter (Frasier, Frank) (Entered: 12/04/2020) |
| 12/07/2020 | 44 | | PRELIMINARY RECORD Sent to Circuit Court (Re: 43 Notice of Appeal to Circuit Court ) (With attachments) (sc, Dpty Clk) (Entered: 12/07/2020) |

| 12/07/2020 | 45 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 20−5113 (#43) (Re: 43 Notice of Appeal to Circuit Court ) (sc, Dpty Clk) (Entered: 12/07/2020) |
|---|---|---|---|
| 12/14/2020 | 46 | | REPLY (Re: 42 Objection to Bill of Costs ) by City of Nowata, Oklahoma (With attachments) (Wilson, Emily) (Entered: 12/14/2020) |
| 12/18/2020 | 47 | | ATTORNEY APPEARANCE by Steven R Hickman on behalf of Stephen Parmenter (Hickman, Steven) (Entered: 12/18/2020) |
| 12/18/2020 | 48 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 43 Notice of Appeal to Circuit Court ) by Stephen Parmenter (Hickman, Steven) (Entered: 12/18/2020) |
| 12/18/2020 | 49 | | ORDER from Circuit Court *Notice that record is complete by 12/28/2020 for Mark C. McCartt, Clerk of Court* (Re: 43 Notice of Appeal to Circuit Court ) (sc, Dpty Clk) (Entered: 12/18/2020) |
| 12/21/2020 | 50 | | CLERK'S RECORD on Appeal Sent to Circuit Court (Re: 43 Notice of Appeal to Circuit Court ) (jln, Dpty Clk) (Entered: 12/21/2020) |
| 12/29/2020 | 51 | | ORDER by Court Clerk , taxing costs in amount of $1,238.59 in favor of Defendant against Plaintiff (eaw, Dpty Clk) (Entered: 12/29/2020) |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

FILED

AUG 0 5 2019

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

1) STEPHEN PARMENTER,                )
                                     )
                Plaintiff,           )
                                     )      19 CV   431 TCK - JFJ
v.                                   )
                                     )      Case No.:
1) CITY OF NOWATA,                   )      ATTORNEYS' LIEN CLAIMED
OKLAHOMA,                            )      JURY TRIAL DEMANDED
                                     )
                Defendant.           )
                                     )

## COMPLAINT

COMES NOW Plaintiff and for his claims and causes of action against

Defendant states and alleges:

1.    Plaintiff, Stephen Parmenter, is a resident of Nowata County, Oklahoma.

2.    Defendant, City of Nowata, Oklahoma, is a municipal corporation in the

      Northern District of Oklahoma.

3.    Jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1331, in that this

      action arises under federal laws, including, but not limited to, 42 U.S.C. §

      1983. The supplemental jurisdiction of this court for state law claims is

      invoked under 28 U.S.C. § 1367.

4.    For over five years up until April 8, 2019, Plaintiff was the non-probationary

      fire chief of the City of Nowata, which was subject to 11 O.S. § 29-104.

5.    On April 8, 2019, Plaintiff was terminated without cause, and with neither

      pre-termination nor post-termination procedures.

2019-08-05 10:16 am
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\Complaint.wpd/vs

6.     As a result of this violation of Plaintiff's civil rights, he has lost wages and
other benefits of employment, including harm to his retirement, has lost his
job, has endured humiliation and emotional distress.

7.     Plaintiff timely has made notice on the City of Nowata under the Oklahoma
Governmental Tort Claims Act, which was denied, and this lawsuit timely
commences.

WHEREFORE, premises considered, Plaintiff prays for judgment against
Defendant in the sum of $500,000, interest, costs, attorneys' fees, reinstatement
to his job position, other equitable relief, and any and all other relief to which he
is deemed entitled.

Respectfully submitted,

FRASIER, FRASIER & HICKMAN, LLP

By:      _____

Frank W Frasier, OBA #17864
1700 Southwest Blvd.
Tulsa, OK 74107
Phone: (918) 584-4724
Fax: (918) 583-5637
E-mail: frasier@tulsa.com

2019-08-05 10:16 am
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\Complaint.wpd/vs

8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) STEPHEN PARMENTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-CV-431-TCK-JFJ** |
| | ) | |
| **(1) CITY OF NOWATA, OKLAHOMA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ANSWER OF DEFENDANT, CITY OF NOWATA, OKLAHOMA</u>

COMES NOW Defendant City of Nowata, Oklahoma, by and through its attorneys of record, Thomas A. LeBlanc and Jessica L. Foutch of the law firm of Best & Sharp, and hereby submits its Answer to Plaintiff's Complaint.   Defendant generally denies the allegations of Plaintiff's Complaint unless specifically admitted herein and further alleges and states as follows:

1. Defendant is without sufficient information to either admit or deny the allegations contained in Paragraph 1 of Plaintiff's Complaint, and therefore denies the same and demands strict proof thereof.

2. Defendant admits the allegations contained in Paragraph 2 of Plaintiff's Complaint.

3. Defendant admits the allegations contained in Paragraph 3 of Plaintiff's Complaint.

4. Defendant admits Plaintiff was a non-probationary fire chief at the time of his termination, and Defendant denies the remaining allegations contained in Paragraph 4 of Plaintiff's Complaint.

5. Defendant denies the allegations contained in Paragraph 5 of Plaintiff's Complaint.

6. Defendant denies the allegations contained in Paragraph 6 of Plaintiff's Complaint.

7. Defendant denies the allegations contained in Paragraph 7 of Plaintiff's Complaint.
   Defendant denies Plaintiff's WHEREFORE paragraph of Plaintiff's Complaint.

## AFFIRMATIVE DEFENSES AND OTHER AVOIDANCES:

1. Plaintiff's state law claims, if any, are barred by the Oklahoma Governmental Tort Claims Act, codified at 51 O.S. §§ 151 *et seq*.

2. The Plaintiff has failed to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) upon which relief may be granted.

3. Plaintiff has failed to comply with the notice requirements of the Oklahoma Governmental Tort Claims Act.

4. The Plaintiff's alleged damages, if any, were not caused by the acts of Defendant, its agents, officers or employees.

5. Defendant would state that any damages sustained by Plaintiff were caused by his own acts or omissions, and such acts or omissions constitute a bar to recovery from Defendant.

6. All actions undertaken by Defendant were performed in good faith and for legitimate, nondiscriminatory, and non-retaliatory reasons, and were in compliance with state and federal law.

7. Plaintiff was an at-will employee and was not entitled to due process in regard to his termination.

8. Defendant pleads all affirmative defenses available under the law to the extent that such defenses are supported by the evidence.

## RESERVATION OF RIGHTS

As discovery is continuing, Defendant specifically reserves the right to amend its Answer to include additional or affirmative or general defenses upon the completion of discovery and reserves the right to raise the same by separate dispositive motion. If there is any material

allegation which Defendant has not denied and which would adversely affect its rights, it here and now denies the same.

WHEREFORE, Defendant, City of Nowata, Oklahoma, prays that the Court grant judgment in its favor and against the Plaintiff, together with its costs, attorney's fees, and all other and further relief to which it may be entitled.

Respectfully submitted,

**BEST & SHARP**

**JURY TRIAL DEMANDED**

s/ Jessica L. Foutch
Thomas A. LeBlanc, OBA #14768
tleblanc@bestsharp.com
Jessica L. Foutch, OBA #31851
jfoutch@bestsharp.com
Williams Center Tower 1
One West Third Street, Suite 900
Tulsa, OK 74103
Telephone: (918) 582-1234
Facsimile: (918) 585-9447
*Attorney for Defendant,*
*City of Nowata*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 27th day of August, 2019, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

Frank W. Frasier, OBA #17864
<u>frasier@tulsa.com</u>
1700 Southwest Blvd.
Tulsa, OK  74107
Telephone: 918-584-4724
Facsimile: 918-583-5637
*Attorney for Plaintiff*

s/ Jessica L. Foutch

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) STEPHEN PARMENTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-CV-431-TCK-JFJ** |
| | ) | |
| **(1) CITY OF NOWATA, OKLAHOMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Respectfully submitted,

Thomas A. LeBlanc, OBA #14768
tleblanc@bestsharp.com
Jessica L. Foutch, OBA #31851
jfoutch@bestsharp.com
**BEST & SHARP**
Williams Center Tower 1
One West Third Street, Suite 900
Tulsa, OK 74103
Telephone: (918) 582-1234
Facsimile: (918) 585-9447
*Attorney for Defendant,*
*City of Nowata*

May 18, 2020

{00569890}

13

## **TABLE OF EXHIBITS**

Exhibit 1 – Reprimand 8-31-17

Exhibit 2 – Deposition Excerpts of Stephen Parmenter

Exhibit 3 – Fire Chief Job Description Annotated

Exhibit 4 – Carrick Memo dated 3-5-19

Exhibit 5 – Carrick Memo dated 3-7-19

Exhibit 6 – Chief McElhaney Statement

Exhibit 7 – Carrick Memo dated 3-11-19

Exhibit 8 – Termination Letter to Plaintiff 4-8-19

Exhibit 9 – City Charter, Section 26

Exhibit 10 – Nowata's Municipal Code Section 2-302

Exhibit 11 – Personnel Manual §§1-1, 1-3, 2-5, 9-1, 9-2

{00569890}

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) STEPHEN PARMENTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-CV-431-TCK-JFJ** |
| | ) | |
| **(1) CITY OF NOWATA, OKLAHOMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION FOR SUMMARY
## JUDGMENT AND BRIEF IN SUPPORT

COMES NOW Defendant City of Nowata, and pursuant to Fed. R. Civ. P. 56, and LCvR

56.1, moves this Court for summary judgment.  In support of its motion, Defendant hereby files

this Motion for Summary Judgment, and Brief in Support.

## I.    INTRODUCTION

This lawsuit involves the employment termination of Nowata Fire Chief, Stephen Parmenter

(hereinafter "Plaintiff" or "Parmenter"). As a Department Head and employee of the City,

Parmenter could be fired by the City Manager at any time with or without cause.  On August 31,

2017 Plaintiff was formally reprimanded for a number of severe substantiated infractions

(discussed in UDF No. 4). The morale of the Fire Department was severely suffering.  Plaintiff

was also told he must work one regular fire shift per week. Months later, in March 2018, with

problems continuing, Plaintiff was provided the opportunity to look through and provide feedback

on his job description in an effort by City officials to salvage Plaintiff's employment and address

the ongoing infractions. Then, in May 2018, Plaintiff met with City Manager, Melanie Carrick

("Carrick"), City Attorney John Heskett ("Heskett") for <u>hours</u> to discuss Plaintiff's employment

and adjustments to certain duties and responsibilities. Yet still, in March 2019, these ongoing

infractions continued to occur. On April 8, 2019, Carrick terminated Parmenter for these ongoing

infractions and for the good of the City of Nowata Fire Department. Despite numerous warnings

and discussions as to the concerns with Plaintiff's employment performance for over a year and a

half, Plaintiff feigns surprise at his termination and claims that he was terminated without due

process to which he was entitled. Plaintiff's claim is without merit, and Defendant is entitled to

summary judgment.

## II.    STATEMENT OF UNCONTROVERTED FACTS

1.    Plaintiff was the Fire Chief for the City of Nowata. (Plaintiff's Complaint, Dkt. #2).

2.    The City of Nowata's City Charter includes the following provision: "The powers and duties of the City Manager shall be:…to appoint and remove all Heads of Departments, and all subordinate officers and employees of the City." (Exhibit 9, City Charter Section Twenty-Six; Exhibit 10, City Code Section 2-302.)

3.    The City of Nowata's Personnel Manual clearly states that all City employees are "at will" and can be fired with or without cause and without notice. (Exhibit 11, Personnel Manual, §§1-1, 1-3, 2-5, 9-1, 9-2).

4.    On August 31, 2017, Plaintiff received a formal, documented, reprimand. (Exhibit 1, August 31, 2017 Employee Warning Notice.) At that time, Plaintiff was also removed from the EMS Director role. (Exhibit 1; Exhibit 2, Deposition of Stephen Parmenter at 90-91.) The twelve infractions Plaintiff was counseled on are as follows:

Altering of employee timesheets, falsification of own time sheet, interfered with the City's relationship with Harmon Foundation, providing false information to a supervisor, hindering the accounting process by holding checks that need to be deposited and not turning them in for deposit in a timely manner, allowing multiple employees to take comp time that they had not accrued, issuance of comp time not in accordance with the City

personnel manual, fostering and allowing to continue an environment of low morale in the department, creating feelings of fear of retribution or retaliation in employees in the department creating a harassing, hostile and threatening work environment for employees, non-compliance with hiring policy, holding volunteer pay until dues are paid, scheduling part-time workers more than part time hours.

*See* Exhibit 1.

5. On that date, Plaintiff was also advised he was to work at least one regular shift per week as a firefighter. (Exhibit 1; Exhibit 2, Deposition of Stephen Parmenter at 87-88.)

6. On August 31, 2017, Plaintiff was aware that any further infractions could result in disciplinary action against him, including termination. (Exhibit 1; Exhibit 2, Deposition of Stephen Parmenter at 94.)

7. Carrick continued to address with Plaintiff the items contained in the reprimand "throughout a year or a year and a half" prior to his termination. (Exhibit 2, Deposition of Stephen Parmenter at 95-96.)

8. Beginning in March 2018, Carrick and Parmenter had at least two discussions related to Plaintiff's job and even discussed changes to the Job Description to accommodate Plaintiff. (Exhibit 2, Deposition of Stephen Parmenter at 97-101; Exhibit 3, Fire Chief Job Description Annotated.)

9. Then, in May 2018 a meeting related to the fire chief job description and Plaintiff's duties, which lasted an hour and a half or longer, between Plaintiff, Carrick and Heskett occurred. (Exhibit 2, Deposition of Stephen Parmenter at 105-106; Exhibit 3, Fire Chief Job Description Annotated.)

10.    At no time from August 2017 to the date of Plaintiff's termination did Plaintiff fulfill his duty to work a single fire shift. (Exhibit 2, Deposition of Stephen Parmenter at 87-88 and 116.)

11.    In March 2019, the same issues that had been occurring with Plaintiff the two years prior arose yet again. (Exhibit 4, March 5, 2019 Carrick Memo; Exhibit 5, March 7, 2019, Carrick Memo; Exhibit 6, Chief McElhaney Statement; Exhibit 7, March 11, 2019, Carrick Memo.)

12.    On April 8, 2019, Plaintiff was terminated by Carrick.[1] (Exhibit 8, Termination Letter to Plaintiff April 8, 2019.)

## III.   ARGUMENTS AND AUTHORITIES

### A.    Standards for Summary Judgment

Summary judgment is appropriate if the pleadings, affidavits, depositions, and evidence on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is essential to the proper disposition of a claim under controlling law and an issue is genuine if the evidence is such that a rational trier of fact could resolve the issue either way. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Id.* at 255. The movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element of a claim, then all other factual issues concerning the claim become

---

[1] Carrick is the City Manager. Defendant City of Nowata has adopted a municipal charter as provided by 11 O.S. § 13-101. Pursuant to Nowata City Charter, Article III, § 26 the City Manager has the authority to "appoint and remove all Heads of Departments, and all subordinate officers and employees of the City."

{00569890}                                  4

immaterial. *Id.* at 322. If the movant carries its burden, the non-movant must then "set forth specific [admissible] facts," outside of the pleadings, that show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 248. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita Elec. v. Zenith Radio Corp.*, 475 U.S. 574, 586– 87 (1986).

A mere "scintilla" of evidence will not avoid summary judgment. *See Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993). "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson v. Liberty Lobby*, 477 U.S. at 249. Plaintiff's mere belief, conjecture, and conclusory allegations are not sufficient to withstand summary judgment. *See Rice v. United States,* 166 F.3d, 1088, 1092 (10th Cir. 1999) *cert. den*. 528 U.S. 933 (1999). Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007), citing *Matsushita Elec.*, 475 U.S. at 586-587. "When opposing parties tell two different stories, one of which is *blatantly contradicted by the record*, so that no reasonable jury could believe it, a court *should not adopt that version of the facts* for purposes of ruling on a motion for summary judgment." *Id.* (emphasis added).

### B.   PLAINTIFF'S § 1983 CLAIM AGAINST THE CITY OF NOWATA FAILS AS A MATTER OF LAW

Plaintiff's procedural due process claim is without merit. The Fourteenth Amendment prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. "Procedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision."

*Archuleta v. Colorado Department of Insts., Div of Youth Servs.*, 936 F.2d 483, 490 (10th Cir.

1993).  "To determine whether a plaintiff was denied procedural due process, [Courts] engage in

a two-step inquiry: (1) did the individual possess a protected property interest to which due process

protection was applicable? (2) was the individual afforded an appropriate level of process?"

*Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998).  "Whether an employee has a

protected property interest in his position is purely a question of law to be determined by the court."

*Whatley v. City of Bartlesville, 932 F.Supp. 1300, 1302 (N.D. Okla. 1996).*

### 1.  **Plaintiff did not have a protected property interest in his employment.**

Although the Constitution provides for the <u>protection</u> of property interests, the Supreme

Court has noted that property interests are <u>not created</u> by the Constitution.  *See Board of Regents*

*v. Roth*, 408 U.S. 564, 577 (1982) (emphasis added).  Rather, they are created, and their dimensions

defined, by existing rules or understandings that stem from an independent source such as state

law.  *Id.* at p. 577.  The existence of a property interest is determined by whether the terms of

employment, created by contract, statute, city charter, or employee manual, create a sufficient

expectancy of continued employment.  *See Vinyard v. King*, 728 F.2d 428, 432 (10th Cir. 1984).

Such property interest must be a <u>legitimate entitlement</u> and <u>not a mere unilateral expectation</u>.  *See*

*Board of Regents*, 408 U.S. at 577 (emphasis added).

Plaintiff contends that he possessed a property interest in his position as Fire Chief pursuant

to state statute 11 O.S. § 29-104, which provides that as a Fire Chief he could only be fired for

cause.  (Dkt. # 2, para. 4-5).  That statute provides: "The chief and members of all paid municipal

fire departments shall hold their respective positions unless removed for a good and sufficient

cause as provided by applicable law or ordinance."  However, in this case the statute relied upon

by Plaintiff does not apply, because Nowata's City Charter governs Plaintiff's employment relationship with the City.  11 O.S. §13-109 provides:

> Whenever a charter is in conflict with any law relating to municipalities in force at the time of the adoption and approval of the charter, the provisions of the charter shall prevail and shall operate as a repeal or suspension of the state law or laws to the extent of any conflict.

In other words, a city charter is controlling over a conflicting state law when the matter is one of municipal concern. Generally, employment issues have been held to be matters of purely municipal concern, thus a city charter providing an at-will employment relationship is controlling.  "The law is clear that the control of a freeholder charter city over the personnel of its fire department is solely a matter of municipal concern, and hence not subject to legislative control." *City of Wewoka v. Rodman,* 172 Okla. 630, 46 P.2d 334, 335 (1935) (internal citations omitted).   The holding in *City of Wewoka* was affirmed and followed in *Jones v. Bayless*, 208 Okla. 270, 255. P2d 506, 511-512 (1952), where the Court held that in matters of municipal employment "the matter before us controlled by the City Charter in question, not by general laws or by the specific enactments of other municipalities, governmental units or jurisdictions."

Plaintiff may argue that *In re City of Durant v. Cicio*, 50 P.3d 218 (Okla. 2002) is controlling. In *Cicio,* the Oklahoma Supreme Court was analyzing Oklahoma's statutory police pension system and stated in dicta that police and fire protection are not matters of purely municipal concern and are a matter of statewide interest. *Id.* at 222. However, this is unpersuasive. In the *Cicio* case, the Court undertook an interpretation and application of the Oklahoma Police Pension and Retirement System – a different set of laws than at issue in this case. *Id.* at 219-220. Most importantly, Durant was not a chartered city and conceded such.  *Id.* at 222. In *Cicio,* the City of Durant was not a home-rule city, but organized and run by state statutes. *Id.* at 220. In *Edwards v. City of Sallisaw*, 2014 OK 86, n. 9, the Oklahoma Supreme Court distinguished *Cicio*

{00569890}                                      7

for home-rule cities (i.e., charter cities) stating *Cicio* is distinguishable in the context of police

protection in home-rule cities.   The Oklahoma Supreme Court previously held in *Moore v.

Oklahoma City,* 254 P. 47 (Okla. 1927) that the power, solely vested in the city manager, to hire

and fire the police chief and other officers did not infringe on matters which were state concerns,

rather than purely local matters. *See also Edwards*, 2014 OK 86, *4.

In this case, Nowata is a home rule city and has an adopted City Charter. Nowata's City

Charter, Section Twenty-Six, grants the City Manager the unrestricted authority "to appoint and

remove all Heads of Departments, and all subordinate officers and employees of the City."  (Ex.

9)  The statute relied upon by Plaintiff would restrict the authority of the City Manager by allowing

terminations only "for cause", and as such it is in conflict with Nowata's Charter.  In accordance

with 11 O.S. §13-109, Nowata's Charter operates to repeal or suspend 11 O.S. § 29-104, and the

City Manager can fire employees, including the Fire Chief, without restriction, thus creating an at-

will employment relationship where no good cause is needed to terminate the employment.  See

also Nowata's Municipal Code (Exhibit 10) and Personnel Manual (Exhibit 11) which clearly

confirm that all City employees are "at-will".  And as such, Plaintiff possessed no protected

property interest in his employment with the City of Nowata.

## 2.   Plaintiff received adequate due process

Even though Plaintiff had no protected property interest in his job and was therefore not

entitled to due process, he did in fact receive adequate due process.  "An essential principle of due

process is that a deprivation of life, liberty or property be preceded by notice and opportunity for

hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532,

542 (1985) (internal quotation omitted). "This principle requires 'some kind of a hearing' prior to

the  discharge  of  an  employee  who  has  a  constitutionally  protected  property  interest  in  his

employment." *Id.* (citations omitted). A constitutionally adequate "pretermination

hearing requires: (1) 'oral or written notice [to the employee] of the charges against him;' (2) 'an

explanation of the employer's evidence and [3] an opportunity [for the employee] to present his

side of the story.'" *Qualls v. City of Piedmont, No. CIV-14-126-D, 2016 WL 6078356, at \*4 (W.D.*

*Okla. Oct. 17, 2016)* quoting *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir. 2004);

quoting *Loudermill*, 470 U.S. at 546; *see also Riggins v. Goodman*, 572 F.3d 1101 (10th Cir.

2009). The court of appeals has explained:

> We have upheld as sufficient to meet these requirements informal proceedings,
> such as pretermination warnings and an opportunity for a face-to-face meeting with
> supervisors, *see Seibert v. University of Oklahoma Health Sciences Center*, 867
> F.2d 591, 598 (10th Cir. 1989), and even a limited conversation between an
> employee and his supervisor immediately prior to the employee's
> termination, *see Powell v. Mikulecky*, 891 F.2d 1454, 1459 (10th Cir. 1989). The
> objective of the process is "an initial check against mistaken decisions – essentially,
> a determination of whether there are reasonable grounds to believe that the charges
> against the employee are true and support the proposed action." *West [v. Grand
> Cty.*], 967 F.2d [362,] at 367 [ (10th Cir. 1992) ] (citation omitted).

*Riggins*, 572 F.3d at 1108 (footnote omitted). "Due process requires notice and opportunity to be

heard in a meaningful time and manner," and "is flexible and calls for such procedural protections

as the particular situation demands." *Qualls,* 2016 WL 6078356, at \*6 citing *Sutherland v. Tooele*

*City Corp.*, 91 Fed. Appx. 632 (10th Cir. 2004).

While Plaintiff feigns surprise by his termination, Plaintiff was put on notice of his many

infractions while Fire Chief for the City of Nowata. As shown by the undisputed facts ("UDFs")

Plaintiff was provided with notice of the charges against him. The many charges were discussed

with Plaintiff, admittedly numerous times, through the last year and a half of his employment.

These pre-termination procedures included a formal, detailed reprimand in August 2017.

Furthermore, Plaintiff was provided the opportunity to revise the fire chief job description to fit

Plaintiff's needs in March – May 2018. Yet again, in March 2019, the very issues plaguing the

Nowata Fire Department under Plaintiff's tenure continued to fester. And, in his deposition Plaintiff testified that in the month prior to his termination he knew "things started going south when I walked into City Hall". (Exhibit 2, at 158-159.)[2] It is unequivocal that Plaintiff received numerous pre-termination procedural protections that provided him with notice as to the charges against him. Plaintiff was given nearly two years to correct the deficiencies that Plaintiff was undeniably on notice of.

Here, as in *Seibert v. University of Oklahoma Health Sciences Center*, 867 F.2d 591, 599 (10th Cir. 1989) the plaintiff "was not fired for reasons that he did not know," and he "was not fired without being given the 'opportunity to present his side of the story.' " Id. (quoting Loudermill, 470 U.S. at 542, 105 S.Ct. at 1493). *See also*, *Williams v. Fed. Deposit Ins. Corp.,* 723 F. Supp. 612, 615 (W.D. Okla. 1989) (finding due process adequate where employee knew reasons for termination); and *Aronson v. Gressly*, 961 F.2d 907, 909–10 (10th Cir. 1992) (due process was met where employee was warned that discipline including termination could result from continued conduct). The pre-termination procedures provided to Plaintiff were more than sufficient due process. Defendant is entitled to summary judgement.

## IV.    CONCLUSION

No disputed material facts remain in this case. Plaintiff did not have a protected property interest in his employment. Moreover, Plaintiff was on notice of the continued infractions he was committing while Fire Chief, and he was provided ample opportunity to correct or defend his actions. Plaintiff was terminated after a number of pre-termination meetings and discussions as to his employment. The process provided to Plaintiff was more than sufficient to meet constitutional

---

[2] Plaintiff testified he made 10- 20 recordings of conversations, but deleted them from his phone. Id.

standards, if any due process was owed to Plaintiff. For those reasons Defendant is entitled to summary judgment.

WHEREFORE, premises considered, there being no dispute as to any material fact in this case, and Defendant being entitled to judgment as a matter of law as a result, Defendant respectfully requests this Court grant summary judgment in favor of Defendant, and award any other relief the Court may deem just and equitable.

Respectfully submitted,

**BEST & SHARP**

s/ Thomas A. LeBlanc

Thomas A. LeBlanc, OBA #14768
tleblanc@bestsharp.com
Jessica L. Foutch, OBA #31851
jfoutch@bestsharp.com
Williams Center Tower 1
One West Third Street, Suite 900
Tulsa, OK 74103
Telephone: (918) 582-1234
Facsimile: (918) 585-9447
*Attorney for Defendant,*
*City of Nowata*

{00569890}                                    11

## CERTIFICATE OF SERVICE

I hereby certify that on  18th day of May, 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

Frank W. Frasier, OBA #17864
frasier@tulsa.com
1700 Southwest Blvd.
Tulsa, OK  74107
Telephone: 918-584-4724
Facsimile: 918-583-5637
*Attorney for Plaintiff*

s/ Thomas A. LeBlanc

| YOUR LOGO HERE | | Company Name |

## Employee Warning Notice

| Employee Information | | |
|---|---|---|

| Employee Name: | Steve Parmenter | Date: | |
|---|---|---|---|
| Employee ID: | | Job Title: | Fire Chief |
| Manager: | Melanie Carrick –Interim City Manager | Department: | Administration |

| Type of Warning | | |
|---|---|---|

| ☐ First Warning | ☐ Second Warning | ☒ Final Warning |

| Type of Offenses | | |
|---|---|---|
| **Details** | | |

**Description of Infraction:** Altering of employee time sheets, falsification of own time sheet, Interfered with the City's relationship with the Harmon Foundation, providing false information to supervisor, hindering the accounting process by holding checks that need to be deposited and not turning them in for deposit in a timely manner, allowing multiple employees to take comp time that they had not accrued, issuance of comp time not in accordance with City personnel manual, fostering and allowing to continue an environment of low morale in department, creating feelings of fear of retribution or retaliation in employees in the department creating a harassing, hostile and threatening work environment for employees, non-compliance with hiring policy, holding volunteer pay until dues are paid, scheduling part-time workers more than part time hours.

**Actions that have been taken:** This formal reprimand, verbal "talking to" by previous city manager on at least one occasion. Fire Chief will be required to work at least one regular shift per week as a regular fireman to foster better relationships with employees in the department and boost morale. He is relieved of all EMS related duties. He will not interfere with donations from outside entities ie. Harmon Foundation

Steve is directed at this point to: change the remit address on all Fire or EMS payments to City Hall, 114 S Maple ST, Nowata OK 74048. Copies will be made and given to him for his records. All checks in the possession of the Fire Dept. or EMS will be delivered to City Hall no later than August 28, 2017. Time sheets will be turned in on time and complete. Employees must change and initial their own time sheets if corrections are needed and be turned in on time to prevent delaying of payroll. Promote the City of Nowata and its employees in a positive manner. Improve the morale of his Department. Comp time will not be issued and Steve will address and develop a plan to address the comp time hours owed to the fire department by John Albert. Steve has been informed and reminded of the hiring policy on more than one occasion and will adhere to it. Volunteers and employees will receive their pay checks on the day the pay is scheduled for regardless of any dues that are owed.

**Consequences of Further Infractions:** This is the only warning that Steve will receive due to the serious and damaging nature of the offenses. Any further infractions will result in disciplinary action, up to and including termination of employment

| Acknowledgment of Receipt of Warnings | |
|---|---|

By signing this form, you confirm that you understand the information in this warning. You also confirm that you and your manager have discussed the warning and a plan for improvement. Signing this form does not necessarily indicate that you agree with this warning.

| _Steve Parmenter_ | _5/31/17_ |
|---|---|
| Employee Signature | Date |
| _Melanie Carrick_ | _8-31-17_ |
| Manager Signature | Date |

EXHIBIT

1

Witness Signature (if employee understands warning but refuses to sign)          Date

_Chris Emert did witness the transaction But I did not make him sign because Steve did_

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA


STEPHEN PARMENTER,

     Plaintiff,

-vs-                         Case No. 19-CV-431-TCK-JFJ

CITY OF NOWATA, OKLAHOMA,

     Defendant.



DEPOSITION OF STEPHEN PARMENTER
TAKEN ON BEHALF OF THE DEFENDANT

ON JANUARY 29, 2020, BEGINNING AT 10:11 A.M.

IN TULSA, OKLAHOMA



APPEARANCES

on behalf of the PLAINTIFF

    Mr. Frank W. Frasier, III
    FRASIER, FRASIER & HICKMAN, L.L.P.
    1700 Southwest Boulevard
    Tulsa, OK 74107
    918-584-4724
    frasier@tulsa.com


(Appearances continued on next page.)

REPORTED BY:  Shannon S. Harwood, CSR, RPR



485bc887-db03-4a2e-b4fa-56a2aebf678d

PR#143930                 PARMENTER, STEPHEN                    1/29/2020

Page 2

```
 1          (Appearances continued.)
 2     on behalf of the DEFENDANT
 3          Ms. Jessica L. Foutch
            BEST & SHARP
 4          Williams Center Tower 1
            One West 3rd Street
 5          Suite 900
            Tulsa, OK 74103
 6          918-582-1234
            jfoutch@bestsharp.com
 7
 8     ALSO PRESENT:  Ms. Tina Parmenter
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

485bc887-db03-4a2e-b4fa-56a2aebf678d

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 87

1      A.    I don't dispute that it happened, yeah.

2      Q.    If we keep reading, it says, "This formal

3  reprimand, verbal 'talking to' by previous city manager

4  on at least one occasion."  So to me, that looks like

5  Melanie Carrick is saying that the previous city manager

6  also spoke with you about these issues, correct?

7      A.    No.

8      Q.    Charlie Spencer never spoke with you about any

9  of these issues?

10     A.    Not these issues.

11     Q.    Did he talk to you about other issues?

12     A.    Yes.

13     Q.    What other issues did he talk to you about?

14     A.    The ordering payment for Watch Distributing

15  which is they get the paper towels, toilet paper, soap,

16  all that stuff.

17     Q.    Okay.  Anything else?

18     A.    The three hours vacation time that we had

19  talked about.

20     Q.    The next sentence says, "Fire chief will be

21  required to work at least one regular shift per week as

22  a regular fireman to foster better relationships with

23  employees in the department and boost morale."  Did you

24  ever work a shift, one regular shift per week as a

25  regular fireman as you were advised to do on 8-31-2017?

485bc887-db03-4a2e-b4fa-56a2aebf678d

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 88

1      A.   No.

2      Q.   Why not?

3      A.   I talked to Melanie, explained to her why, and

4  never heard anything more about it after that.

5      Q.   Tell me about why you didn't work a full-time

6  shift.

7      A.   Because that wouldn't -- if I worked a full-

8  time shift, regular fireman's shift, that would give me

9  less time at the fire department with each one of the

10 firemen than if I worked my regular shift Monday through

11 Friday.  Plus, I had to -- I had to take care of the EMS

12 stuff Monday through Friday and I explained to her all

13 the reason -- the reasons why and I was never wrote up

14 for it, it was never brought up again after that.

15     Q.   So this -- it's your testimony this was the

16 only time on 8-31-2017 that was ever discussed with you

17 that you were supposed to be working a fire shift?

18     A.   I am not saying -- no.

19     Q.   So it was discussed again after 8-31-2017?

20     A.   Yes.

21     Q.   How many times?

22     A.   One that I can remember.

23     Q.   When?

24     A.   I don't remember the date.

25     Q.   Tell me about who spoke with you about it on

485bc887-db03-4a2e-b4fa-56a2aebf678d

PR#143930                 PARMENTER, STEPHEN                1/29/2020

Page 90

1   during that year's time, you didn't work any fire

2   shifts; is that correct, as you were advised to?

3       A.   Yes.

4       Q.   And you had said you had talked to Melanie and

5   told her why and that was because it would give you less

6   time at the fire department and you still had all your

7   EMS duties, right?

8       A.   Correct.

9       Q.   What was her response to that?

10      A.   She didn't say anything after that.  I just

11  never heard anything more about it after that.

12      Q.   So did she tell you it was okay not to work

13  your shift?

14      A.   She didn't say anything.

15           MR. FRASIER:  Thank you, Jessica.

16           MS. FOUTCH:  Yeah, no problem.

17      Q.   (By Ms. Foutch)  So looks like a big reason

18  for you to work a shift was to boost morale, correct?

19      A.   That's what she put in there.

20      Q.   Says on 8-31-2017, that next sentence, "He is

21  relieved of all EMS duties."

22      A.   Correct.

23      Q.   Do you dispute that?

24      A.   No.

25      Q.   Okay.  So at that time, 8-31-2017, you were

485bc887-db03-4a2e-b4fa-56a2aebf678d

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 91

1    just back to being solely the fire chief, correct?

2         A.    Yes.

3         Q.    So you had to change an address to remit

4    payment.  Do you remember that?  Was there a reason for

5    that, that third paragraph?  "Steve is directed at this

6    point to:  Change the remit address on all fire EMS

7    payments to city hall," and then it's got the address.

8    "Copies will be made and given to him for his records."

9         A.    Oh.

10        Q.    So, "All checks in possession of the fire

11   department or EMS will be delivered to city hall no

12   later says August 28th," but it's marked out and says --

13   looks like September maybe 7th, I'm not sure.  So is

14   there a reason why all the checks started going to --

15   for fire started going to city hall?

16        A.    What I explained earlier about the fire

17   subscriptions.

18        Q.    Okay.  So it was to fix that issue that they

19   complained about here saying you weren't turning them in

20   on time?

21        A.    Correct.

22        Q.    This last sentence in the third paragraph,

23   "volunteers and employees will receive their paychecks"

24   --

25        A.    Hold on.  Okay.

485bc887-db03-4a2e-b4fa-56a2aebf678d

Page 94

1     A.    I brought them from city hall and gave them to

2   the treasurer at the fire department.

3     Q.    Who was the treasurer of the fire department?

4     A.    I -- Shawnda Anderson -- as far as I know,

5   Shawnda Anderson is the treasurer right now, as far as I

6   know.

7     Q.    Okay.

8     A.    And I know -- I can't think of who the other

9   one was before her.  I mean, they vote people in and out

10   every year as treasurer/secretary all that, and I don't

11   remember who was the one -- who was the treasurer before

12   her.

13     Q.    And then the last little paragraph here in

14   that main box, "Consequences of further infractions:

15   This is the only warning that Steve will receive due to

16   the serious and damaging nature of the offenses.  Any

17   further infractions will result in disciplinary action

18   up to and including termination of employment."

19          Do you see that?

20     A.    Yes.

21     Q.    So you were aware as of August 31, 2017, that

22   if there were any other disciplinary actions related to

23   this, you could have been terminated; is that fair?

24     A.    Yes.

25     Q.    After this 8-31-2017 meeting with Melanie

485bc887-db03-4a2e-b4fa-56a2aebf678d

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 95

1    Carrick, and I believe you had told me there was one

2    other person present?

3         A.    Yes.

4         Q.    Okay.  Between this date and your termination,

5    did you ever have any other meetings with Melanie or

6    city manager or anyone about concerns with your job?

7              MR. FRASIER:  Their concerns or his concerns?

8         Q.    (By Ms. Foutch)  Their concerns about your

9    employment.

10        A.    No.

11        Q.    Did you ever have any conversations with

12   Melanie about any of these issues that we just went over

13   in detail?

14        A.    I had conversations with her about a few of

15   them.

16        Q.    Okay.  Which ones?

17        A.    Well, like I told you, about the 24-hour shift

18   thing.  I talked to her about that.  Never heard

19   anything more about that.  I told her what was -- what

20   happened with the three hours on my time sheet,

21   falsifying my time sheet.  I told her about being told

22   to do the comp time the way -- the way it was done.

23        Q.    Well, I'm asking after this meeting that you

24   had with Ms. Carrick on 8-31-2017, did you ever talk to

25   her again about these issues that are listed?

PR#143930                 PARMENTER, STEPHEN                 1/29/2020

Page 96

1      A.   That's what I'm saying, yes.

2      Q.   Okay.

3      A.   I have, yeah, at different times.

4      Q.   So let's start with the first one, the comp

5   time.  You had another conversation with her about that?

6      A.   I mentioned to her that why we were doing the

7   comp time because I was told to, like I said.

8      Q.   And did you do that when you met with her here

9   on 8-31?

10     A.   No.

11     Q.   Okay.  When did you tell her that?

12     A.   I don't -- I don't remember what date it was.

13  We talked about different things on this whole issue

14  throughout a year or year and a half with her.  I don't

15  remember a specific date.

16     Q.   Okay.

17          MS. FOUTCH:  I think we've been going for

18  awhile.  Is now a good time to take a break?

19          THE WITNESS:  Uh-huh.

20          MR. FRASIER:  If you want to, sure.

21          MS. FOUTCH:  Yeah, that would be great.

22          MR. FRASIER:  Okay.

23          (A recess was taken from 12:43 p.m. to

24  1:31 p.m.)

25          MS. FOUTCH:  We are back on the record after a

PR#143930                  PARMENTER, STEPHEN                  1/29/2020

Page 97

1    lunch break.

2        Q.   (By Ms. Foutch)  And I think we had just went

3    through the Exhibit 3, which was the 8-31-2017 employee

4    warning notice, and so I want to get to -- was there any

5    time after this 8-31-2017 -- and I want to be clear on

6    this, so I apologize if I had already asked it.  Was

7    there any other time that you sat down and met with

8    Melanie about any of these concerns in Exhibit 3 that we

9    talked about?

10       A.   I'm going to answer no, not specifically met

11   with her about this.

12       Q.   Okay.  Do you recall a time meeting with

13   Ms. Carrick and reviewing the position description, I

14   think is what it's titled.  I'm going to hand you

15   Exhibit 8.

16           (Deposition Exhibit No. 8 was marked for

17   identification and made part of the record.)

18           MS. FOUTCH:  Frank, I sat you down a copy

19   right there.

20           MR. FRASIER:  Oh, thank you.

21       A.   Okay.  So what was your question on this?

22       Q.   (By Ms. Foutch)  Have you ever seen this

23   before?

24       A.   Yes, I have.

25       Q.   It appears that there's a couple of different

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 98

1    colors of writing on top of the typed coloring or on top

2    of the typed words.  Do you agree with that?  There's --

3    looks to be some black writing and then there's some red

4    writing, correct?

5         A.   Yes.  You asked if I agree with the red or

6    black, right?

7         Q.   Yeah, I asked if there was red and black,

8    right?

9         A.   Yes.

10        Q.   And aside from the whole red and black, is any

11   of the handwriting on this exhibit, which is two pages,

12   Nowata 030 and Nowata 031, is any of this your

13   handwriting?

14        A.   No.

15        Q.   Do you know whose handwriting it is?  And I'm

16   guessing -- that's probably a guess.  I know you can't a

17   hundred percent opine, but do you have an idea whose

18   this might be?

19        A.   Some of it.

20        Q.   Okay.  Whose do you think some of it is?

21        A.   Melanie.

22        Q.   Do you think anybody else wrote on this

23   document besides Melanie?

24        A.   I don't know that for sure.

25        Q.   Okay.  Which ones look like Melanie's writing?

485bc887-db03-4a2e-b4fa-56a2aebf678d

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 99

1      A.   I believe the day we talked about this, she

2  had a red pen.

3      Q.   Okay.  So you remember talking to her about

4  this job description?

5      A.   Yeah.

6      Q.   When was that?  It says up here, "Revised

7  Date:  March 2018," in the top right?

8      A.   I don't know the exact date.  I mean, I can't

9  recall the exact date.

10      Q.   Does March 2018 sound right?

11      A.   I can't say yes or no.  I mean, I don't know.

12  I don't know what date it was.

13      Q.   Do you have any reason to dispute that it was

14  March 2018?

15      A.   I -- no.

16      Q.   What was this meeting about?

17      A.   There was not an actual meeting.  She gave me

18  this, a copy of this and I read it over, and the next

19  day, I came back in and told her, can't do -- I can't do

20  all these.  I'm not licensed to do all these things, so

21  that's when she started writing down all different

22  things and she was going to change it and give me

23  another copy after it was changed, but I never got

24  another copy after it was changed that I remember.

25      Q.   Okay.  So what did it look like when she

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 100

1    handed it to you?  Did it have any writing on it?

2         A.   Not the copy I had originally, no.

3         Q.   So all this handwriting was when you had come

4    back and brought it back to her and you said, I can't

5    legally do some of this?

6         A.   Right.

7         Q.   Okay.  And then a discussion from there

8    ensued, correct?

9         A.   She said she would get back with me.

10        Q.   Did you bring -- what did you tell her that

11   you couldn't do?

12        A.   Do you want me to go through the whole thing?

13        Q.   Yes.

14        A.   Okay.  She didn't even make changes here on

15   this.  It's, like, on the position summary, said, (As

16   read) This position serves as Fire Chief of the fire

17   department -- department's operation/administration,

18   Fire --

19        Q.   Where is that?

20        A.   Right here on the first paragraph under the

21   summary.

22        Q.   Uh-huh.  Okay.

23        A.   And it says, "operations/administration, Fire

24   Marshal with focus on fire prevention and fire

25   investigation," I can't -- I couldn't do -- I can't be a

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

                                                              Page 101

1    fire marshal because I'm not licensed to be a fire

2    marshal and we can't do the fire investigations.

3         Q.   Okay.

4         A.   The state -- we had to notify at the beginning

5    of any investigation, we had to notify the state to come

6    in.

7         Q.   Okay.

8         A.   The state fire marshal.  Building official,

9    she wanted me to be the building -- building inspector

10   and code enforcement and I told her I can't do that.

11   I'm not licensed.  I'm not a licensed building official.

12        Q.   And look down here, doesn't that kind of

13   reflect -- looks like this is marked out fire

14   investigation?

15        A.   Right.

16        Q.   And then it looks like -- something about a

17   pension -- so are these notes in response to what you

18   were telling her you have concerns about?

19        A.   Yeah, I mean, she wanted me to review building

20   plans and stuff.  I can't -- I'm not a building

21   inspector.

22        Q.   Okay.  And so she had the red pen and was

23   writing these down as you were telling her?

24        A.   Right.

25        Q.   Okay.  And so the next one has got circles on

485bc887-db03-4a2e-b4fa-56a2aebf678d

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 105

1      A.    I sent -- I think I sent this to John Heskett.

2      Q.    With the changes or plain?

3      A.    To show him what she was wanting.

4      Q.    Okay.

5      A.    I don't remember if they had the changes on

6   it.  I said there was some discrepancies in -- in that.

7      Q.    Okay.  So you -- you -- how did you send it to

8   John Heskett?

9      A.    I believe I just emailed a copy of it to him,

10   I think.  I don't remember exactly.  I don't know if I

11   copied and mailed it to him or --

12      Q.    Was -- okay.  Was -- who is John Heskett?

13      A.    He was -- he's the city attorney.  I don't

14   know if he still is, but he was.

15      Q.    Was he present when you were telling Melanie

16   about all your concerns with this and she was making

17   these notations?  Was he present?

18      A.    Not when me and Melanie talked the first time,

19   and I'm not positive these are her notations on here.

20      Q.    Okay.

21      A.    I just -- I think she had a red pen.  I don't

22   know.  She was over at her desk and I was --

23      Q.    Well, a red pen is pretty descriptive to

24   remember.

25      A.    I can't say all this was on here.

485bc887-db03-4a2e-b4fa-56a2aebf678d

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 106

1       Q.    That's fair.

2       A.    When John came up and met, that's when we

3    talked about the 300 and $400 and all that.

4       Q.    Okay.  So then did you meet with John and

5    Melanie at --

6       A.    John was -- me, John and Melanie were in her

7    office.

8       Q.    Okay.  And did you guys make additional

9    changes to this or did you discuss this?

10      A.    I didn't even know they had this.  They were

11   sitting there with it.  I was sitting over at the table.

12   John was sitting over here and she was at her desk, so I

13   didn't even know that they had this right there.  That's

14   the first time I've seen this.

15      Q.    When did you meet with John and Melanie?

16      A.    Like I said, I think it was sometime in May, I

17   believe, because it was before I took EMS back.

18      Q.    Okay.  So on to page 2, back to this, part E,

19   it looks like there's some writing on it.  Coordinate,

20   it looks like, and conduct the fire investigation and

21   conduct -- so that looks like that's going back to more

22   of what you were talking to Melanie about --

23      A.    Right.

24      Q.    -- of what you couldn't do legally?

25      A.    Right.

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 116

1    medication.  And I told John after a city meeting, city

2    council meeting we were walking up, I said, I wanted to

3    let you know that I am not having a problem walking and

4    stuff.

5             Because my feet would swell up.  My ankles

6    would swell up and I said, Since I'm on this medication

7    now, which all it is an arthritis medication that I take

8    twice -- morning and the evening, I said, Since I've

9    started taking that, I said, It's a whole different

10   world.  I feel totally different walking and my feet

11   aren't swelling up any more.  So that's what I told him.

12        Q.   Okay.  And so after you told Mr. Heskett that

13   you were feeling good, you were obviously physically

14   capable of doing a firefighter shift, did you at any

15   time after that do any firefighter shifts prior to your

16   termination?

17        A.   No.

18        Q.   And just to make that clear for the record, at

19   no point in time between August 2017 and the time you

20   were terminated did you ever complete a firefighter

21   shift with the City of Nowata?

22        A.   No.

23        Q.   Okay.  And so then May I believe was your

24   testimony, you think about May is when you had the

25   meeting with Melanie Carrick and John Heskett?

PR#143930                   PARMENTER, STEPHEN                   1/29/2020

Page 158

1      Q.    You didn't talk about the termination after?

2      A.    No.

3      Q.    You didn't contact her and she didn't contact

4  you, correct?

5      A.    No.

6      Q.    Did you ever contact the city attorney,

7  Mr. Heskett --

8      A.    No.

9      Q.    -- after your termination?

10      A.    No.

11      Q.    Did you ever -- did you ever take any audio or

12  video recordings at city hall?

13      A.    Yes.

14      Q.    Tell me about those.  Which -- how many times

15  did you record at city hall?

16      A.    I don't remember how many times.

17      Q.    Would you say more than five?

18      A.    Yes.

19      Q.    More than 10?

20      A.    Yes.

21      Q.    More than 20?

22      A.    Probably not.

23      Q.    And where are those audio recordings?

24      A.    I don't have them any more.

25      Q.    Where did they go?

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 159

1       A.    I deleted them off my phone.  They were just

2   on my phone.

3       Q.    What were the audio recordings about?

4       A.    I just turned on my phone on record whenever

5   things started going south when I walked into city hall

6   and sometimes you could hear people talk, sometimes you

7   couldn't.  So that's why I just deleted all of them.

8       Q.    So but some of them you could hear people

9   talking?

10      A.    Yes.

11      Q.    And you said when everything went south.  What

12  do you mean?

13      A.    When things started going bad.

14      Q.    So you knew things were bad with the city

15  prior to your termination?

16      A.    I told you -- I told you about a month before

17  that I...

18      Q.    And so you didn't produce any of those

19  recordings to your attorney?

20      A.    No, I don't have any.

21      Q.    You -- which phone were they on?  Are they on

22  your current phone?

23      A.    I don't remember if this is still the phone --

24  I don't remember how long we've had these phones.  I'll

25  have to take it back to U.S. Cellular and see.

PR#143930                  PARMENTER, STEPHEN                    1/29/2020

Page 177

1    I can't go take a dishwasher job.  I'm embarrassed for

2    my sons, what they think.  If you want to talk to

3    anybody --

4              MR. FRASIER:  She's not asked you a question

5    yet.

6              THE WITNESS:  Okay.

7         Q.   (By Ms. Foutch)  Have you sought any medical

8    treatment or counseling for your emotional distress?

9         A.   No because I can't afford it.  I'm -- no.

10        Q.   Do you currently have health insurance?

11        A.   I have health insurance through my wife's

12   work.

13        Q.   And prior to being terminated, did you have

14   health insurance through the city or was that through

15   your wife's?

16        A.   It was cheaper through my wife's work.

17        Q.   So you're not making any claim for medical

18   treatment or medical bills; is that correct?

19        A.   I don't have any.

20        Q.   Did you ever request any kind of meeting or

21   hearing with the city, maybe not even specifically

22   Melanie Carrick or John Heskett, but generally after you

23   were terminated?

24        A.   No, I haven't talked to anybody there.

25        Q.   Did you file any grievance with the

PR#143930                     PARMENTER, STEPHEN                     1/29/2020

Page 178

1    firefighter pension?

2         A.    I didn't know that there was a grievance thing

3    with the firefighter pension, but to answer your

4    question, no.

5         Q.    Are you claiming any other damages beyond the

6    annual salary that we had discussed, the 48,800 and I

7    know it says times 4.7 years, and then loss to pension

8    and humiliation and emotional distress, are you making

9    any other claims in this lawsuit?

10        A.    Not that I'm aware of.  I mean, I lost my life

11   insurance policy I had there and I lost my Aflac that I

12   had I had two different policies after that because I

13   couldn't afford to pay them after I got terminated.

14        Q.    What Aflac policies did you have?

15        A.    I had a disability policy and an accident

16   policy and then --

17        Q.    How much were those a month?

18        A.    I'd have to go back and look at my pay stubs.

19   They were automatically -- I think one was 17 something

20   or 20 something.  I have to look at my pay stubs.

21        Q.    And then you lost your life insurance?

22        A.    There was a life insurance policy I had that

23   came out of my paychecks too.  I believe it was 60

24   something a month, 60 something a paycheck.  I'd have to

25   look to be exact on that too.

485bc887-db03-4a2e-b4fa-56a2aebf678d



**POSITION DESCRIPTION**

**CITY OF NOWATA, OKLAHOMA**

**Job Title:** Fire Chief

**Department:** Fire

**Status:** Exempt

**Revised Date:** March 2018

**Reports to:** City Manager

### POSITION SUMMARY:

The coordination and supervision of fire prevention, fire investigation and other services for the protection of life and property from fire or other disaster. Responsible for administering, planning, and directing the operations of the Fire Department under the direction of the City Manager.

The position involves administrative work in the performance and direction of activities including compliance with administrative codes, laws and ordinances, policies, procedures and/or special instructions, and fire investigations in the City of Nowata. This position serves as Fire Chief of the fire department's operations/administration, Fire Marshall with focus on fire prevention and fire investigation, Building Official with focus on zoning and code compliance, and Emergency Management Director with focus on serving the community in times of disaster.

The Fire Chief administrates all instruction and training of the public and Fire Department personnel in the techniques of fire prevention and fire investigation with the ability to develop, coordinate and conduct an effective program of fire prevention and education.

### CHARACTERISTIC WORK OF THE POSITION:

A. Definition: This work is performed at a professional level in the fields of fire service, fire prevention, suppression, rescue, training, supervision, and public fire/life safety education.

B. Nature: Under the supervision of the City Manager, perform such duties and activities as may be required in the codes and ordinances, State statutes and the rules and regulations of the Fire Department.

### FUNDAMENTAL JOB DUTIES:

A. Assume responsibility for the administrative operation of the fire prevention and fire investigation programs. Assume responsibility for the administrative operation of the EMS service.

B. Development of codes and standards for fire safety and EMS service in the City of Nowata.

Review building plans and site plans for recognized fire/life codes and safety standards.

C. Implementation of public fire and life safety education programs

D. Coordinate the investigation of fires and analyze findings to determine the cause of fires.

**EXHIBIT**

**3**

Nowata 030

*with State Marshall*

E. Coordinate ~~and conduct the~~ fire investigation, fire prevention ~~and inspection programs~~ for the City of Nowata *of final determination of State Marshall inspections*

F. Prepare written or computerized reports ~~of inspections,~~ investigations and training and maintain a file of all records.

G. Demonstrate knowledge of the proper methods of performing various techniques in fire prevention, ~~investigation~~ and education

H. Assist the City Clerk in the review and approval of plans for construction, installation and operation of equipment and structures in the City of Nowata to ensure they meet the zoning and code requirements for all State and ~~local~~ codes and ordinances. *Checking to see if he can do this*

I. Assist the City Clerk in the development and maintenance of an effective system of records and reports of inspections and investigations and other activities as required by the State of Oklahoma and the City of Nowata

J. Provides supervision of fire department personnel, volunteer fire personnel, and EMS personnel including assigning and reviewing work. Immediately reports to the City Manager any necessary disciplinary action, employee complaints, and recommendations on employee appointments.   *Don Belton*

K. Assist the City Manager in the preparation of the Fire Department and EMS budget including lines items related to prevention, ~~investigation~~ inspections and public education   *liability?*

L. ~~Conduct plan review, installation inspections and permit inspections of building, plumbing, electric, concrete, and mechanical permits~~

M. ~~Conduct plan review installation inspections and permit inspections of fire sprinkler and suppression systems~~

N. Conduct review of all required inspections in the City of Nowata.

O. Conduct reviews and approvals of all burn permits *or designee*

P. Perform the purchasing functions for the City of Nowata Fire Department and EMS Department

Q. Ensure all State of Oklahoma laws and requirements are met for the Fire Department and EMS

R. Work closely with the City of Nowata Medical Director and EMS – Co Director / Assistant Director

S. Billing fire runs and subscriptions, working with medical claims billing for EMS, and billing collections. Systematic aggressive approach to Billing and Collections for Fire Department and EMS

T. Foster good morale in EMS and Fire Department. Keeping City Manager involved with all employee actions and concerns.

U. Maintain and promote a positive work environment in the Fire Department and EMS Department

V. Oversee and verify completion of EMS and Fire run reports in accordance with the laws of the State of Oklahoma, City of Nowata Medical Director, and State Fire Marshall

W. Manage the routine scheduled flushing of hydrants in the City of Nowata

X. Respectfully takes direction from the City Manager

## ANCILLARY JOB RESPONSIBILITIES:

A. Schedule and conduct fire ~~inspection~~ training courses for all Fire Department personnel and Volunteer Fire Department personnel *or designee*

B. Incident Management functions and positions as needed during an emergency incident.

C. Assist the City Manager with personnel disciplinary action

Nowata 031

**Memorandum of Reference**

On March 5, 2019 I was contacted by phone by Barbara Couch who is employed by the City of Nowata is the EMS department. Barbara was crying and very upset. She had spoken with her supervisor Steve Parmenter about the work schedule. She said she had talked to Parmenter multiple times about this and felt like she was being blown off and her concerns were not taken into consideration and she had no other choice than to contact me. She informed me others in the department were having the same issue. Barbara explained that Steve had taken Cole Brooks into the office and the two of them created the schedule for March and then Steve left for the day without a word to anyone. I told Barbara that I would come to the fire department at 2:00 pm the following day (March 6, 2019) and that I would meet with the EMS workers and we would look at the schedule. She was appreciative that her concerns were being taken seriously.

On March 6, 2019 I followed through the meeting with the EMS workers. 4 EMS workers and 1 firefighter were in attendance at the meeting. I asked them what was going on and what issues they had. The workers were upset about scheduling, morale and overall leadership of the department. All in attendance confirmed the same as Barbara Couch had told me. These employees informed me they had multiple discussion with the supervisor Steve Parmenter and were given an attitude of like it or lump it and that their requests were not considered. 2 of the EMS workers are in class to advance their skills to improve the service to our community and had asked to mover her days to accommodate for that. One of those workers was told by Steve "It's not my fault you are in class". I was told by all 5 in attendance that the morale in the department and in the fire, department is very low and has been for a while.

I got 2 copies of the schedule out of the fire office. I whited out the people scheduled starting on the following Monday (March 11, 2019) through the end of the month. I asked each one what days they had asked Steve for before the schedule was created. I went one by one and entered them on the days they requested to see if it was a workable schedule. I left the weekends as they were previously scheduled. I had all of the employees there assist me in completing this as they know the staffing needs in better detail. We had a new workable schedule. We also created an alternative schedule to address the issue of excessive overtime by one employee. The City of Nowata is licensed as a basic service. We want to provide the best service possible and do employee 1 full time paramedic. The overtime for this person is in excess and the supervisor Steve Parmenter has been advised by myself on several occasions to address the overtime by this person.

I asked them for their input on the morale issue. I got the same answer from each of them. The employees were worried about repercussions from the schedule change in general and asked that we continue with the first one we had created and I would address the excess overtime issue with Steve again. The new schedule was printed and ready for pick up by the employees of the department. They each feel the low morale is due to what the call Steve's "My way or the highway" attitude. The lack of interest in what the employee needs are, special privilege given to one particular employee on scheduling issues, as well as, the "My way or the highway" attitude by that employee. They are unhappy and feel tension in the work environment between them and the supervisor. Because the have been to the supervisor on multiple occasions with no resolve, they feel like the have no options and no where to turn for assistance other than to come to me.

EXHIBIT
4

Nowata 032

The meeting with the employees lasted approximately 3 hours. After the meeting, I went into the Bay at the fire department and seen Charles Ryan. Charles Ryan works on EMS and was sitting at the table. He seemed upset. He was not there when I got there for them meeting. I asked Charles why he looked upset. Charles said he has been frustrated for awhile because he had wanted to be off on some Saturdays or Sundays for family. He was told to keep his head down and work. He had specifically asked for March 22, 2019 off before the schedule was made because he had class or testing. When the schedule came out, he was scheduled to work on that day. With the new schedule that was just made he is off on March 22, 2019. I told Charles that there was no problem with him trading a shift with another worker if he needed to as long as it was in the same work week. I told Charles that if he did that each person needed to make sure that their time sheet reflected the traded shift. Charles told me that sometimes he would have to leave during a shift to care for goats and another employee would come in and cover for him. Charles told me that those hours were on this time sheet and that he paid the employee who covered the cash for those hours. I told Charles that I needed him to document that.

Charles did not want to document what he told me. There were two other people setting at the table and her what Charles had said. I told Charles lying on the time sheet is false documentation and against the law. I told him if he leaves his shift he needs to clock out and clock back in when he gets back. I told Charles whoever covered that time should fill out a time sheet for the time they were there. The manner in which Charles was speaking made me believe that Steve Parmenter was aware of this practice. If Steve is aware, then he is also falsifying time sheets when he signs as supervisor approving the time sheet.

**Memorandum of Reference**

On March 7, 2019 I started looking into the comments that Charles Ryan had openly discussed on March 6, 2019 about someone else covering hours for him and Charles putting it on his time sheet and paying the other person in cash.

I called the other employee into my office and asked him about what I had been told. The other employee confirmed that this did happen. The employee told me that it had happened maybe 4 times over the last year but did not say which days. I told that employee that could not be done. If he worked for someone that he needed to fill out a time sheet for the time he was there. The employee told me had wondered about if he needed to do that.

This employee normally works in public works. However, he is part time on our EMS service and volunteer fire. I asked him how the morale in the fire department and EMS are. His reply was horrible. I asked him in his opinion, what was the biggest hurdle in morale. His reply was Steve Parmenter. I also asked him what he saw as the biggest hurdle in the functioning of the two emergency services. His reply was Steve Parmenter.



EXHIBIT
5

Nowata 035

On 03/05/2019 while taking a break from patrol I decided to stop at the Nowata fire department.  I was sitting at the table in the bay talking to EMS personal.  The three EMS personal were Nancy Brooks, Shaunda Anderson and Barbara (BJ) Couch.

The conversation stemmed around the hiring of a new EMS fill in, John Albert.  The conversation was that John was given a shift on a ceratain day and none of the full time EMS workers were given the oppurtunity to say if they wanted or needed to swich shifts.

Shortly after Fire Chief Steve Parmenter walked into the bay.  Anderson and Couch started speaking to Parmenter about why John was getting a specific day and nobody else had been asked if they would like the open shift.  At one point I heard Couch tell Parmenter that she would have liked to change one of her shifts to accomodate her going to school to advance her EMT status.

Parmenter commented that it wasn't his fault that she was going to school.  Couch replied to Parmenter that this was all being done to advance her degree for the city.  Couch then reminded Parmenter that she had quit another job to come to work for Nowata EMS full time.  At some point I was asked if this is how I do my shifts.  My reply was no.  If I have a new person coming on I give everybody the oppurtunity to change shifts before assigning the new person their shift.

The descussion was still going on when Parmenter turned and walked away entering back into the main fire department building.

A short time later I observed Cole Brooks enter the bay and then go into the main fire department.   The on duty fire fighter Bub Hewitt came out to the bay and said that Parmenter and Brooks were in Parmenter's office with the door closed.

A short time later I left the fire department as the ambulance crew was getting a transport call.  I was told later that day that when Anderson and Couch left for the transport Parmenter left for the day leaving a new work schedule that he and Cole Brooks had apparently prepared while in his offcie behind closed doors.  Hewitt was left to show the crew the new schedule.

Chief Mike McELhaney

EXHIBIT
6

Nowata 034

54

**Memorandum of Reference**

On March 11, 2019 I spoke with Steve Parmenter about the situation with Charles Ryan and I decided on an employment action. I prepared the employment action notice and gave it to Steve. It was decided that I would meet Steve at the fire department on 3-13-19 at 4:30 to deliver the employment action. When reviewing the statements concerning the incidents with Charles Ryan I asked Steve why Cole Brooks had delivered what is a verbal reprimand with indication of termination for any further violations. I reminded Steve Cole is not the supervisor.

At that time, I also asked Steve if he knew that Charles had put hours on his time sheet that Jason Renz had worked. Steve said he did not know that had happened. I also asked Steve about hours that were missing on Barbara Couch was missing on her time sheets ever since the shift change in Mid-January (approx. 6 weeks prior). I should Steve Barbara's last time sheet and he said he did not catch it. I discussed with Steve that the employees felt like he did not listen to them and they told me they had come to him multiple times before coming to me. He said he would like to know when they came to him and he did not try to accommodate their needs. I told him when I changed the schedule, I had 4 of the full-time employees in the room that assisted me. I also reminded Steve that Cole Brooks is not a supervisor. Cole is a shift lead when he is on shift but he is NOT the other employees' supervisor. Steve is the supervisor. I instructed Steve to call a meeting with all of the EMS workers for 3/14/19 at 10 am for us to all set down and straighten out the schedule.

On March 12, 2019 Steve came into the office to let me know that he was working on developing multiple possibilities on the schedule and he had found a volunteer to cover the 5 hours Charles Ryan would have worked on 3-14-19. I told him we would look over them at the meeting with the Department.

On March 12, 2019 one of the full-time fire fighters came into my office with the questionnaire I had asked all city employees to fill out. He was concerned about filling out because he did not want what he wrote to get back to the fire department. I told him I did not want his name on the form. I told him only put his position and department on the form. This employee said he had been retaliated against in the past from a similar questionnaire. I told the employee I would be the only person who seen these and to make him more comfortable I asked him the questions and wrote his answers down. He felt more comfortable doing that way to guarantee if the form was misplaced he could not be identified by his hand writing.



City of Nowata
114 S Maple St
Nowata OK 74048
4/8/2019

RE: Stephen Parmenter

Dear RE: Stephen Parmenter

This is to inform you that for the good of the service and in my opinion that good and sufficient cause exists for your termination effective immediately.  You are being relieved of your duties for the City of Nowata effective immediately.  You will be paid the balance of you vacation hours on the payroll dated 4/24/19.  Your current health and insurance benefits will remain in effect until April 30, 2019.

Sincerely,

Melanie Carrick
City Manager



Plaintiff's RFPD 165

# CHARTER OF THE CITY OF NOWATA

PREAMBLE: We, the people of the City of Nowata, under the authority of the Constitution and laws of the State of Oklahoma and the powers reserved therein, do ordain and establish this Charter for the City of Nowata.

## ARTICLE ONE

### SECTION ONE
### Boundaries

A.      The boundaries of the City of Nowata, until changed in manner as provided by law, shall be and remain the same as they may exist at the time this Charter shall be adopted and approved by the Governor.

### SECTION TWO
### Rights and Powers of the City

B.      The inhabitants within the boundaries herein defined and their successors, are hereby created and organized a Municipal Corporation and body politic, with perpetual succession under the name of "The City of Nowata" and shall succeed to, own and possess all the property, rights, privileges, franchises, powers and immunities now belonging to the present corporation known as the City of Nowata, and shall be liable for all debt and obligations for which said present corporation is now liable, and shall have the power to adopt a common seal and alter same at pleasure, to sue and be sued, to make contract, to take and acquire property by purchase, condemnation, gift or otherwise, and to hold, lease, convey or otherwise dispose of any of its property, real or personal, within and without the limits of the said City, and it shall have such other powers, rights, privileges, franchises and immunities as are granted and conferred by any other part of this Charter or by the Constitution and the laws of the State of Oklahoma.

### SECTION THREE
### Constitutional Limit of Powers

C.      The City of Nowata shall have power to construct, condemn, purchase, lease, improve, add to, maintain, conduct and operate in whole or part, water works, light plants, telephone systems, power plants, paving plants, transportation systems, heating plants, incinerating and cremating systems or plants; and any other public

APPROVED BY GOVERNOR FALLIN 6/25/2012

EXHIBIT
9

utilities or works or ways, local in use and everything required therefore for the use of said City, and the inhabitants thereof and any system, plant, works or ways, or any contract in relation or connection therewith, said City may desire to purchase in whole or in part, may be purchased or acquired in whole or in part by said City, which may enforce such purchase by proceedings at law or in equity by right of eminent domain; and said City shall have the power to issue bonds upon the vote of the taxpaying electors at any special or general election in any amount necessary to carry out any of said powers or purposes, said amount being alone limited by the Constitution and laws of the State of Oklahoma, and by other provisions of this Charter; provided, that the right to acquire existing public utilities shall be limited by the ordinances of the City granting the right of such existing utilities.

## SECTION FOUR
### Can Receive Bequests

D.      The City of Nowata shall have power to receive bequests, gifts and donations of all kinds of property in trust for charitable purposes and for humane purposes and to perform all acts necessary to carry out the purpose of such gifts, bequests, donations or trusts, with power to manage, sell, lease, or otherwise dispose of same in accordance with the terms of the bequests, gifts, donations or trust.

## SECTION FIVE
### Supersedes State Laws in Conflict

E.      The City of Nowata shall have powers that may hereafter be given it by the Constitution and the laws of this State, and where any provision of this Charter shall be in conflict with any laws relating to cities of the first class in force at the time of the adoption and approval of this Charter, the provisions of this Charter shall operate as a repeal or suspension of such State law, or laws, to the extent of such conflict; and said City shall have power to enact and enforce all ordinances necessary to protect the health, life and property, and to prevent and summarily abate and remove nuisances, and preserve and enforce good government and order for the security of the City and its inhabitants, to protect the lives, health and property of the City, and to enact and enforce all ordinances upon any subject; provided, that no ordinance shall be enacted inconsistent with the Constitution and general laws of this State, or with this Charter.

## SECTION TWENTY-SIX
### Powers and Duties of City Manager

B.      The powers and duties of the City Manager shall be:

(1)      To see all laws and ordinances are enforced.

(2)      Except as herein otherwise provided, to appoint and remove all Heads of Departments, and all subordinate officers and employees of the City.

(3)      To exercise control over all Departments and Divisions created herein, or that hereafter may be created by the Commissioners.

(4)      To have general supervision over all public improvements, works and undertakings, except as otherwise provided in this Charter.

(5)      To attend all regular meetings of the Board of Commissioners, with the right to take part in the discussions but having no vote.

(6)      To prepare the Annual Budget and keep the Board of Commissioners fully advised as to the financial condition and needs of the City.

(7)      To recommend to the Board of Commissioners for their adoption such measures as he may deem necessary or expedient.

(8)      To see that all accidents to City employees are reported to the State Industrial Commission.

(9)      To perform such other duties as may be prescribed by this Charter, or be required of him by ordinance or direction of the Board of Commissioners.

## ARTICLE FOUR

## SECTION TWENTY-SEVEN
### Legislative Department

A.      The legislative powers of the City of Nowata are hereby vested on a Board composed of the Commissioners herein provided for, sitting as a Board of

## CHAPTER 3
## CITY MANAGER

| Section 2-301 | City Manager, Appointment by Board of Commissioners |
|---|---|
| Section 2-302 | Powers and Duties of City Manager |
| Section 2-303 | Designation of Acting City Manager |
| Section 2-304 | Suspension or Removal of City Manager |

### SECTION 2-301    CITY MANAGER, APPOINTMENT BY BOARD OF COMMISSIONERS

The Board of Commissioners shall appoint a City Manager, who shall be the head of the Municipal Government, under the direction and supervision of the Board of Commissioners, and who shall hold Office at the pleasure of the Board of Commissioners, and he shall receive such compensation as may be provided by the Board of Commissioners.  He shall be appointed without regard to his political beliefs, and need not be a resident of the City or State at the time of his appointment.  At the time the first Commissioners take Office, or at any other time that there may be a vacancy in the Office of City Manager, or during the absence or disability of the City Manager, the Board of Commissioners may designate some properly qualified person to temporarily execute the functions of the Office of City Manager.

### SECTION 2-302    POWERS AND DUTIES OF CITY MANAGER

The powers and duties of the City Manager shall be:

1.      To see all laws and Ordinances are enforced;

2.      Except as herein otherwise provided, to appoint and remove all heads of departments, and all subordinate officers and employees of the City;

3.      To exercise control over all departments and divisions created herein, or that hereafter may be created by the Commissioners;

4.      To have general supervision over all public improvements, works and undertakings, except as otherwise provided in this Charter;

5.      To attend all regular meetings of the Board of Commissioners, with the right to take part in the discussions, but having no vote;

6.      To prepare the annual budget and keep the Board of Commissioners fully advised as to the financial condition and needs of the City;

7.      To recommend to the Board of Commissioners, for their adoption, such measures as he may deem necessary or expedient;

EXHIBIT
10

8.   To see that all accidents to City employees are reported to the State Industrial Commission; and

9.   To perform such other duties as may be prescribed by this Charter or be required of him by Ordinance or direction of the Board of Commissioners.

**SECTION 2-303     DESIGNATION OF ACTING CITY MANAGER**

The City Manager, by letter filed with the City Clerk, may appoint a qualified administrative officer of the City to be Acting City Manager during the temporary absence or disability of the City Manager.  The Board of Commissioners may appoint an Acting City Manager whenever:

1.   The Manager fails to make such designation;

2.   The Board of Commissioners suspends the City Manager; or

3.   There is a vacancy in the Office of City Manager.

**SECTION 2-304     SUSPENSION OR REMOVAL OF CITY MANAGER**

The Board of Commissioners may suspend or remove the City Manager or Acting City Manager at any time by a vote of a majority of all its members.

# City of Nowata

# 2018*

# Personnel Manual

*updated March 2018*



EXHIBIT

*11*

Plaintiff's RFPD 085

**ARTICLE I**
General Provisions

## 1-1 Introduction

This Personnel Policy Manual has been prepared to introduce you to the City of Nowata and your job with the City. It will acquaint you with the policies, rules, pay and benefits which apply to your employment with the City.

The information contained in the Manual applies to all employees of the City. **This Manual is for information only and is not to be construed as a contract of employment with any of the employees.** Please read this Manual carefully and keep it handy for future references. One of your first responsibilities is to be familiar with its contents. However, this Manual is only a summary of our policies; please review it with your supervisor if you have any questions. No employee or representative of the City has any authority to enter into an employment contract or to change the "at will" employment relationship, or to make any agreement contrary to the foregoing.

## 1-2 Changes in Policy

Since our business is constantly changing, we expressly reserve the right to change any of our policies, including those covered here, at any time. We will notify you of these changes by posting them on the bulletin board or by other appropriate means. Changes will be effective on dates determined by the City and you may not rely on policies that have been superseded. No Department Head or Supervisor, other than a majority vote from the Board of Commissioners, has any authority to alter the foregoing.

## 1-3 Employment Relationship

Your employment with the City is entered into voluntarily and you are free to resign at any time. Similarly, the City may terminate your employment with or without cause or for violation of the rules, policies, procedures, and or causes, for the good of the service, for any reason, or no reason.

## 1-4 Equal Opportunity Employment

The purpose of this policy is to express our continuing practice of non-discrimination in employment to support the intent, as well as the written work, regarding applicable state and federal registration, including but not limited to the following:

1. Title VII of the Civil Rights Act of 1964, as amended;
2. The Age Discrimination in Employment Act of 1967, as amended;
3. Equal Pay Act of 1963; and
4. Section 501, Rehabilitation Act of 1973.

---

City of Nowata

Page 5
**Plaintiff's RFPD 089**

63

## ARTICLE II
### Definitions: Employment Status

### 2-1 Full-Time

A Full-Time Employees- is one that is regularly scheduled to work forty (40) hours per week or one hundred and six (106) hours for Fire in fourteen (14) day work period (as provided for by FLSA regulation), or eighty-six (86) hours in a fourteen (14) day work period for Police personnel. Full-time employees are eligible for all benefits when all service requirements are met. Full-time employees may be referred to as "regular" employees, however; all employment is subject to availability of funds. Employment may be terminated for the good of the service.

### 2-2 Part-Time

A Part-Time Employees is on that is regularly scheduled to work less than forty (40) hours per week.

### 2-3 Temporary Employees

Temporary Employees are those persons hired for a specific period of time and/or to fulfill a specific function. Temporary employees have, as a condition of their employment, a specified termination date. Temporary employees, upon reaching their termination date, may be eligible for continued employment in another temporary employment position or in a full-time position. Temporary employees may be terminated at any time.

### 2-4 Contract Employees

Contract employees are appointed when the special project requires additional employees for a specified time. The rate of pay and benefits received shall be determined by the City Manager. A written contract shall be submitted for the City Manager's approval and shall be placed in the employees personnel file.

### 2-5 Administration

The City Commission shall appoint a City Manager, City Clerk, Secretary of the Board of Commissioners [City Clerk], the City Attorney, and a Municipal Judge. The City Manager shall have the power to appoint all Department Heads, subordinate City officials, City employees, or such appointees as necessary, with or without cause. The City Manager is responsible for the administration of policies, procedures and regulations of the personnel program contained in this Manual.

### 2-6 Personnel Files

Employees have the right to be informed of all documents that are to be placed in the centralized Personnel Files and review their individual personnel file at City Hall under appropriate supervision. Personnel files are to remain confidential to the extent allowed by law.

---

City of Nowata

Plaintiff's RFPD 093

<u>ARTICLE IX</u>
Discipline – Termination

<u>9-1 Disciplinary Procedures</u>

This Section on employee discipline and dismissals has been prepared as a guidance for the Department Heads and the City Manager. It describes general guidelines of the City concerning discipline and termination decisions. Each case will need to be evaluated on an individual basis. <u>All employees must remember that employment may be terminated with or without cause or notice, at any time by the employee or the City of Nowata.</u>

1. All employee performance incidents should be documented with facts and dates of counseling sessions and disciplinary actions. Performance evaluations should also document problem areas.

2. Department Heads shall have employees sign any disciplinary action form to acknowledge that it has been discussed with them. If the employee refuses to sign the form, it should be noted and initialed by the supervisor and a witness in the employee's presence.

3. When it is necessary to discipline an employee, the steps as described below **may** be used.

   a. Informal Counseling:
      Potential employee problems can be addressed by day-to-day communication and feedback between the employee and his/her supervisor. Many potential problems (job performance, attendance, etc.) can be adequately addressed through proper counseling and guidance by the Department Head regarding reinforcement or explanation of City/Department rules, requirements or standards.

   b. Oral Reprimand:
      Problems or potential problems regarding the employee's performance should be discussed with the employee. An oral reprimand may be used to correct the problem and not to punish the employee. Specific steps or corrective action should be discussed and proper responsibility assigned to the employee for making the necessary corrections/adjustments in the areas discussed. The end result should be a positive change in the employee's behavior. The oral reprimand should be conducted in private and should promptly follow the incident in question. The Department Head should document the oral reprimand, have the employee sign the documentation as an acknowledgement, and, after filing the original with the City Manager, keep a copy of the documentation in the employee's departmental file.

4. The following reprimands are to be given by the City Manager. Before a written reprimand, suspension or demotion of an employee is given, the Department Head must discuss the situation with the City Manager. In the event of termination, City Manager must discuss the issue with the City Attorney. It is essential that proper procedures be followed for these types of discipline. A full-time or part-time employee may be advised of the charges against him/her, given an explanation of the evidence supporting the charges and be allowed an opportunity to respond.

   a. Written Reprimand
      i. A written reprimand shall list corrective action to be taken by the employee and describe expected improvement. Occurrence Report forms should be used for this purpose. First Written warning expires 12 months after date on the Occurrence Report. Final Written warning expires 18 months after the date on the Occurrence Report.

   b. Suspension
      i. In any case, the Department Head may recommend to the City Manager that the employee be suspended with or without pay for such length of time as he/she considers appropriate, not to exceed thirty (30) calendar days. Occurrence Report forms should be used for the purpose of documenting the suspension.

   c. Demotion
      i. Demotion is an alternative step in the disciplinary process that may be utilized in lieu of termination in some instances. Occurrence Report forms should be used for the purpose of documenting the demotion.

   d. Dismissal
      i. Dismissal may result with or without cause or notice. Dismissal may result when no improvement has been made after previous steps or progressive disciplinary measures have been applied or because of the seriousness of the offense. Dismissal may also be used with or without cause, or simply for the good of the City, at the discretion of the City Manager. Occurrence Report forms should be used for the purpose of documenting the dismissal.

5. Reasons for Disciplinary Actions:

   a. Examples of reasons for initiating appropriate disciplinary actions include, but are not limited to, the following:
      i. Insubordination.
      ii. Discourteous behavior to the public or other employees.
      iii. Sleeping on the job, unless the work schedule allows for it.
      iv. Abuse of leave, excessive absenteeism, or repeated tardiness.
      v. Disregard for Departmental or City rules/regulations, including safety regulations.

    vi.  Falsification of records or documents.

   vii.  Willful misconduct.

  viii.  Incompetence, inefficiency, or neglect of duty, including breach of confidentiality.

    ix.  Discriminatory harassment.

     x.  Fighting or horseplay at work.

    xi.  Failure to report a suspended driver's license, if a license is required for the job.

   xii.  Loss of or failure to obtain in a timely manner an appropriate license or certificate which is a necessary requirement for the job.

  xiii.  Misuse of City property or funds.

  xiv.  Unauthorized use, theft, defraud or intentional destruction of the City's property, of another employee's property, or a citizen's property.

   xv.  Using City time, resources, machinery and/or tools for personal gain.

  xvi.  Accepting bribes, gifts or other concessions in return for special consideration.

  xvii.  Conviction of a felony or of a misdemeanor involving baseness, vileness or depravity (moral turpitude).

 xviii.  Absence without proper notice and/or authorization.

  xix.  Use, sale, possession or being under the influence of alcohol or drugs during working hours. "Drugs" shall refer to any substance, legal or illegal, prescribed or non-prescribed, which impairs an employee's ability to perform normal job duties.

   xx.  Disgraceful conduct that discredits the City.

  xxi.  Activity which has been determined to be incompatible with City employment.

  xxii.  For the good of the City or with or without cause.

 xxiii.  At the discretion of the City of Nowata.

## 9-2 Termination of Employment

**Involuntary Termination.** Any employee may be released at any time during his/her period of employment with or without cause or notice upon recommendation of the Department Head and approval of the City Manager.

1. If it becomes necessary to dismiss an employee, the procedures outlined in Section 9-1 are applicable.

**Resignation.** An employee who resigns is asked to give at least ten (10) working days written notice to the Department Head, but is not required to do so. Any employee may terminate employment with or without cause or notice.

**Retirement.** Employees who qualify under the requirements contained in the Nowata Employees' Retirement System, namely the Oklahoma Municipal Retirement Fund, may be eligible for retirement. Employees who plan to retire are asked to notify the City Manager at least forty-five (45) days in advance of their planned retirement date to allow adequate time for necessary arrangements to be made. Eligibility for retirement from the Fire Department and Police

Department shall be in accordance with requirements contained in the Firefighter Pension Plan and the Police Pension Plan.

### 9-3 Processing Upon Termination

1. Regardless of the reason for termination, the Department Head should initiate a final Personnel Action Form as much in advance of the employee's final day as possible for processing.

2. When an employee is not recommended for rehire, the Department Head must so indicate in a memorandum attached to the final Personnel Action Form.  The reasons for this recommendation must be stated.

3. An employee who leaves City employ for any reason is responsible for returning all City property in his/her possession, including keys, uniforms, tools, gas cards, I.D. cards, etc.

4. If a terminating employee is in possession of a gas card, the Department Head should notify the City Clerk so the card can be invalidated before it is actually returned to their immediate supervisor, Department Head or the City Manager.

5. A terminating employee will be paid for any appropriate accumulated leave time on the final paycheck at the current hourly rate of the employee.

6. A terminating employee should check with the City Clerk before his/her last day to ensure that all separation arrangements are made.  No final paychecks will be issued prior to the normal pay date.

City of Nowata

Page 43

Plaintiff's RFPD 127

CITY OF NOWATA RECIEPT
FOR PERSONNEL MANUAL

*Steve*

1 Personnel Manual

I, _____ have received and will read
the Cafeteria Flexible Benefits Plan, Cell Phone Policy, Cobra Notice,
and Personnel Manual

I, _____, WITNESSED (city official) the new
hire receive and sign for the above named forms.

Plaintiff's RFPD 158

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

1) STEPHEN PARMENTER,                    )
                                         )
              Plaintiff,                 )
                                         )
v.                                       )        Case No.: 19-CV-431-TCK-JFJ
                                         )
1) CITY OF NOWATA, OKLAHOMA,             )
                                         )
              Defendant.                 )
                                         )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, Stephen Parmenter, by and through his attorney of record,
Frank W Frasier and the law firm of Frasier, Frasier & Hickman, LLP, in response to the
Defendant's Motion for Summary Judgment and Brief in Support [Dkt. No. 23] and would
state as follows:

### I.  INTRODUCTION

Plaintiff was the Fire Chief for the City of Nowata, Oklahoma.  At no time prior to
or after Plaintiff's termination did the Defendant provide good and sufficient cause as
required by Section 29-104 of Title 11 of the Oklahoma Statutes. Therefore, Plaintiff's
termination by the Defendant is a violation of Section 29-104 of Title 11 Oklahoma
Statutes, as well as a violation of Plaintiff's Due Process Rights.  Plaintiff filed in Federal
court because the Defendant deprived him of rights arising from the termination of his
employment without due process of the law, thus making this actionable under 42 U.S.C.
§ 1983.  Otherwise, Plaintiff would have filed his case in the District Court in and for
Nowata County, State of Oklahoma.

## II.  STATEMENT OF MATERIAL FACTS IN DISPUTE

1.      Defendant terminated Plaintiff's employment without the protections afforded him by statute.  There was no hearing by the Defendant's manager, council or other elected officials.  Proof of this is found at Exhibit 8 to Defendant's Motion [Dkt. No. 23].  This disputes the Defendant's own "uncontroverted fact" 2, 3, 4 and 6.

2.      Defendant never provided Mr. Parmenter any written notices or warnings and there is no evidence of the same because Mr. Parmenter's personnel file cannot be located.  *Please see Exhibit "A" attached hereto and incorporated herein by reference, Deposition of City Manager Melanie Carrick, now Collins, June 23, 2020 at pp. 46, lines 10-17.*  This disputes the "uncontroverted" facts numbered 4 and 7.

3.      The City Manager for Defendant did not know what Title 11 O.S. § 29-104 was and how it relates to the employment of firefighters.  *Please see Exhibit "A" at  pp. 19-20, lines 18-1.*  This places in controversy the Defendant's "uncontroverted" facts numbers 2, 3, 4, 6, 11 and 12.

4.      The City Manager for the Defendant admits there was no post-termination due process as Plaintiff is entitled to pursuant to 11 O.S. § 29-104.  *Please see Exhibit "A" at pp. 31-32, lines 23-17.*   This places in controversy the Defendant's "uncontroverted" facts numbered 2, 3, 4, 6, 11 and 12.

5.      The City Manager for the Defendant had long-running dispute and dislike due to unrelated issues when she was the city clerk for the Defendant. Plaintiff's termination by City Manager Carrick on behalf of the Defendant is a continuation of her ill will towards Plaintiff and manipulating her position to terminate his employment under a perceived color of authority.  *Please see Exhibit "A" at pp. 52-53, lines 14-7.* This

contradicts the notion and "uncontroverted" facts numbered 2, 3, 4 and others that Defendant relies upon to move for summary adjudication when the reality is a petty attempt at payback.

6.      Even more incredible than relying upon records that no longer exist, the City Manager terminated Plaintiff based upon conversations of which she was not a party and overheard to terminate his employment. *Please see Exhibit "A" at p. 53, lines 15-23.* This completely controverts the notion that Defendant had some sort of pretextual reasons to terminate Plaintiff's employment found at Defendant's "uncontroverted" facts 4, 5, 6, 7, 8, 9, 10, 11, and 12.

7.      Not only did Defendant  rely upon hearsay to terminate Plaintiff's employment, but Defendant relies upon hearsay statements to move this court for summary adjudication.  Plaintiff objects to the admission of those statements.  *Please see Exhibit "A" at  pp. 59, 60-61, lines 25-19.*  This testimony of Carrick further controverts the same facts that the Defendant submits are "uncontroverted".

8.      Defendant relied upon false information about poor morale, but offers nothing tangible to provide this court that is admissible.  In fact, none of the employees provided written complaints per the rules and policies of the Defendant.  *Please see Exhibit "A" at pp. 77-78, lines 19-25.*  The truth is that the Plaintiff authorized and provided the city employees comp time which they benefitted from and appreciated.  This disputes the "uncontroverted" facts numbered 4 and 12.

### III: ARGUMENTS AND AUTHORITY

**PROPOSITION I: Defendant has a Heavy Burden on Summary Judgment.**

2020-08-07 1:56 pm
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\rsp to motion for summary judgment MJ080720.wpd/vs

Page 3

The moving party on summary judgment has the burden of showing it is entitled to summary judgment beyond a reasonable doubt or it is denied. *Norton v. Liddel,* 620 F.2d 1375, 1391 (10th Cir. 1980); *Trainor v. Apollo Metal Specialities, Inc.,* 318 F.3d 976 (10th Cir. 2002).

Defendant shoulders the "initial burden to show there is an absence of evidence to support the non-moving party's case." *Clinger v. New Mexico Highlands University,* 215 F.3d 1162 (10th Cir. 2002), citing *Thomas v. IBM,* 48 F.3d 478, 484 (10th Cir. 1995). Defendant fails to meet this burden by showing any absence of evidence to support Plaintiff's case. Further, the attachments to Defendant's motion reveal there remain material facts in dispute. For example, there remains a dispute as to whether Plaintiff was afforded due process as allowed under the Fourteenth Amendment and State Statutes.

The Defendant relies upon distorted facts in its argumentative "introduction" that present in a light very favorable to its position in support of motion for summary judgment, contrary to *Tademy v. Union Pacific Corporation,* 520 F.3d 1149, 1158 (10th Cir. 2008) (condemning the trial court for taking facts in a light most favorable to the movant) and *Tolan v. Cotton,* 572 U.S. 650, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014), to the same effect.

It is questionable whether or not some of the information Defendant relies upon in this introduction is even admissible. Further, Defendant relies upon unsigned and unverified attachments to its motion which are hearsay. Most of the information contained in these items and relied upon by Defendant are taken out of context and not read completely. This is a classic case of a party grasping at straws. Further, relying

upon facts taken out of context, inadmissible evidence, and hearsay, not to mention the lack of an affidavit of a witness and deponents contradicting its own so-called "uncontroverted facts" call into question credibility of a witness and the lack of evidence to support Defendant's motion.

Defendants entire argument relies upon the assertions that are disputed and controverted by evidence.  Under the well-established requirements for ruling on a motion for summary judgment, all disputed facts must be resolved in the favor of the non-moving party.  "A disputed facts is material if it might affect the outcome of the suit under the governing law, and the dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997).  "Once the movant sets forth its argument challenging the non-movant's claims, the non-movant is given wide birth to prove factual controversy exists." *Jeffries v. Kansas Department of Social and Rehabilitation Services,* 147 F.3d 1220, 1228 (10th Cir. 1998).  A reasonable juror could find the actions of the actions of the Defendant violated the Plaintiff's due process rights in taking his employment and in violation of state law with respect to Title 11 O.S. § 29-104. Combined with the testimony of Plaintiff and the inconsistencies of witnesses relied upon by Defendant, it is very likely Plaintiff will receive a favorable verdict in this case.

The court must examine the factual record and make reasonable inferences therefrom "in a light most favorable to the party opposing summary judgment." *Sequoyah County Rule Water District No. 7 v. Town of Muldrow,* 191 F.3d 1192, 1196 (10th Cir. 1999).  The moving party's evidence must be so powerful that no reasonable jury could be free to disbelieve it.  *Leone v. Owsley,* 810 F.3d 1149, 1154 (10th Cir. 2015).

2020-08-07 1:56 pm
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\rsp to motion for summary judgment MJ080720.wpd/vs

Page 5

74

Here, the facts relied upon by the movant are controverted by the actual evidence, the motion must be denied.  The court should remember that it should be granted only if it is shown "beyond a reasonable doubt" that a Plaintiff cannot prevail.  *Trainor v. Apollo Metal Specialities, Inc., supra*.  Inferences from the facts should be taken in a light most favorable to the opponent of summary judgment, Plaintiff herein.  *Tolan v. Cotton, supra* (also noting that district courts are setting this as the correct standard of review, but not following it in fact).  Based on the facts in dispute, as enumerated above, viewed in a light favorable to Plaintiff, require that summary judgment be denied as it is violates the law and would be error.

**PROPOSITION II:  PLAINTIFF'S § 1983 CLAIM AGAINST THE CITY OF NOWATA DOES NOT FAIL AS A MATTER OF LAW: Plaintiff Had a Protected Property Interest in His Employment and Plaintiff Did Not Receive Adequate Due Process as Required by Law.**

In Plaintiff's case, his termination occurred without the protections created by Section 29-104 of Title 11 of the Oklahoma Statutes, which became effective on July 1, 1978, and which states,

> "the chief and members of all paid municipal fire departments shall hold their respective positions unless removed for a good and sufficient cause as provided by applicable law or ordinance."

Plaintiff is not an "at will" employee.  An "at will" employee is defined as *"an employee whose employment may be terminated at an employer's discretion." Darr v. Town of Telluride*, 495 F.3d 1243, 1252 (10th Cir. 2007); *McCrady v. Okla. Dept. of Pub. Safety*, 2005 OK 67, 122 P.3d 473; *City of Jenks v. Stone*, 2014 OK 11, 321 P. 3d 179; *Blanton v. Housing Authority of Norman*, 1990 OK 38, 794 P.2d 412. Applying that definition to the facts in the instant case, it is abundantly clear that Plaintiff as Chief of

2020-08-07 1:56 pm
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\rsp to motion for summary judgment MJ080720.wpd/vs
Page 6

75

the Defendant's Fire Department **is not** an "at will" employee because of Section 29-104

of Title 11 of the Oklahoma Statutes.   However, Section 29-104 requires that "good and

sufficient cause" be provided, the opposite of at will. *Lawton v. International Union of*

*Police Ass'ns, Local 24*, 2000 OK CIV APP 2, 996 P.2d 954; *City of Durant v. Cicio (In re*

*City of Durant)*, 2002 OK 52, 50 P.3d 218.   *Hall v. O'Keefe*, 1980 OK 108, 617 P.2d 196;

*Wilson v. City of Tulsa*, 2004 OK CIV APP 44, 91 P.3d 673.

Section 29-104 of Title 11 of the Oklahoma Statutes makes the Chief and members

of municipal fire departments merit employees.   In the *Loudermill* Decision, the

Supreme Court of the United States held that

> "all process that is due is provided by a pre-termination opportunity
> to respond, coupled with post-termination administrative procedures
> as provided by..."

*See Cleveland Board of Education v. Loudermill*, supra.

An employee cannot be terminated in violation of public policy in Oklahoma.

*Burk v. K-Mart Corp.*, 1989 OK 22, 770 P.2d 24.   Employers that fail or refuse to abide by

statutory requirements such as 11 O.S. § 29-104 are in violation of public policy.   See

*Stanolind Oil & Gas Co. v. Phillips*, 195 Okla. 377, 157 P.2d 751 (1945).   Even if this

Defendant gave reasons outlined for termination, it cannot escape liability claiming

Plaintiff was "at will."  It must not only provide "good and sufficient cause," it must allow

this person like Plaintiff the opportunity to respond, and post-termination proceedings,

including right to counsel, to call witnesses, etc. *Loudermill*, 470 U.S. 532 (1985);

*Barnthouse v. City of Edmond*, 2003 OK 42, 73 P.3d 840; *Benavidez v. City of Albuquerque*,

101 F.3d 620 (10th Cir. 1996).

2020-08-07 1:56 pm
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\rsp to motion for summary judgment MJ080720.wpd/vs

Page 7

76

As stated by the Court in *Barnthouse*, citing *Benavidez*,

"[w]hen the pre-termination process offers little or no opportunity for the employee to present his side of the case, the procedures in the post-termination hearing become much more important... and where the pre-termination hearing process has been minimal, the employee's fate may depend entirely upon the post-termination hearing."

*Barnthouse*, supra.   Even if the pre-termination procedure that the City of Nowata alleges that it provided to Plaintiff is deemed to be sufficient by the Court, the City failed to afford Plaintiff any post-termination procedures to which he is entitled per the Court's rulings in *Barnthouse* and *Benavidez*.   *Id*.   The City afforded Plaintiff with no post-termination processes such as the ones set forth in *Benavidez*, including hearings at which Plaintiff could be represented by counsel, the opportunity to present evidence, and the opportunity to cross-examine witnesses. *Id*. at 627.   The burden of proof is on the City to show that no material issues of fact remain that would defeat Plaintiff's claim. *Barnthouse* at ¶ 21.   An objective standard is applied to determine whether a defendant violated "clearly established statutory or constitutional rights..." *Id*.   The City of Nowata fails to meet this burden.

The Due Process Clause provides that certain substantive rights–life, liberty, and property–cannot be deprived except pursuant to constitutionally adequate procedures. If a party has a property right in continued employment, the State cannot deprive him or her of this property without due process.   *Loudermill* at 541.   An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.   This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.   *Id*. at 542.

2020-08-07 1:56 pm
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\rsp to motion for summary judgment MJ080720.wpd/vs

Page 8

The discharge of this Plaintiff was without a hearing from the Defendant's Manager, Council or other elected officials. Rather, Plaintiff's termination was an action taken *sua sponte* by the City Manager. There is no applicable law or ordinance allowing the Manager to terminate Plaintiff's employment, therefore, it is a clear violation of the Statute. 11 O.S. § 29-104. In order to terminate the employment of a Fire Chief in Oklahoma, a municipality must "have good and sufficient cause." *Id*.

The Defendant in this case did not allow Plaintiff a pre-termination opportunity to respond or post termination administrative procedures he is to be afforded as a property-interest-protected employee. *Barnthouse*, supra. In so doing, the Defendant violated Plaintiff's rights, making his termination wrongful. There are no facts disputing the Defendant's actions with respect to the Plaintiff's employment as Fire Chief for the Defendant. This Court must interpret Section 29-104 of Title 11 of the Oklahoma Statutes strictly. Applying the law to the facts in Plaintiff's case, it is clear Defendant's actions violated this statute and applicable case law. Therefore, Defendant is not entitled to summary judgment as a matter of law.

**PROPOSITION III: Plaintiff Was Wrongfully Terminated in Violation of 11 O.S. § 29-104.**

There are sufficient facts in dispute allowing the court to find that as a matter of law Defendant violated 11 O.S. § 29-104. Further, there are sufficient material facts showing the Defendant did not have the right under 11 O.S. § 29-204 to terminate Plaintiff and that it did not provide him due process.

In other words, Defendant cannot state that it terminated Plaintiff simply because it believed he was an at-will employee and could do so under the law. Defendant specifically chose to terminate Plaintiff but it must abide by the law like everybody else.

2020-08-07 1:56 pm
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\rsp to motion for summary judgment MJ080720.wpd/vs

Page 9

78

The authority to remove a municipal employee cannot always be exercised arbitrarily or capriciously. *Jones v. Bayless,* 1953 OK 92, ¶ 14, 255 P.2d 506 (1953). 11 O.S. § 29-104 of the Oklahoma Statutes requires that by refusing members of all paid municipal fire departments shall hold their respective positions unless removed for the good and sufficient cause as provided by applicable law or ordinance.

In the instant case, the Defendant cannot hide behind the at-will employment doctrine in this situation. Reasonable persons cannot disagree that Plaintiff was the fire chief of the department and entitled to protections afforded him under the law. It is clear from the undisputed facts, that Plaintiff's termination occurred without protections afforded him by this statute. Therefore, Plaintiff's termination is a violation of § 29-104 of Title 11 of the Oklahoma Statutes. There is not dispute that the discharge of Plaintiff was without a hearing from the Defendant's manager, city council or other elected officials. Rather, Plaintiff's termination was an action taken *sua sponte* by the newly installed city manager.

There is no applicable law or ordinance allowing the city manager to terminate Plaintiff's employment for her questionable reasons, therefore, it is a violation of the statute. In order to terminate the employment of a Fire Chief in Oklahoma a municipality must "have good and sufficient cause." *Id.* It cannot just be because the city manager puts that language into a termination letter. That does not mean Defendant had actual good and sufficient cause to terminate Plaintiff's employment. Even if this Defendant gave reasons outlined in its letter, it cannot escape by falsely claiming Plaintiff was "at-will." It must provide "good and sufficient cause," and it must allow this

person like Plaintiff an opportunity to respond.  *Please see Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed.2d 494 (1985).

Section 29-104 of Title 11 of the Oklahoma Statutes makes the chief and members of the municipal fire department merit employees.  In the *Loudermill* decision, the Supreme Court of the United States held that:

> All process that is due is provided by a pre-termination opportunity to respond, coupled with post-termination administrative procedures as provided by...

*Id.* at 538.

Pursuant to the standards set forth in *Loudermill,* the Defendant contends the information given Plaintiff why his employment might be terminated two and three years prior, as sufficient now even though Plaintiff was denied due process.  In fact, there is information provided in Defendant's motion that the issues were addressed but between Plaintiff and the then acting City Manager Carrick and resolved.  The Defendant in this case did not allow Plaintiff a pre-termination opportunity to respond or post-termination administrative procedures that he is afforded.  In so doing, the Defendant violated Plaintiff's rights making his termination wrongful.

**PROPOSITION IV:  The City Charter Does Not Repeal Nor Suspend 11 O.S. § 29-104.**

Defendant argues that 11 O.S. § 29-104 does not apply to this case, and they are entitled to summary judgment as a matter of law because the allege Nowata's City charter governs Plaintiff's employment relationship with the City.  They allege that 11 O.S. § 13-109 provides:

> Whenever a charter is in conflict with any law relating to municipalities in force at the time fo the adoption and approval of the charter, the provisions  of the charter shall prevail and shall operate as a repeal or suspension of the state law or laws to the extent of any conflict.

2020-08-07 1:56 pm
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\rsp to motion for summary judgment MJ080720.wpd

Page 11

80

In defense of its actions, Defendant in this matter relies upon the City of Nowata's City Charter, which includes the following provision:

> "The powers and duties of the City Manager shall be:... to appoint and remove all Heads of Departments, and all subordinate officers and employees of the City."

See Exhibit 9 attached to Defendant's Motion.  The Defendant further alleges that pursuant to the Defendant's Personnel Manual, all City employees are "at will" and can be fired "with or without cause and without notice".  See Exhibit 11 attached to Defendant's Motion.  These documents relied upon by Defendants do not supercede state statutes, Constitutional rights or Plaintiff's due process rights.

Municipal charters as granted or as amended cannot contravene constitutional provisions.  *In re Supreme Court Adjudication of Initiative Petitions in Norman Numbered 74-1 and 74-2*, 534 P.2d 3 (Okla. 1975).  Further, the Oklahoma Attorney General issued an Opinion stating that municipal charter provisions may not contravene state constitutional provisions. Op.Atty.Gen. No. 81-213 (Aug. 6, 1981).

Charter provisions do not supersede legislative enactments of general concern in which the state has sovereign interest.  Where a charter provision conflicts with the general law of the state, the latter will control.  *City of Sapulpa v. Land*, 101 Okl. 22, 223 P. 640, 646, 35 A.L.R. 872; *Walton v. Donnelly*, 83 Okl. 233, 201 P. 367; *Fossett v. State*, 34 Okla. Cr. 106, 245 P. 668; *Ex parte Shaw*, 53 Okl. 654, 157 P. 900.

This Court has previously been mindful that "the question as to what constitutes purely municipal matters or affairs [is] a question difficult of determination, as there does not appear to be any well-established rule by which it may be determined as to just what affairs or matters are purely municipal." *Tulsa Fire Fighters Ass'n, IAFF Local*

2020-08-07 1:56 pm
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\rsp to motion for summary judgment MJ080720.wpd/vs

Page 12

81

*176 v. City of Tulsa*, 834 F. Supp. 2d 1277, 1292 (N.D. Okla. 2011), citing *City of Sapulpa v. Land*, 1924 OK 92, 101 Okla. 22, 223 P. 640, 642 (Okla. 1924).

In *Cicio*, supra, the Oklahoma Supreme Court found that the statute at issue was not ambiguous and was clearly intended to protect policemen who are members of the state pension and retirement system from arbitrary discharge from employment. Just as in Title 11, Section 29-104, the statute addressed in *Cicio* restricts the reason for discharge "for cause" and ensures that all members will have a right to appeal the discharge. The Court in *Cicio* further finds that "**police and fire protection is unquestionably a matter of statewide interest**." *Id.* at ¶ 17. (Emphasis Added). *In Tulsa v. Public Employees Relations Board*, 1990 OK 114, 845 P.2d 872, the Oklahoma Supreme Court held that whether a chartered home rule city was obligated to bargain in good faith as required by the Fire and Police Protection Act regarding municipal employees' wage provisions contained in an expired collective bargaining agreement **was not a matter of purely municipal concern**. *Id.* (Emphasis Added). The Oklahoma Supreme Court rejected the city's position that it had the right to make and implement all decisions regarding its employees, and found that since a wider public interest was at stake in the issues of police and fire bargaining and as to the rights provided to employees, **the home rule doctrine was inapplicable**. *Id.* at ¶ 18. (Emphasis Added).

The Oklahoma Supreme Court stated in *Fraternal Order of Police, Lodge No. 165 v. City of Choctaw*, 1996 OK 78, 993 P.2d 261, 267, that:

> Since police and **fire protection is a matter of statewide concern**, the legislature has the power to enact laws... to insure the continuity of protection and resolution of disputes regarding the actual rendering of those services by officers and firefighters.

2020-08-07 1:56 pm
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\rsp to motion for summary judgment MJ080720.wpd   Page 13

82

*Id.* at ¶ 19. (Emphasis Added).

In line with the previous decisions, *Bethany v. Public Employees Relations Board*, 1995 OK 99, 904 P.2d 604, 607, the Oklahoma Supreme Court rejected the city's assertion that pursuant to its charter, it would have the exclusive right to resolve disputes regarding discipline and discharge of employees.  The Oklahoma Supreme Court further stated "that any such conflict between a charter and a state statute regarding arbitration of grievances would be governed by the state statute which took precedence over the city charter." *Id*.

Just as the courts above have all found, in the instant case, Defendant's  city charter does not repeal nor suspend Plaintiff's rights pursuant to 11 O.S. § 29-104.

### IV:  CONCLUSION

Title 11 O.S. § 29-104 of the Oklahoma Statutes is very clear that a Plaintiff is afforded certain protections and that he should not have been terminated without due process.  It is clear from the facts set forth herein that Plaintiff was terminated without the rights afforded him by 29-104 of Title 11 of the Oklahoma Statutes and the United States Supreme Court decision in *Cleveland Board of Education v. Loudermill*, *supra*.

Plaintiff should have been provided due process before his employment ended with the Defendant.  The Defendant cannot come back and claim now it had reasons over two years ago; such arguments strain credibility.  Even if remotely true, relevant or timely, the Defendant failed to provide Plaintiff due process.

All of these events arise from the Defendant's careless disregard of the law and Plaintiff's rights under the law.  Instead of respecting Plaintiff's rights under the law, Defendant took the opportunity to terminate him when it had no discernable evidence

2020-08-07 1:56 pm
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\rsp to motion for summary judgment MJ080720.wpd/vs

Page 14

83

of a good and sufficient cause that was proximate to the date of his termination.  It had been over two years before they had given him any type of warning about his employment.  The evidence herein satisfies the *prima facie* case for Plaintiff's wrongful termination pursuant to § 29-104 of Title 11 of the Oklahoma Statutes.  Because Plaintiff's termination was a violation of the Act, the Defendant is not entitled to summary adjudication.  The court should deny the Defendant's motion and set the matter for trial to determine the nature and extent of Plaintiff's damages.

Respectfully submitted,

FRASIER, FRASIER & HICKMAN, LLP

By:   */s/Frank W Frasier*
       Frank W Frasier, OBA #17864
       1700 Southwest Blvd.
       Tulsa, OK 74107
       Phone: (918) 584-4724
       Fax: (918) 583-5637
       E-mail: frasier@tulsa.com
       Attorney for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on 7 August, 2020, a true, correct, and exact copy of the foregoing document was served *via* electronic notice by the CM/ECF filing system to all parties on their list of parties to be served in effect this date.

By:   *s/Frank W Frasier*
       Frank W Frasier

2020-08-07 1:56 pm
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\rsp to motion for summary judgment MJ080720.wpd/vs         Page 15

84

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA


1) STEPHEN PARMENTER,          )
                               )
              Plaintiff,       )
                               )
        -vs-                   )Case No. 19-CV-431-TCK-JFJ
                               )
2) CITY OF NOWATA, OKLAHOMA,)
                               )
              Defendant.       )
                               )


   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *


DEPOSITION OF MELANIE COLLINS

TAKEN ON BEHALF OF THE PLAINTIFF

TAKEN AT 114 SOUTH MAPLE STREET

NOWATA, OKLAHOMA

JUNE 23, 2020


   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *


BALLARD REPORTING
611 WEST 15TH STREET, C-3
TULSA, OKLAHOMA  74127
(918) 407-2278
ballardreporting@gmail.com

   ·   *   *   *   *   *   *   *


REPORTED BY:  ASHLEY BALLARD, CSR

Page 18

1 A. "For over five years, up until April 8, 2019,
2   Plaintiff was the non-probationary fire chief of the
3   City of Nowata which was subject to 11 O.S.
4   Subsection 29-104."
5 Q. Do you agree with that assertion?
6    MR. LeBLANC: Objection to the form; calls for
7   a legal conclusion.
8 Q. (By Mr. Frasier) Now, remember, Judge Kern isn't
9   here to call balls and strikes. Mr. Thomas makes
10  his record -- we're in federal court; I should say
11  Mister. Counsel makes his record and then the judge
12  will rule on it later. That lets this thing go on
13  without having to call the judge; okay?
14 A. Okay.
15 Q. So let me ask you: Do you agree with that
16  allegation in paragraph 4?
17    MR. LeBLANC: Object to the form; calls for a
18  legal conclusion.
19 Q. (By Mr. Frasier) Please answer.
20    MR. LeBLANC: If you know the answer.
21 A. I don't know how long he was the fire chief for
22  sure. I don't know.
23 Q. (By Mr. Frasier) Do you think he was fire chief
24  for the five years prior to April 2019?
25 A. I don't know.

Page 19

1 Q. All right.
2 A. I know he was the fire chief from '17 to '19.
3 Q. Was he the fire chief before you started here?
4 A. I don't know.
5 Q. You don't remember --
6 A. I believe he was.
7 Q. Okay.
8 A. I know he was when I came.
9 Q. And when you came, do you think that he was the
10  probationary or temporary fire chief?
11 A. No.
12 Q. You think he was probably the permanent fire chief?
13 A. Yes.
14 Q. Okay. And do you know what Oklahoma -- are you
15  familiar with Oklahoma statutes?
16 A. I have to go read them, but I defer to counsel
17  because I don't know them.
18 Q. Okay. And do you know what Title 11 of the
19  Oklahoma statutes Section 29-104 is?
20 A. I do not.
21 Q. All right. Have you, even since this case began,
22  looked it up?
23 A. No, sir, I have not.
24 Q. Do you know if it applies to firefighters or city
25  managers?

Page 20

1 A. I don't know.
2 Q. Okay. Paragraph number 5, would you read that for
3   us, please.
4 A. "On April 8, 2019, Plaintiff was terminated without
5   cause and with neither pre-termination nor
6   post-termination procedures."
7 Q. All right. Do you know or agree with any of the
8   assertions made in paragraph number 5?
9 A. I do not agree with that.
10 Q. And what is it that you disagree with?
11 A. Mr. Parmenter was terminated with cause and he had
12  multiple pre-termination hearings and he received
13  his termination process. I don't agree with that at
14  all.
15 Q. Okay. So tell me then what the cause was of his
16  termination.
17 A. There were a lot of reasons.
18 Q. Please provide them.
19 A. Do you have a copy of his first reprimand, please?
20 Q. I do --
21 A. Can I ask for that?
22 Q. -- someplace in this mess. Do you not recall off
23  the top of your head?
24 A. I cannot recall all of them off the top of my head.
25 Q. Okay.

Page 21

1 A. Some of them were morale, time sheets. But without
2   looking at that, right off the top of my head, those
3   are the two that -- but the morale was the biggest.
4 Q. Okay. And what is it with the morale? That he
5   inspired morale? He was a --
6 A. No.
7 Q. Okay.
8 A. No.
9 Q. Tell me about it then.
10 A. The morale was horrible in the department. It
11  ended up affecting two departments. It never got
12  better.
13 Q. All right.
14 A. It was destroying those two services.
15 Q. All right. So you believe that he was having a
16  negative impact on morale?
17 A. Yes.
18 Q. All right. What was he doing that was having a
19  negative impact on morale?
20    I should say it this way: What was he doing
21  or not doing that was having a negative impact on
22  the morale?
23 A. He was not listening to his employees. It was the
24  my-way-or-the-highway attitude that he had. And it
25  was just ongoing. There was fear of retribution and

6 (Pages 18 to 21)

Page 30

1   A. Okay.
2   Q. Well, while we're doing that, I can kind of work
3       simultaneously. I'm putting before you Exhibit No.
4       2. Are you familiar with that document?
5   A. Yes.
6   Q. What is that document?
7   A. City of Nowata Personnel Manual, 2012.
8   Q. All right. And was that the city manual in place
9       when you came to work here?
10  A. Yes.
11  Q. Has it changed over the years?
12  A. There's been one revision to it.
13  Q. All right. Have you seen Exhibit No. 3 before?
14  A. Yes.
15  Q. And what is Exhibit No. 3?
16  A. Chief McElhaney's statement.
17  Q. And when did he give that to you?
18  A. March 5th or 6th of 2019.
19  Q. All right. And is it dated?
20  A. It is dated March 5, 2019.
21  Q. And why did he give it to you?
22  A. He witnessed what he felt was unjust and brought it
23      to my attention.
24  Q. Did you ask him to write that document?
25  A. No, I did not.

Page 31

1   Q. Do you know where he wrote that document?
2   A. No, I do not.
3   Q. You would agree with me that document is not
4       notarized?
5   A. It is not.
6   Q. And could have been done at any time, couldn't it?
7   A. I don't know.
8   Q. Could have been done after this litigation
9       commenced; right?
10      MR. LeBLANC: Object to the form of the
11      question.
12      If you didn't understand his question, tell
13      him you don't understand. If you have an answer --
14      I think he is asking you to guess or speculate,
15      but...
16  A. Can you clarify your question?
17  Q. (By Mr. Frasier) Sure. Why didn't the chief just
18      tell you?
19  A. That, I don't know.
20  Q. Of course it's going to be right here under my
21      nose. There's just a few papers in this case.
22  A. Just a little bit.
23  Q. Do you agree with me that Mr. Parmenter did not
24      have a post-termination hearing of any kind?
25  A. Post-termination?

Page 32

1   Q. Right.
2   A. How do you define post-termination?
3   Q. Well, post would mean after he was terminated from
4       his employment.
5   A. Yes, he did.
6   Q. He did?
7   A. Yes.
8   Q. Explain that to us.
9   A. He came -- I had him come into my office. He was
10      terminated. He had an opportunity to speak. That
11      is post, after the termination. Yes, he had his --
12  Q. Okay. But he didn't have an opportunity to talk to
13      the city council or anybody else in Nowata
14      government other than --
15  A. I don't make those determinations.
16  Q. -- other than you?
17  A. Right. Yes.
18      MR. LeBLANC: Occasionally you've started your
19      answer while Mr. Frasier is still asking his
20      question. Just be a little bit patient and let him
21      get the question all the way out, then give him his
22      answer. And he will do the same for you, you know,
23      let you finish your answer completely before he
24      starts the next question. It makes Ashley's life so
25      much easier.

Page 33

1       THE WITNESS: Okay.
2       MR. FRASIER: We don't want to make her mad.
3       THE WITNESS: No, we don't want to make her
4       mad.
5   Q. (By Mr. Frasier) Okay. If you would look to the
6       second page of Exhibit 1, paragraph number 6. Why
7       don't you read that for us, please.
8   A. "As a result of this violation of Plaintiff's civil
9       rights, he has lost wages and other benefits of
10      employment, including harm to his retirement, has
11      lost his job, and endured humiliation and emotional
12      distress."
13  Q. Okay. You understand that my client believes that
14      he was wrongfully terminated?
15  A. Yes.
16  Q. And do you agree or disagree with that?
17  A. I disagree.
18  Q. Okay. Now, as the fire chief for Nowata, we know
19      he was paid because we know that at sometime, from
20      what you circled on Exhibit 4, he was paid how much?
21  A. $1,880 every two weeks.
22  Q. All right. Did he have any other benefits of
23      employment here?
24  A. Yes.
25  Q. Like what?

9 (Pages 30 to 33)

16a95b2a-1ba2-4c84-a4fe-864430408414

Page 50

1  A. It's a memo that I sent to all the department
2     heads.
3  Q. Okay. And why did you do that?
4  A. I had recently been appointed as the interim city
5     manager and I wanted to let them kind of know what
6     my expectations were and to address some issues that
7     had been going on without pointing out any one
8     person specifically.
9  Q. And when you say the department heads, who is that?
10 A. The fire chief, the police chief, Jerry Jackson, at
11    the time it would have been Jerry Martin, and Roger
12    Smith in public works.
13 Q. Okay. And I'm sorry, I should have asked this
14    before: On Exhibit No. 5, was there anybody who was
15    present when you gave that to Mr. Parmenter?
16 A. Christopher Emert.
17 Q. And who is that person?
18 A. He was the code enforcement officer at the time.
19 Q. Why did you have him witness?
20 A. Anytime you're giving a reprimand, you should have
21    a witness.
22 Q. Okay.
23 A. It's always a good idea to have.
24 Q. Just a best practice?
25 A. Uh-huh.

Page 51

1  Q. Is that yes?
2  A. Yes. Yes.
3  Q. All right. We have been going about an hour. What
4     do you say we take a break? Would you like that?
5  A. That sounds great.
6        (Whereupon, a short break was taken.)
7  Q. (By Mr. Frasier) All right. We're back on the
8     record. We've had a break. Hopefully we're warmer.
9  A. Yes.
10 Q. Okay. Great.
11       Let me ask you: Looking at Exhibit 7, how
12    long had you been -- at that point, were you --
13    strike that. Let me ask it better.
14       Were you interim city manager or were you the
15    official city manager when you wrote Exhibit 7?
16 A. Interim.
17 Q. Okay. And you became -- I think your testimony was
18    roughly three months/90 days later, you became the
19    actual -- or six months?
20 A. Six months.
21 Q. Six months. So it would have been into 2018 that
22    you became...
23 A. Yes.
24 Q. So when you wrote that memo that is Exhibit 7, how
25    long had you been interim city manager?

Page 52

1  A. Not very long. I don't remember an exact time. It
2     wasn't very long.
3  Q. Okay. And that's fair. I'm not wanting to know if
4     it had been 14 days or if -- I mean would it have
5     been a matter of --
6  A. About a month.
7  Q. About a month?
8  A. About a month.
9  Q. Okay. Looking at Exhibit 5, you wrote up
10    Mr. Parmenter within 30 days of your becoming
11    interim city manager; is that right?
12       MR. LeBLANC: Object to the form.
13 A. Yes.
14 Q. (By Mr. Frasier) And had you had some prior
15    history or issues with Mr. Parmenter before you
16    became the interim city manager?
17 A. Yes.
18 Q. Tell me about that, please.
19 A. When I was doing the city clerk and I was doing the
20    time sheets, there were issues. They weren't
21    getting turned in on time. He was changing the
22    people's times and I had told him he couldn't do
23    that. And I brought it to the city manager's
24    attention and I know the city manager spoke with him
25    about it.

Page 53

1  Q. And how is it that you know that? Were you
2     present?
3  A. I heard it through the wall.
4  Q. Okay. Is the fire chief responsible for turning in
5     the time sheets for the employees of the EMS and
6     fire department?
7  A. Yes.
8  Q. And why was he changing the time sheets, if you
9     know?
10 A. I don't know.
11 Q. What was wrong with him changing the time sheets?
12 A. It's illegal. The employee has to do it.
13 Q. Okay. And how do you know that?
14 A. That was one of the HR things I did know.
15 Q. Okay. When you overheard that conversation, you
16    were city clerk?
17 A. Yes.
18 Q. And you weren't in a position to hire or fire city
19    personnel in that job, are you?
20 A. No.
21 Q. How many times did you bring changes to the time
22    sheets to the city manager's attention?
23 A. A couple of times. I don't know an exact number.
24 Q. Do you know how many times he had discussions with
25    Mr. Parmenter?

16a95b2a-1ba2-4c84-a4fe-86443040844f

Page 58

1  Q. Why is hers handwritten?  And is that in your
2     handwriting?
3        MR. LeBLANC:  What's the page number, please?
4        MR. FRASIER:  I'm sorry.
5        THE WITNESS:  Nowata 052.
6        MR. LeBLANC:  Thank you.
7  A. This is not my handwriting.
8  Q. (By Mr. Frasier)  Okay.  Let me ask you:  Were you
9     friends with Nancy Brooks?
10 A. I have work relationships with everybody.  I don't
11    go in the evenings and have dinner with any of the
12    employees.
13 Q. Attend church or anything --
14 A. No.
15 Q. -- like that?
16 A. No.  I go to work.  I go home.  I don't socialize
17    with the employees after work.
18 Q. All right.  In looking at Exhibit 5 -- let me find
19    mine here in this mess.  All right.  Looking under
20    Details, it reads Description of Infraction, and
21    then it was altering of employee time sheets.
22 A. Uh-huh.
23 Q. Now, you told me that he was altering the
24    employees' time sheets.
25 A. Uh-huh.

Page 59

1  Q. And how is it you know that he was altering the
2     employees' time sheets?
3  A. Part of them was Whited-Out and it was his -- he
4     would handwrite in -- you could tell it was his
5     handwriting and not theirs.
6  Q. Was the alteration a falsification?
7  A. I don't remember.
8  Q. Okay.
9  A. It's been too long ago.  I don't remember.
10 Q. Would you expect him to turn in correct time
11    sheets?
12 A. I would expect him to, yes.
13 Q. All right.  You would agree with me that you could
14    make an alteration to a time sheet to make it
15    correct from incorrect; right?
16 A. No, the employee has to do that.
17 Q. No, no, no.  I want you to hear my question.
18 A. Okay.
19 Q. Someone can change/alter a time sheet making it
20    correct if it was incorrect?
21 A. No.
22 Q. Okay.  And that's because the employee has to do it
23    his or her --
24 A. Yes.
25 Q. -- self?

Page 60

1  A. Yes.
2  Q. All right.  The next allegation here reads:
3     "Falsification of own time sheet."
4        Did I read that correctly?
5  A. Yes.
6  Q. Tell me what that means.
7  A. He wrote down hours that he was at work when he
8     wasn't at work.
9  Q. And how do you know that?
10 A. This was when Charlie was here and Charlie
11    addressed this with him.  He said he was at work.
12    He wrote down that he was at work, when, in fact,
13    other employees seen him not at work and called
14    Charlie and reported it.
15 Q. Okay.  So between August 1st and August 31st, how
16    many times did you find that he was falsifying his
17    own time sheets?
18 A. That was the one time I know about.
19 Q. The one time was when your predecessor was city
20    manager and he ran it through an office wall --
21        MR. LeBLANC:  Object to the form.
22 Q. (By Mr. Frasier)  -- or an open door?
23        MR. LeBLANC:  Object to the form.
24        You can answer it if you can.
25 Q. (By Mr. Frasier)  Let me rephrase it.  This

Page 61

1     reference to a falsification of the time sheet did
2     not happen when you were city manager, did it?
3  A. No.
4  Q. It did not happen when you were interim city
5     manager, did it?
6  A. No.
7  Q. It's something that you overheard and you were not
8     a party to the conversation.
9        MR. LeBLANC:  Object to the form.
10 Q. (By Mr. Frasier)  Isn't that correct?
11 A. Yes, I was not in the room during the conversation.
12 Q. All right.  You overheard it; you eavesdropped,
13    didn't you?
14 A. They were screaming through the wall.  You could
15    hear.
16 Q. You overheard it or eavesdropped, didn't you?
17 A. Yes.
18 Q. Yes or no.
19 A. Yes.
20 Q. Now, that happened when?
21 A. When Charlie Spencer was city manager.
22 Q. 2015? 2013? 2012?
23 A. End of 2016 ot beginning of 2017.
24 Q. Okay.
25 A. Sometime in January.

16a95b2a-1ba2-4c84-a4fe-8644304084f4

Page 74

1  Q. Okay.
2  A. It was there when I started.
3  Q. Okay.
4  A. I mean it was already there. That was already --
5     that was ongoing.
6  Q. But what I'm looking for is a specific instance
7     between August 1st and August 31st.
8  A. I can't remember a specific instance.
9  Q. All right.
10 A. It was ongoing. It was every day that they felt
11    like this and the morale was bad.
12 Q. Well, we know it was sometime into 2019 because you
13    did this survey.
14 A. Uh-huh.
15 Q. Correct?
16 A. Uh-huh.
17 Q. Yes?
18 A. Yes.
19 Q. So how did you know the morale was bad in the
20    department between August 1st and August 31st of
21    2017?
22 A. Because the employees had talked to me about it.
23 Q. And how often did they do that?
24 A. It was several times. I don't know an exact
25    number.

Page 75

1  Q. All right. More than a dozen?
2  A. Within the time frame from when I started as city
3     clerk to this point, I would say probably, yes, a
4     dozen.
5  Q. All right. What about the time frame when you
6     became city manager?
7  A. It was still off and on, ongoing. It was just
8     random when they would come in; so I don't know a
9     specific number.
10 Q. Do you recall any specifics about any one thing
11    they may have said or one person may have said?
12 A. "My way or the highway."
13 Q. Okay. And you told somebody it was your --
14 A. "You do this or you're not going to have a job."
15 Q. Okay. Those were directives you gave?
16 A. No. Those were what was brought to me by the
17    employees.
18 Q. Okay. And --
19 A. Favoritism.
20 Q. Okay. "My way or the highway." Who said, "My way
21    or the highway"?
22 A. Steve did.
23 Q. Steve Parmenter?
24 A. Uh-huh. That was -- the employee that brought that
25    to me said that that was the mentality; that's how

Page 76

1     Steve was with them. Whenever they would bring
2     concerns to him, he didn't care; he wouldn't listen.
3     "It's my way or the highway," that was the
4     mentality.
5  Q. And which employee told you that?
6  A. Nancy Delmas.
7  Q. And when did she tell you that?
8  A. Oh, my gosh. Multiple times all the way back.
9     They've all told me that at one time or another.
10 Q. Do you recall an instance when Nancy told you that
11    between August 1st and August 31st?
12 A. Not between August 1st and August 31st, no.
13 Q. So that's information that you knew before you were
14    interim city manager?
15 A. Yes.
16 Q. All right. Did Nancy have a problem with comp time
17    or not getting comp time?
18 A. I believe she was included in -- she was one of the
19    ones that was negative in the hours.
20 Q. Okay. Was she disciplined for that?
21 A. The ones that were negative, we came up with a plan
22    for them to fix it, to pay for those hours.
23 Q. Okay. Nobody lost his or her job?
24 A. No.
25 Q. You had also said -- in addition to "my way or the

Page 77

1     highway," I think your other information was that -
2     and I don't want to misquote you; you tell me if I'm
3     wrong - that he wouldn't listen and was
4     unsympathetic is generally what I heard. Is that
5     correct?
6  A. Yes. He wouldn't listen to them. He wouldn't take
7     their issues into consideration. He blew them off.
8  Q. Okay.
9  A. They all felt like they were blew off.
10 Q. All right. And that created, in your opinion, low
11    morale?
12 A. Yes.
13 Q. All right. The next item is creating feelings of
14    fear of retribution or retaliation in employees in
15    the department, creating a harassing, hostile, and
16    threatening work environment for employees.
17 A. Yes.
18 Q. Tell me about that, please.
19 A. When the employees would come to me with these
20    complaints or these concerns or this had happened or
21    that had happened and I would tell them, "Okay.
22    Well, I need to document that. I need you to
23    write down what happened," nobody would write down
24    anything, because they said that Steve would
25    retaliate against them; that he had done it in the

20 (Pages 74 to 77)

Page 78

1    past and he would do it again.
2    Q. Okay.
3    A. Nobody wanted to document anything because they
4       were scared to death of being retaliated against.
5    Q. And tell me, did they give you any examples, any
6       names of people who had been retaliated against?
7    A. They felt like they had been before in the past.
8    Q. Okay.
9    A. But they wouldn't give me specific --
10   Q. But they never lost their job?
11   A. No.
12   Q. And they apparently were given comp time.
13   A. Uh-huh.
14   Q. Which is against the city policy; right?
15   A. Yes.
16   Q. So here you've got the chief of the fire department
17      who is apparently -- sounds like Shrek, to hear you
18      say it, but he is giving them comp time when they're
19      not supposed to have it.
20   A. Yes.
21   Q. It's kind of a mixed signal, wouldn't you agree?
22      MR. LeBLANC: Object to the form.
23   Q. (By Mr. Frasier) Please answer.
24      MR. LeBLANC: Same objection.
25   A. Yes.

Page 79

1    Q. (By Mr. Frasier) Okay. Noncompliance with hiring
2       policy.
3    A. Yes.
4    Q. Tell me about that, please.
5    A. He hired without going through the proper channels.
6       He actually ended up doing the hiring and not the
7       city manager.
8    Q. All right. And --
9    A. He did everything and -- yep.
10   Q. Can you give me a specific instance?
11   A. When I was the city manager he done it. I can't
12      remember the exact employee that he hired at that
13      time. And that's why this memo was sent.
14   Q. Okay.
15   A. That's part of why this memo was sent.
16   Q. And "this memo" is Exhibit 7?
17   A. Exhibit 7, yes.
18   Q. Okay. So you were interim city manager and he
19      hired somebody he shouldn't have or tried to hire
20      somebody he shouldn't have?
21   A. He did hire them.
22   Q. Who did he hire?
23   A. I don't remember the person's name.
24   Q. All right. Do they still work for the City?
25   A. I don't believe so.

Page 80

1    Q. When did they leave?
2    A. I don't remember. EMS has a lot of turnover.
3    Q. Why is that?
4       MR. LeBLANC: Object to the form.
5    Q. (By Mr. Frasier) I mean if you know. If you
6       don't, you don't.
7    A. I don't know.
8    Q. Okay. We'll talk about that later.
9       The next one is holding volunteer pay until
10      dues are paid.
11   A. Uh-huh.
12   Q. Explain that to me.
13   A. We do volunteer pay once a month, and it had come
14      to my attention that Steve was holding their checks
15      and wouldn't give them their checks until after they
16      paid their dues, or they could pick their check up
17      and go cash it and bring the money straight back to
18      him for the dues, or to the treasurer, whoever.
19   Q. Okay. First, this begs the question: Volunteer?
20      Getting paid? Tell me about that. Why do
21      volunteers get paid in Nowata?
22   A. Our volunteers get a certain amount per run
23      depending on what the run is. And at the end of the
24      month, we pay them for the runs that they've done.
25   Q. Okay. And that's kind of a misnomer around the

Page 81

1    state, that the volunteer firefighters -- they
2    really kind of get a reimbursement for their gas and
3    their time, don't they?
4    A. Call it whatever you want. I don't know. All I
5    know is that's how it works.
6    Q. I hear you. I hear you.
7       What dues was he holding out?
8    A. I don't know. I think it was the volunteer fire
9    dues that they have to pay.
10   Q. Maybe some union dues?
11   A. I don't know.
12   Q. Was there ever a time when there was a problem of
13   paying into the firefighter pension while
14   Mr. Parmenter was chief?
15   A. I don't know.
16   Q. Did he ever bring to your attention an issue with
17   monies not being paid into the pension?
18   A. Not that I remember.
19   Q. Okay. "Scheduling part-time workers more than
20   part-time hours."
21      Did I read that correct?
22   A. Yes.
23   Q. And tell me about that, please.
24   A. The part-time workers were working full-time hours
25   and sometimes getting overtime.

21 (Pages 78 to 81)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **(1) STEPHEN PARMENTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-CV-431-TCK-JFJ** |
| | ) | |
| **(1) CITY OF NOWATA, OKLAHOMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S REPLY BRIEF IN SUPPORT OF THE
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant, City of Nowata, Oklahoma, by and through its attorneys of record, Thomas A. LeBlanc and Emily K. Wilson, and hereby submits its Reply Brief in Support of the Defendant's Motion for Summary Judgment [Doc. #23].

**I.  PLAINTIFF'S § 1983 CLAIM AGAINST THE CITY OF NOWATA FAILS AS A MATTER OF LAW.**

The issue of whether Plaintiff's § 1983 claim against the City of Nowata fails is a matter of law for this Court to determine.  Plaintiff failed to raise any genuine issues of material facts related to this argument in his response brief [Doc. #32].  Therefore, Defendant submits this matter is ripe without any further arguments.

**II. PLAINTIFF RECEIVED ADEQUATE DUE PROCESS.**

The Defendant maintains that the City Charter provisions control in this matter and that Plaintiff was an at will employee and therefore not entitled to due process. However, if this Court finds that 11 O.S. § 29-104 controls in this matter,  then the Defendant argues that the City Manager had good and sufficient cause when she fired the Plaintiff and, the Plaintiff was afforded all due process as required by the U. S. Constitution.

{00579230}                                       1

## A.   PLAINTIFF WAS FIRED FOR GOOD AND SUFFICIENT CAUSE.

Plaintiff erroneously argues that the City Manager terminated him for "questionable reasons" and that the decision to terminate the Plaintiff was made "sua sponte." Plaintiff is correct in asserting that the test for "good cause" is whether the decision to terminate an employee was made "arbitrarily or capriciously." *Jones v.* Bayless, 1953 OK 92, ¶14 (1953). However, the Plaintiff fails to present any evidence that would support his assertion that the decision was made "arbitrarily or capriciously." To the contrary, the documentation provided by the Defendant shows that the City Manager had "good and sufficient cause" to terminate Plaintiff, and her decision was the result of a lengthy and deliberative process.

The first step in this lengthy termination process was the issuance of the Employee Warning Notice ("the Notice"). Ex. 1. The Notice listed the reasons that Plaintiff would be terminated if his performance did not improve. Ex. 1. Specifically listed in the Notice under the "Description of Infraction" is the following:

> …fostering and allowing to continue an environment of low morale in the department, creating feelings of fear of retribution or retaliation in employees in the department creating a harassing, hostile and threatening work environment for employees…Ex. 1.

In order to address this issue, the City Manager specifically ordered the Plaintiff to "work at least one regular shift per week as a regular fireman to foster better relationships with employees in the department and boost morale." Ex. 1. There is no dispute that Plaintiff failed to work any regular shift as a regular fireman as ordered by the City Manager. Plaintiff admits that he never worked a regular shift as ordered by the City Manager. Ex. 2, pgs. 87-88, lines 20-1. This is supported also by the deposition testimony of the City Manager. Ex. 12, pg. 85, lines 14-21.

Despite being given the Notice and a direct order to address the issue of morale, the morale of the fire department continued to decline. The City Manager testified that the morale in the fire

{00579230}                                           2

department was "horrible." Ex. 12, pg. 21, lines 10-12 and pgs. 22-23, lines 20-2.  In fact, the City Manager noted that the morale issue ended up affecting two departments, fire and EMS. Ex. 12, pg. 21, lines 10-12.  Furthermore she stated that the morale "never got better".  *Id*.  Additionally, the City Manager noted that there was a "fear or retaliation or retribution" among the employees of the fire department as well as EMS. Ex. 12, pgs. 21-22, lines 23-3.  These issues reached a critical point in March 2019 when the City Manager sent questionnaires to all employees of each City department. Ex.12, pgs. 106-107, lines 3-6 and Pgs.110-111, lines 19-17.  None of the fire department or EMS employees wanted to fill out the questionnaires for fear of retaliation and retribution. Ex. 12, pgs. 110-111, lines 24-3. The City Manager testified that no other department within the City had such negative reviews and low morale. *Id*. at Pg. 111, lines 11-17.

All of this culminated in the City Manager's decision to terminate the Plaintiff.  The City Manager, under repeated questioning, clearly stated that the Plaintiff was terminated for issues related to the Notice he received on August 31, 2017.  Ex. 12, pgs. 20-21, lines 11- 17, pgs. 42-43, lines 25-2 and Pgs. 111-112, lines 11-1.  When initially being questioned about the cause of Plaintiff's termination, the City Manager instantly refers to the Notice that was provide to the Plaintiff. Ex. 12, pg. 20, lines 11-19. When pressed for specifics she recalls that "morale was the biggest" reason he was terminated.  Ex. 12, pg. 21, lines 1-3.  Finally, The City Manager confirmed that the issue with morale, as evidenced by the results of the questionnaires, was one of the reasons she terminated the Plaintiff. Ex. 12, pg. 111, lines 18-20.

Plaintiff alleges that the City Manager relied on false information regarding the morale at the fire department. Plaintiff also incorrectly states that the Defendant does not offer any tangible evidence to the Court to support this argument. Yet, it is Plaintiff who does not offer any tangible evidence to support his accusations. Instead, Plaintiff points to a lack of any written complaints by

{00579230}                                          3

the employees as his evidence. However, the above-outlined deposition testimony clearly offers tangible evidence of the low morale. Additionally, the deposition testimony of the Police Chief, Mike McElhaney, corroborates the fact that the morale in the fire department, prior to the Plaintiff's termination, was low. Ex. 13, pg. 34, lines 4-12. Finally, Plaintiff himself admits that the morale in the department was low. Ex. 2, pg. 74, lines 9-13, and pg. 127, lines 19-25.

Considering all the evidence as presented, it is clear that the City Manager did not act "arbitrarily or capriciously." To the contrary, the City Manager clearly and deliberately stated her concerns with morale in the department. She also stated a direct order on how to improve morale in the department. Plaintiff failed to obey the order of the City Manager. Plaintiff also failed to improve the morale of the department. Therefore, ample evidence exists in the record to show that Plaintiff was terminated for good and sufficient cause.

## B.      PLAINTIFF WAS PROVIDED DUE PROCESS.

In addressing a claim for violation of due process a Court must determine whether the Plaintiff received the appropriate level of process. *Watson v. University of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996). The Due Process Clause of the United States Constitution entitles each citizen to notice and an opportunity to be heard prior to the deprivation. *Id*. The differences between pre and post termination process are addressed in *Benavidez v. City of Albuquerque,* 101 F.3d 620 (10th Cir. 1996). Essentially, if the pre-termination process "offers little or no opportunity for the employee to present his side of the case, the procedures in the post termination hearing become much more important." *Id.* at 626. That is because, as the Court reasoned, the post termination hearing "represents the only meaningful opportunity the employee has to challenge the employer's action." *Id.* However, the Court further draws a contrast between the pre and post termination process by stating:

[w]hen the employee has had a meaningful opportunity to explain his position and challenge his dismissal in pre-termination proceedings, the importance of the procedures in the post-termination hearing is not as great. In this type of post-termination hearing, simply giving the employee "some opportunity" to present his side of the case "will provide a meaningful hedge against erroneous action." *Id*. (Citing *Loudermill*, 470 U.S. at 543).

Applying the requirements for procedural due process to the facts at issue, it is clear that Plaintiff's procedural due process claim fails. First, Plaintiff was provided with notice and an opportunity to be heard prior to his termination. Plaintiff received his pre-termination notice at the meeting with the City Manager on August 31, 2017. Ex. 1.  The Notice Plaintiff received provided him notice of the charges against him as evidenced in Exhibit 1. It also put Plaintiff on notice that this was his final written warning and he could be terminated for failure to improve his performance. Ex. 1 & Ex. 2, pg.94, lines 21-24. Somehow, Plaintiff tries to argue that he never received any written notice or warning.  However, as is evidenced by the Plaintiff's own deposition testimony, he received the Notice. Plaintiff clearly acknowledges his signature on the Notice. Ex. 2, pg. 44, lines 2-8. Additionally, Plaintiff clearly stated that he was aware that if he received any other disciplinary actions related to this Notice he could be terminated. Ex. 2, pg. 94, lines 21-24. This argument by Plaintiff is disingenuous at best, and wholly contradicted by the evidence in the record.

Second, Plaintiff was provided an opportunity to discuss these charges with the City Manager at that time and over the course of his continued employment. Plaintiff had a face-to-face meeting with the City Manager on August 31, 2017 where she handed him the Notice. Ex. 2, pg. 40-41, lines 18-2, pg. 44, lines 2-25, and Ex. 12, pg. 42, lines 16-22.  At that time Plaintiff had the opportunity to present his side of the story.  Plaintiff admits that he did address at least some, if not all the issues listed in the Notice with the City Manager. For example, Plaintiff acknowledges that he had a few conversations with the City Manager about the items in the written notice. Ex.

2, pg. 95, lines 11-15, Pg. 140, lines 9-22, and pg. 188, lines 14-19.  Likewise, the City Manager states they had several meetings over the time from the date of the Notice to termination. (Ex. 12, pg. 20, lines 11-13, pg. 24, lines 2-3, pgs. 42-43, lines 16-22).  Clearly, Plaintiff was able to address his concerns and his side of the story with the City Manager prior to his termination.

As such, since Plaintiff was provided an extensive pre-termination process, the law only requires that he have one last chance to present his side of the story post-termination. *Benavidez* at 627. Plaintiff was afforded that final chance to respond to his termination. On April 8, 2019 the City Manager once again met with Plaintiff in person and gave him the termination letter. Ex. 2, pg. 143, and pgs. 184-185, lines 16-8. Plaintiff was then allowed to address the issue directly with the City Manager. Ex. 12, pg. 32, lines 2-17. Plaintiff mischaracterizes the City Manager's deposition testimony in an attempt to bolster his argument regarding a lack of post-termination process. Plaintiff incorrectly states that the City Manager admitted there was no post-termination due process. However, no such admission was made by the City Manager. Instead, the City Manager clearly states that Plaintiff was afforded an opportunity to speak after she handed him the termination letter. Ex. 12, pg. 32, lines 9-11.

Plaintiff attempts to create an issue of fact by stating that his termination letter provides proof that he was not afforded a post-termination hearing. The termination letter is just that, a letter terminating the Plaintiff. The fact that it does not address any post-termination process is not proof that the Plaintiff was somehow denied due process. Furthermore, what Plaintiff fails to admit to this Court is that he was never directly denied an opportunity to be heard once he was terminated. This is not the situation where a terminated individual requested a post-termination hearing only to be denied. Instead, in this instance, Plaintiff never requested any sort of post-termination hearing

{00579230}                                6

from the Defendant. In fact, Plaintiff admits in his own deposition that he never sought an appeal. Ex. 2, pgs. 177-178, lines 20-4 and pg. 198, lines16-22.

The evidence provided by Defendant clearly shows that Plaintiff received notice of the reasons why he might be terminated. Plaintiff's wholly unsupported attempt to dispute this fact does not make it a disputed fact for purposes of deciding this motion. The record clearly contradicts any argument otherwise by the Plaintiff. The evidence also shows that Plaintiff was given ample opportunity to be heard and to tell his side of the story before he was terminated. Again, any argument to the contrary is wholly unsupported by the record in this matter. Finally, the Plaintiff was given one last opportunity to address this issue in a face-to-face meeting with the City Manager at the time of his termination. Thus Plaintiff was afforded sufficient due process to protect any alleged property interest in his employment.

### III.    CONCLUSION

The City of Nowata Charter controls in this matter, and Plaintiff's termination was in accordance with the applicable law. Moreover, Defendant did not violate any alleged due process rights. The undisputed evidence provides proof that Plaintiff was fired for "good and sufficient cause." Additionally, the undisputed evidence shows that Plaintiff was afforded notice and an opportunity to be heard prior to his termination.  Finally, the undisputed evidence provides that Plaintiff had an opportunity for a post-termination hearing. For these reasons, Defendant is entitled to summary judgment.

WHEREFORE, based on the pleadings, depositions and evidence on file, there is no genuine issue as to any material fact. As such, Defendant is entitled to judgment as a matter of law.  Defendant respectfully requests this Court grant its motion for summary judgment, dismiss

all the claims against this Defendant, and award any other relief as the Court may deem just and equitable.

Respectfully submitted,

**BEST & SHARP**

s/ Emily K. Wilson
Thomas A. LeBlanc, OBA #14768
tleblanc@bestsharp.com
Emily K. Wilson, OBA #33091
ewilson@bestsharp.com
Williams Center Tower 1
One West Third Street, Suite 900
Tulsa, OK 74103
Telephone: (918) 582-1234
Facsimile: (918) 585-9447
*Attorneys for Defendant,*
*City of Nowata*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>21st</u> day of <u>August</u>, 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

Frank W. Frasier, OBA #17864
frasier@tulsa.com
1700 Southwest Blvd.
Tulsa, OK  74107
Telephone: 918-584-4724
Facsimile: 918-583-5637
*Attorney for Plaintiff*

s/ Emily K. Wilson

YOUR LOGO HERE

**Company Name**

## Employee Warning Notice

| Employee Information | | |
| --- | --- | --- |

| Employee Name: | Steve Parmenter | Date: | |
| --- | --- | --- | --- |
| Employee ID: | | Job Title: | Fire Chief |
| Manager: | Melanie Carrick –Interim City Manager | Department: | Administration |

| Type of Warning | | |
| --- | --- | --- |
| ☐ First Warning | ☐ Second Warning | ☒ Final Warning |

| Type of Offenses |
| --- |
| Details |

**Description of Infraction:** Altering of employee time sheets, falsification of own time sheet, Interfered with the City's relationship with the Harmon Foundation, providing false information to supervisor, hindering the accounting process by holding checks that need to be deposited and not turning them in for deposit in a timely manner, allowing multiple employees to take comp time that they had not accrued,  issuance of comp time not in accordance with City personnel manual, fostering and allowing to continue an environment of low morale in department, creating feelings of fear of retribution or retaliation in employees in the department creating a harassing, hostile and threatening work environment for employees, non-compliance with hiring policy, holding volunteer pay until dues are paid, scheduling part-time workers more than part time hours.


**Actions that have been taken:** This formal reprimand, verbal "talking to" by previous city manager on at least one occasion.  Fire Chief will be required to work at least one regular shift per week as a regular fireman to foster better relationships with employees in the department and boost morale.  He is relieved of all EMS related duties. He will not interfere with donations from outside entities ie. Harmon Foundation


**Steve is directed at this point to:** change the remit address on all Fire or EMS payments to City Hall, 114 S Maple ST, Nowata OK 74048. Copies will be made and given to him for his records.   All checks in the possession of the Fire Dept. or EMS will be delivered to City Hall no later than August 28, 2017.  Time sheets will be turned in on time and complete. Employees must change and initial their own time sheets if corrections are needed and be turned in on time to prevent delaying of payroll. Promote the City of Nowata and its employees in a positive manner. Improve the morale of his Department.  Comp time will not be issued and Steve will address and develop a plan to address the comp time hours owed to the fire department by John Albert.  Steve has been informed and reminded of the hiring policy on more than one occasion and will adhere to it. Volunteers and employees will receive their pay checks on the day the pay is scheduled for regardless of any dues that are owed.


**Consequences of Further Infractions:** This is the only warning that Steve will receive due to the serious and damaging nature of the offenses.  Any further infractions will result in disciplinary action, up to and including termination of employment

| Acknowledgment of Receipt of Warnings |
| --- |

By signing this form, you confirm that you understand the information in this warning. You also confirm that you and your manager have discussed the warning and a plan for improvement. Signing this form does not necessarily indicate that you agree with this warning.

_Steve Parmenter_      _5/31/17_
Employee Signature      Date

_Melanie Carrick_      _8-31-17_
Manager Signature      Date

Witness Signature (if employee understands warning but refuses to sign)      Date

_Chris Emert did witness the transaction But I did not make him sign because Steve did_

**EXHIBIT 1**

Page 40

1  read it to me and had me sign it and I went out -- went

2  back out of city hall.

3      Q.   Do you know when that happened?  What day?  I

4  know you said 30 days after she took over, but what day

5  did that happen?

6      A.   I believe it was the 29th of August, 28th or

7  29th of August of '17.

8      Q.   So I'm going to hand you response to request

9  for admissions.  If you will read Request For Admission

10 No. 2 for me out loud, please.

11     A.   Says -- you talking about this one here?

12     Q.   It says request and then response.

13     A.   "Request For Admission No. 2:  Admit that you

14 were reprimanded by the City of Nowata as early as

15 2017."

16     Q.   And what's your response, Mr. Parmenter?

17     A.   Denied.

18     Q.   And that's -- that's incorrect, right?

19 Because you just told me in August of 2017, Ms. Carrick

20 discussed 12 things with you, correct?

21         MR. FRASIER:  Tell her why.

22     A.   Because my lawyer told me to put denied.

23     Q.   (By Ms. Foutch)  Your employer told you to

24 put --

25     A.   No, my lawyer.

**EXHIBIT 2**

Page 41

1      Q.   You can't tell me, Mr. Parmenter, about

2   discussions that you've had with Frank?

3      A.   Oh, I don't know.  I mean, I'm not sure what

4   you're asking me to say then.

5      Q.   Well, so you were reprimanded in 2017, to be

6   fair, correct?

7      A.   Correct.

8      Q.   Okay.  And now from your August 2017 meeting

9   with Ms. Carrick, you did not, I believe you told me,

10  keep any record of that personally, correct?

11     A.   I've got a copy of the write-up.

12     Q.   Did you make any notes yourself related to

13  that meeting?

14     A.   I have things that I wrote down to each

15  allegation --

16     Q.   Okay.

17     A.   -- but...

18     Q.   Where did you write those things down?

19     A.   Just on a pad at my house.

20     Q.   Okay.  And do you have that?

21     A.   No.

22     Q.   Where did that go?

23     A.   I probably -- I threw it away because I didn't

24  go through the whole thing and do it.

25     Q.   So you threw away notes that you knew were

Page 42

1    relevant to your lawsuit?

2         A.   No.

3              MR. FRASIER:   Objection to form.

4         Q.   (By Ms. Foutch)  So where -- so what happened

5    to these notes you were keeping you said

6    contemporaneously at this time?  Was it contemporaneous

7    or was it after?

8         A.   What is contemporaneous?

9         Q.   Sorry.  The notes that you were keeping, were

10   you taking those at the same time this was happening in

11   2017 or did you do that after?

12        A.   You mean at the time I got the write-up?

13        Q.   Yes.

14        A.   Oh, no, I didn't.  She just read the write-up

15   to me, I signed it, and I went out the door.

16        Q.   Okay.

17        A.   So there's no notes.

18        Q.   She -- so she just read from a piece of paper?

19        A.   She read the whole write-up to me.

20        Q.   Did it -- well, let me just give this to you

21   then.  Let me see if you have ever seen this.  We'll

22   mark this as Exhibit 1.

23             MR. FRASIER:   Wait.  Is that 1?

24             MS. FOUTCH:   I didn't attached those.  I mean,

25   we can if you want.

Page 44

1    that.

2              If you'll look down at the bottom,

3    Mr. Parmenter, there's a signature on the employee line.

4    Is that your signature?

5         A.   That's my signature.

6         Q.   And it looks like it's dated 8-31-2017,

7    correct?

8         A.   Correct.

9         Q.   And you have no reason to dispute the date; is

10   that fair?

11        A.   No.  There's no witness signature on here that

12   was on here.

13        Q.   Do you know if anybody was present?

14        A.   Yes.

15        Q.   Who?

16        A.   I don't recall what his name is.  He was

17   the -- I believe the -- I don't know if he was the dog

18   catcher at that time or animal control at that time

19   or -- but she called him in specifically into the office

20   to be a witness and I know he -- he had signed it.  I

21   believe it's on my copy or she had him --

22        Q.   And it looks here at the top in the second

23   bolded paragraph, it says, "Type of Warning," what --

24   what is checked there, Mr. Parmenter?

25        A.   It's checked final warning.

Page 74

1   that's how I was told to do it, so it wasn't -- it

2   wasn't something I made up.

3       Q.   Okay.   The next one here says, "Fostering and

4   allowing to continue an environment of low morale in the

5   department."   Do you dispute that the department had low

6   morale at the time you were terminated?

7       A.   Yes.   I mean, yes, it had a low morale or no,

8   it didn't?   I don't understand.

9       Q.   Well, you tell me.   Did it have a low morale?

10      A.   At the time when I was terminated?

11      Q.   Yes.

12      A.   It was probably not as good as it could have

13  been.

14      Q.   Why not?

15      A.   Because a lot of -- there was a lot of turmoil

16  in who was in charge on what.   There was a lot of stuff

17  going behind my back and so I had no respect there on

18  authority as far as --

19      Q.   So tell me about that.   You're talking vague

20  to me.   Tell me about it.   Who went behind your back?

21      A.   People would go -- people would go to city

22  hall and talk to Melanie about things and complain about

23  things and not talk to me about it.

24      Q.   Okay.   Who did that?

25      A.   I can't specifically say who, because I wasn't

Page 87

1          A.    I don't dispute that it happened, yeah.

2          Q.    If we keep reading, it says, "This formal

3     reprimand, verbal 'talking to' by previous city manager

4     on at least one occasion."  So to me, that looks like

5     Melanie Carrick is saying that the previous city manager

6     also spoke with you about these issues, correct?

7          A.    No.

8          Q.    Charlie Spencer never spoke with you about any

9     of these issues?

10         A.    Not these issues.

11         Q.    Did he talk to you about other issues?

12         A.    Yes.

13         Q.    What other issues did he talk to you about?

14         A.    The ordering payment for Watch Distributing

15    which is they get the paper towels, toilet paper, soap,

16    all that stuff.

17         Q.    Okay.  Anything else?

18         A.    The three hours vacation time that we had

19    talked about.

20         Q.    The next sentence says, "Fire chief will be

21    required to work at least one regular shift per week as

22    a regular fireman to foster better relationships with

23    employees in the department and boost morale."  Did you

24    ever work a shift, one regular shift per week as a

25    regular fireman as you were advised to do on 8-31-2017?

485bc887-db03-4a2e-b4fa-56a2aebf678d

PR#143930                     PARMENTER, STEPHEN                     1/29/2020

Page 88

1     A.    No.

2     Q.    Why not?

3     A.    I talked to Melanie, explained to her why, and

4  never heard anything more about it after that.

5     Q.    Tell me about why you didn't work a full-time

6  shift.

7     A.    Because that wouldn't -- if I worked a full-

8  time shift, regular fireman's shift, that would give me

9  less time at the fire department with each one of the

10  firemen than if I worked my regular shift Monday through

11  Friday.  Plus, I had to -- I had to take care of the EMS

12  stuff Monday through Friday and I explained to her all

13  the reason -- the reasons why and I was never wrote up

14  for it, it was never brought up again after that.

15     Q.    So this -- it's your testimony this was the

16  only time on 8-31-2017 that was ever discussed with you

17  that you were supposed to be working a fire shift?

18     A.    I am not saying -- no.

19     Q.    So it was discussed again after 8-31-2017?

20     A.    Yes.

21     Q.    How many times?

22     A.    One that I can remember.

23     Q.    When?

24     A.    I don't remember the date.

25     Q.    Tell me about who spoke with you about it on

485bc887-db03-4a2e-b4fa-56a2aebf678d

Page 94

1      A.    I brought them from city hall and gave them to

2    the treasurer at the fire department.

3      Q.    Who was the treasurer of the fire department?

4      A.    I -- Shawnda Anderson -- as far as I know,

5    Shawnda Anderson is the treasurer right now, as far as I

6    know.

7      Q.    Okay.

8      A.    And I know -- I can't think of who the other

9    one was before her.  I mean, they vote people in and out

10   every year as treasurer/secretary all that, and I don't

11   remember who was the one -- who was the treasurer before

12   her.

13     Q.    And then the last little paragraph here in

14   that main box, "Consequences of further infractions:

15   This is the only warning that Steve will receive due to

16   the serious and damaging nature of the offenses.  Any

17   further infractions will result in disciplinary action

18   up to and including termination of employment."

19           Do you see that?

20     A.    Yes.

21     Q.    So you were aware as of August 31, 2017, that

22   if there were any other disciplinary actions related to

23   this, you could have been terminated; is that fair?

24     A.    Yes.

25     Q.    After this 8-31-2017 meeting with Melanie

Page 95

1   Carrick, and I believe you had told me there was one

2   other person present?

3        A.   Yes.

4        Q.   Okay.  Between this date and your termination,

5   did you ever have any other meetings with Melanie or

6   city manager or anyone about concerns with your job?

7             MR. FRASIER:  Their concerns or his concerns?

8        Q.   (By Ms. Foutch)  Their concerns about your

9   employment.

10       A.   No.

11       Q.   Did you ever have any conversations with

12  Melanie about any of these issues that we just went over

13  in detail?

14       A.   I had conversations with her about a few of

15  them.

16       Q.   Okay.  Which ones?

17       A.   Well, like I told you, about the 24-hour shift

18  thing.  I talked to her about that.  Never heard

19  anything more about that.  I told her what was -- what

20  happened with the three hours on my time sheet,

21  falsifying my time sheet.  I told her about being told

22  to do the comp time the way -- the way it was done.

23       Q.   Well, I'm asking after this meeting that you

24  had with Ms. Carrick on 8-31-2017, did you ever talk to

25  her again about these issues that are listed?

Page 127

1    it after that.  I don't remember saying anything.

2         Q.   I mean, if Don Belden was taking over your

3    job, you didn't feel necessary to go to the city

4    manager?

5         A.   That was just before -- that was just before I

6    found out that we had the thing on Friday and Saturday,

7    and then Monday, I was terminated.

8         Q.   Well, I thought we were talking -- this was

9    back in 2018 when Don Belden was taking over these

10   items, I thought?

11        A.   No, we worked fine after that meeting.  After

12   that meeting, we left with the same understanding as we

13   came in with and everything was fine up until the last

14   month or so before I was terminated.  Then it seemed

15   like things were getting totally out of whack, you know,

16   and he was getting upset about stuff.  I mean, if there

17   was more going on, I didn't know about it.  Nobody said

18   anything to me about it.

19        Q.   How was the morale in the fire department and

20   EMS at the time of your termination?

21        A.   It was fine before Melanie came.

22        Q.   That wasn't my question.  At the time of your

23   termination, how was the morale in the fire department?

24        A.   I believe I said before it wasn't as good as

25   it should have been.

485bc887-db03-4a2e-b4fa-56a2aebf678d

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 140

1    same time that I was juggling around.

2         Q.   So you said something, it just wasn't it

3    wasn't your fault she was going back to school?

4         A.   No, I didn't -- if it was that -- if that's

5    what they took it as, it wasn't meant that way.  I had

6    no control over her going back to school.  She used to

7    work Sundays at another EMS position, but I wasn't aware

8    at that time that she had quit that job.

9         Q.   Okay.  And back to Exhibit 3, all those items

10   we had talked about, the, quote, description of

11   infraction, I think there were 12 or so that we had went

12   through.  You said, I just want to be clear, most of

13   these items on these infractions were things that not

14   only were they brought up here at this first meeting,

15   8-31-2017, with Melanie Carrick, but some of these items

16   you had discussed with her throughout the pendency of

17   your employment.

18             Specifically, I think you had said the time

19   sheet issues, the employee time sheet issues, all those

20   were discussed kind of throughout your employment after

21   this and remedied, right?

22        A.   Yeah.

23        Q.   Okay.

24        A.   The time sheet things were remedied, yes.

25        Q.   Okay.  And so then these other things, I know

485bc887-db03-4a2e-b4fa-56a2aebf678d

Page 143

1      A.    When I brought the time sheets up, I gave them

2   to -- gave her the time sheets and stuff and she handed

3   them to whoever takes care of it.  Gave her all the time

4   sheets.  I was getting ready to turn around and leave

5   and she said -- she says, No, I need -- I need to see

6   you in my office for a minute.  I thought she had

7   something she needed to go over.

8      Q.    Okay.

9      A.    So she went in her office and she called Brad

10  Perkins in there with them and he's one of the city

11  council and when I walked in, he had already sat down on

12  the corner and she was standing there by her desk.  I

13  walked in and she said, Here you go.  I read it, I said,

14  Really?

15     Q.    Did you ask why?

16     A.    Yeah, I said, Why?  She said, It's on the

17  sheet.

18     Q.    She said, It's on the sheet?

19     A.    Yeah, for the good of the city.

20     Q.    And did you say what does that mean?  Did you

21  ask her?

22     A.    No, I just turned around and left, went back

23  to the fire department and got my stuff.

24     Q.    What else did Ms. Carrick say?

25     A.    Nothing.

Page 177

1    I can't go take a dishwasher job.  I'm embarrassed for

2    my sons, what they think.  If you want to talk to

3    anybody --

4           MR. FRASIER:  She's not asked you a question

5    yet.

6           THE WITNESS:  Okay.

7       Q.   (By Ms. Foutch)  Have you sought any medical

8    treatment or counseling for your emotional distress?

9       A.   No because I can't afford it.  I'm -- no.

10      Q.   Do you currently have health insurance?

11      A.   I have health insurance through my wife's

12   work.

13      Q.   And prior to being terminated, did you have

14   health insurance through the city or was that through

15   your wife's?

16      A.   It was cheaper through my wife's work.

17      Q.   So you're not making any claim for medical

18   treatment or medical bills; is that correct?

19      A.   I don't have any.

20      Q.   Did you ever request any kind of meeting or

21   hearing with the city, maybe not even specifically

22   Melanie Carrick or John Heskett, but generally after you

23   were terminated?

24      A.   No, I haven't talked to anybody there.

25      Q.   Did you file any grievance with the

485bc887-db03-4a2e-b4fa-56a2aebf678d

Page 178

1    firefighter pension?

2         A.   I didn't know that there was a grievance thing

3    with the firefighter pension, but to answer your

4    question, no.

5         Q.   Are you claiming any other damages beyond the

6    annual salary that we had discussed, the 48,800 and I

7    know it says times 4.7 years, and then loss to pension

8    and humiliation and emotional distress, are you making

9    any other claims in this lawsuit?

10        A.   Not that I'm aware of.  I mean, I lost my life

11   insurance policy I had there and I lost my Aflac that I

12   had I had two different policies after that because I

13   couldn't afford to pay them after I got terminated.

14        Q.   What Aflac policies did you have?

15        A.   I had a disability policy and an accident

16   policy and then --

17        Q.   How much were those a month?

18        A.   I'd have to go back and look at my pay stubs.

19   They were automatically -- I think one was 17 something

20   or 20 something.  I have to look at my pay stubs.

21        Q.   And then you lost your life insurance?

22        A.   There was a life insurance policy I had that

23   came out of my paychecks too.  I believe it was 60

24   something a month, 60 something a paycheck.  I'd have to

25   look to be exact on that too.

485bc887-db03-4a2e-b4fa-56a2aebf678d

Page 184

1    say that, but I know that's why I haven't gotten a lot

2    of jobs.

3          Q.    You think it's because your age?

4          A.    I know it is, but I can't -- I can't testify

5    to it.

6          Q.    Okay.  Well, you are testifying to it.

7                MR. FRASIER:  You are testifying to it.

8                MS. FOUTCH:  That is precisely what we're

9    doing.

10               MR. FRASIER:  You have -- you may have no

11   other evidence it.

12         A.    I was thinking in a courtroom.

13         Q.    (By Ms. Foutch)  I know.  I know.  I know.  I

14   do the same thing.

15               MR. FRASIER:  It's all right.

16         Q.    (By Ms. Foutch)  During your meeting with

17   Ms. Carrick on April 8th, the day you were terminated, I

18   believe you told me Ms. -- Brad Perkins was there,

19   correct?

20         A.    Yeah.

21         Q.    Did Mr. Perkins say anything at that meeting?

22         A.    Not a thing.

23         Q.    Did he say anything to you after the meeting?

24         A.    No, he was still in Melanie's office when I

25   left.  I left her office and went to the fire

Page 185

1    department.

2        Q.   Now, did you get upset when she gave you your

3    termination notice?

4        A.   I was upset, but I didn't yell at her or do

5    nothing.  I just asked her what -- you know, what I told

6    you I asked her, that -- she said that and it was what

7    her opinion was and so I said okay and I walked out of

8    her office.

9        Q.   So you didn't say anything else to her?

10       A.   No.

11       Q.   You never raised your voice?

12       A.   No.

13       Q.   Or got aggressive?

14       A.   No.

15       Q.   Never got angry audibly with --

16       A.   No.

17       Q.   -- Melanie Carrick?

18       A.   No.  Went down to the fire station, packed my

19   stuff up and the police chief was down there when I

20   packed my stuff up.  Matter of fact, he even helped me

21   carry one of my boxes out and put it in the truck and

22   then they gave me a ride home.

23       Q.   Okay.  Who took you home?

24       A.   I don't even remember.  One of the city guys.

25   One of the city workers.

116

Page 188

1  have to look at my list.  I think that was just some

2  small stuff that they had, but she told me I would have

3  to -- that she wasn't doing anything like that.  I would

4  have to talk to my attorney or whatever about it.

5      Q.   Okay.  Do you know the value of those items?

6      A.   Well, I think the two things -- U.S. Cellular,

7  I think that's -- those were over 50 bucks.  I mean,

8  both of them together I think and the jumper cables, I

9  believe they're 60 to 80 bucks now for a set like that.

10  I mean, I think it's under 200 bucks, I mean, total.

11      Q.   Is there a reason why you never worked a full

12  firefighter shift?

13      A.   I did for --

14      Q.   After you were the fire chief.  Is there a

15  reason why you didn't perform any full-time firefighter

16  shift?

17      A.   There wasn't a need for me to do that.  Like I

18  said, I talked to Melanie about it and told her my

19  reasonings why and she never brought it up again, so...

20          MS. FOUTCH:  I don't have any further

21  questions.

22                  CROSS EXAMINATION

23  BY MR. FRASIER:

24      Q.   Mr. Parmenter, so I want to be clear.  A

25  couple minutes ago, you talked about your selling real

PR#143930                    PARMENTER, STEPHEN                    1/29/2020

Page 198

1        A.    Yes, 24 hours a day, we run two-man crew or

2    two-person crew on the ambulance and one fireman.

3        Q.    Did that create -- did -- did these people --

4    without -- not condoning knocking people going to

5    school, but did that create some challenges for

6    scheduling people and their shifts?

7        A.    It created a lot of challenges, but I

8    encouraged people to go to school.

9        Q.    Okay.  Were you offered any type of appellate

10   opportunity, appeal opportunity once you received the

11   termination?

12       A.    No.

13             MR. FRASIER:  I'll pass the witness.

14                   REDIRECT EXAMINATION

15   BY MS. FOUTCH:

16       Q.    So just a couple of follow-up questions.  Did

17   you seek an appeal after your termination?

18       A.    I seeked (sic) a lawyer.

19       Q.    So the answer to that question is no, correct?

20       A.    I didn't know.

21       Q.    Did you seek an appeal?

22       A.    No.

23       Q.    You discussed running the scene -- I believe

24   Frank asked you about the importance of the chain of

25   command and running a scene.  Mr. Parmenter, how many

485bc887-db03-4a2e-b4fa-56a2aebf678d

Page 20

1   A.   I don't know.

2   Q.   Okay.  Paragraph number 5, would you read that for

3        us, please.

4   A.   "On April 8, 2019, Plaintiff was terminated without

5        cause and with neither pre-termination nor

6        post-termination procedures."

7   Q.   All right.  Do you know or agree with any of the

8        assertions made in paragraph number 5?

9   A.   I do not agree with that.

10  Q.   And what is it that you disagree with?

11  A.   Mr. Parmenter was terminated with cause and he had

12       multiple pre-termination hearings and he received

13       his termination process.  I don't agree with that at

14       all.

15  Q.   Okay.  So tell me then what the cause was of his

16       termination.

17  A.   There were a lot of reasons.

18  Q.   Please provide them.

19  A.   Do you have a copy of his first reprimand, please?

20  Q.   I do --

21  A.   Can I ask for that?

22  Q.   -- someplace in this mess.  Do you not recall off

23       the top of your head?

24  A.   I cannot recall all of them off the top of my head.

25  Q.   Okay.

**EXHIBIT 12**

16a95b2a-1ba2-4c84-a4fe-864430408f4f

Page 21

1  A.  Some of them were morale, time sheets.  But without

2     looking at that, right off the top of my head, those

3     are the two that -- but the morale was the biggest.

4  Q.  Okay.  And what is it with the morale?  That he

5     inspired morale?  He was a --

6  A.  No.

7  Q.  Okay.

8  A.  No.

9  Q.  Tell me about it then.

10 A.  The morale was horrible in the department.  It

11    ended up affecting two departments.  It never got

12    better.

13 Q.  All right.

14 A.  It was destroying those two services.

15 Q.  All right.  So you believe that he was having a

16    negative impact on morale?

17 A.  Yes.

18 Q.  All right.  What was he doing that was having a

19    negative impact on morale?

20        I should say it this way:  What was he doing

21    or not doing that was having a negative impact on

22    the morale?

23 A.  He was not listening to his employees.  It was the

24    my-way-or-the-highway attitude that he had.  And it

25    was just ongoing.  There was fear of retribution and

Page 22

1      retaliation.  I heard over and over and over -- the

2      employees kept coming to me over and over.  It never

3      got any better.

4   Q.  Okay.  Your testimony was that the police just kept

5      coming to you.

6   A.  No, the employees.

7   Q.  Employees.  I'm sorry.  I did not hear that.

8   A.  I'm sorry.  I talk soft sometimes.  I'm sorry.

9   Q.  No, thank you.  We're communicating.

10  A.  Okay.

11  Q.  That's what we need to do.

12  A.  Yes.

13  Q.  So the employees came to you several times.

14  A.  Yes.

15  Q.  Which employees?

16  A.  Fire employees.  Mainly EMS employees.

17  Q.  Okay.

18  A.  Nancy, Shaunda, B.J.  Those three are the ones that

19     come to the top of my head.

20  Q.  All right.  Your testimony a few minutes ago was

21     that there were two departments, it was impacting

22     two departments.

23  A.  Yes, the fire department.

24  Q.  And?

25  A.  The morale there was horrible.

16a95b2a-1ba2-4c84-a4fe-864430408f4f

Page 23

1    Q.  All right.  And what other department?

2    A.  EMS.

3    Q.  Okay.  Your testimony also has been that there

4        was -- you said time sheets.

5    A.  Uh-huh.

6    Q.  Tell me what was good or bad or wrong about the

7        time sheets.

8    A.  He changed the employees' hours.

9    Q.  All right.  And --

10   A.  It was -- is it okay if I tell you something when I

11       remember it?

12   Q.  Sure.

13   A.  The --

14   Q.  Unless Thomas stops you.

15   A.  Okay.  Overtime issues; comp time issues.  Those

16       are other things that I remember were reasons why he

17       was in trouble or why he got his reprimands.

18   Q.  All right.  And overtime and comp time issues on

19       the time sheets of the fire department employees or

20       the EMS employees?

21   A.  EMS.

22   Q.  All right.  Anything with the fire department?

23   A.  Yes, but not time sheet issues.

24   Q.  Okay.

25   A.  There was a meeting that was held, and

Page 24

1      Mr. Parmenter and myself and Don Belden were all

2      present.  This was one of many meetings -- or

3      multiple meetings - I'm sorry - and it was decided

4      that Mr. Parmenter would be basically the fire chief

5      on paper.  He would sign, as chief, the things that

6      the law required him to sign.  Don Belden was to be

7      the acting chief and everything was supposed to go

8      through him, and Mr. Parmenter did not relinquish

9      certain duties over to Don and that created more and

10     more tension.

11  Q. Okay.

12  A. And made the morale, even with the volunteers,

13     worse and worse and worse because they didn't -- it

14     was a struggle for them.

15  Q. All right.  So when did this change occur or when

16     was this meeting?

17  A. I would have to look at the documentation.  I

18     believe that's it right there.

19     (Exhibit No. 4 marked for identification.)

20  Q. I'm going to hand you what we'll mark as Exhibit 4

21     to your deposition.

22     MR. FRASIER:  Counsel, I'll tell you it's --

23     this is Nowata's production beginning on page 030.

24     Do you want a copy?  I've got them.

25     MR. LeBLANC:  If you've got extras.

Page 32

1    Q.   Right.

2    A.   How do you define post-termination?

3    Q.   Well, post would mean after he was terminated from

4         his employment.

5    A.   Yes, he did.

6    Q.   He did?

7    A.   Yes.

8    Q.   Explain that to us.

9    A.   He came -- I had him come into my office.  He was

10        terminated.  He had an opportunity to speak.  That

11        is post, after the termination.  Yes, he had his --

12   Q.   Okay.  But he didn't have an opportunity to talk to

13        the city council or anybody else in Nowata

14        government other than --

15   A.   I don't make those determinations.

16   Q.   -- other than you?

17   A.   Right.  Yes.

18            MR. LeBLANC:  Occasionally you've started your

19        answer while Mr. Frasier is still asking his

20        question.  Just be a little bit patient and let him

21        get the question all the way out, then give him his

22        answer.  And he will do the same for you, you know,

23        let you finish your answer completely before he

24        starts the next question.  It makes Ashley's life so

25        much easier.

Page 42

1   A.  Yes, they look the same.

2   Q.  (By Mr. Frasier)  Okay.  That's what I believe too,

3       but I wanted to make sure, because we kind of joked

4       earlier that there are a lot of documents flying

5       around in this case; right?

6   A.  Yes.

7   Q.  So that was really -- that was the point of my

8       question, just for your information.

9           Now, my understanding is that that's the final

10      warning he got, Mr. Parmenter got.

11          MR. LeBLANC:  Object to the form.

12  Q.  (By Mr. Frasier)  If I've mischaracterized that --

13      if I'm wrong, tell me.

14          MR. LeBLANC:  Object to the form.

15          You can answer it as best you can.

16  A.  This was the only or final written.  Mr. Parmenter

17      and I had several discussions over this two-year

18      period after this in meetings.

19  Q.  (By Mr. Frasier)  Okay.  So after that meeting in

20      August of -- approximately August of 2017, there

21      were other meetings; is that right?

22  A.  Yes.

23  Q.  All right.  But no written warnings after that?

24  A.  No.

25  Q.  And was Mr. Parmenter terminated for the things

Page 43

1    written in that written warning?

2    A.   Yes.

3    Q.   All right.   Why wasn't it expunged or removed from

4         his file?

5    A.   I don't know.

6    Q.   All right.   When was he fired?

7    A.   2019.

8    Q.   All right.   And you would agree with me that he was

9         fired 18 months after this document, Exhibit 5;

10        correct?

11   A.   Yes.

12   Q.   Okay.   And we look at page 040 of Exhibit No. 2 --

13        and I guess that's a document you're familiar with;

14        right?

15   A.   Yes.

16   Q.   And why are you familiar with it?

17   A.   It is the City's personnel manual.

18   Q.   And is it something that applies to you in your

19        work?

20   A.   Yes, I use it for reference.

21   Q.   Okay.   Well, it governs your work, the work that

22        you do; correct?

23   A.   Yes.

24   Q.   And is it something that you helped create?

25   A.   No, I did not help create it.

16a95b2a-1ba2-4c84-a4fe-864430408f4f

Page 85

1    A.  No.

2    Q.  All right.  So it could have happened in 2016; it

3        could have happened in 2015.

4            MR. LeBLANC:  Object to the form.

5    Q.  (By Mr. Frasier)  You would agree with that?

6    A.  No, I know when it happened.

7    Q.  Okay.

8    A.  I heard it.

9    Q.  All right.  But you overheard a conversation; you

10       eavesdropped on a conversation.  It's not one you

11       were a party to; isn't that correct?

12   A.  Yes.

13           MR. LeBLANC:  Object to the form.

14   Q.  (By Mr. Frasier)  Now, the next sentence is:  "The

15       fire chief will be required to work at least one

16       regular shift per week as a regular fireman to

17       foster a better relationship with employees in the

18       department and boost morale."

19   A.  Yes.

20   Q.  And did that happen?

21   A.  No.

22   Q.  Do you know why not?

23   A.  He said he could and then he said he couldn't and

24       then he said he could; so I don't know.

25   Q.  All right.  "He is relieved of all EMS duties."

16a95b2a-1ba2-4c84-a4fe-86443040084f4

Page 106

1      mention those words in your -- what I think is

2      Exhibit 4, your memo of August 1.

3          You know, the questionnaire that went around

4      to the different employees, did it go to the police

5      department?

6   A.  It went to all of the employees, yes.

7   Q.  Okay.  Was that outside of the chain of command?

8      Did that follow the chain of command by giving it to

9      all the employees?

10  A.  Whenever I took them down to the fire station,

11     Steve wasn't there for me to give it to the

12     supervisor.  The other ones were given to the

13     supervisors and the supervisors brought them back to

14     me if the individual did not, but the majority of

15     them were brought back by the supervisors because

16     they were turned into them.

17  Q.  Did you get a greater number of responses from one

18     department versus another?

19  A.  Every single employee filled it out.

20  Q.  Including Mr. Parmenter?

21  A.  No, Mr. Parmenter did not.  I'm sorry.

22  Q.  That's okay.  No, no.

23          Was he given one to fill out?  Was he expected

24     for one to be filled out?

25  A.  None of the department heads were given one to fill

Page 107

1         out.  He wasn't expected to.

2    Q.  Okay.  As was the police chief or --

3    A.  Right.  Because I wanted the employees' opinions on

4         how their departments were functioning.

5    Q.  Your idea was it was a bottom-up review.

6    A.  Yes.

7    Q.  Okay.

8    A.  A tool; that way, I could discuss it with the

9         department heads.

10   Q.  Quick break.

11   A.  Okay.

12            (Whereupon, a break was taken.)

13   Q.  When the schedules were changed - and in reference

14        to the e-mail in all caps there that is Exhibit 17 -

15        did Mr. Parmenter tell you anything about what would

16        happen if that changed?

17   A.  I don't remember him saying anything.

18   Q.  Did that mean that some of the EMS employees would

19        lose some overtime?

20   A.  I don't know.  I don't remember.

21   Q.  As somebody mindful of the budgets for the

22        departments, were you conscious about or -- that's

23        not really the right word.

24            Given your role over the departments, did you

25        have to keep an eye on the budgets of the

Page 110

1      questionnaires?

2   A.  Yes.

3   Q.  And it says interview questions, position,

4       department.  And I think you said that every

5       employee for the City of Nowata got one of these and

6       was asked to fill it out and return it; is that

7       right?

8   A.  Yes.

9   Q.  And I think you told Mr. Frasier that every

10      employee did do that except for the department

11      heads.

12  A.  Yes.

13  Q.  Okay.  Now, I just want to be clear.  If we look

14      just collectively at this group starting on page

15      038, Nowata 038 through Nowata 058, just kind of

16      glance over those and I'm going to ask you a

17      question about it.

18  A.  Okay.

19  Q.  And so are all of these questionnaires reflecting

20      the information provided by and the feelings and

21      observations of employees of the fire department and

22      EMS?

23  A.  Yes.

24  Q.  And I think you told us earlier that they initially

25      did not want to write them in their own hand or sign

Page 111

1          them for fear of retaliation and retribution; is

2          that correct?

3     A.   Yes.

4     Q.   Did you have that same problem with any other

5          department in the City?

6     A.   No.

7     Q.   Were other employees other than the fire department

8          and EMS willing to fill out their own documentation

9          and return it to you?

10    A.   Every other employee filled out their own.

11    Q.   And did you have any other department within the

12         City of Nowata where every review that came back

13         from the employee of that department was negative

14         and expressed low morale and concern about the

15         functioning of the department as is reflected in

16         these at Nowata 038 through 058?

17    A.   No.

18    Q.   And you had these when you made the decision to

19         terminate Mr. Parmenter's employment; is that true?

20    A.   Yes.

21    Q.   And you also had the e-mail from Mr. Parmenter that

22         you looked at earlier, Exhibit 17; right?

23    A.   Yes.

24    Q.   And you also had these other e-mails and these

25         other write-ups, you had all that information?

Page 112

1   A.  I did.

2   Q.  Okay.  Now, if you would, look at Plaintiff's

3       Exhibits 12 and 13.  These are the Nowata Fire & EMS

4       Building Policy and Procedures; is that correct?

5   A.  Yes.

6   Q.  What are the years on the two exhibits?

7   A.  February 3, 2016 and December 13, 2018.

8   Q.  Okay.

9           MR. LeBLANC:  Can I have another exhibit

10      sticker, somebody?

11          MR. FRASIER:  Plaintiff?

12          MR. LeBLANC:  It doesn't matter.  I just need

13      the sticker.

14          What's the next exhibit number?  18?

15          THE REPORTER:  18.

16        (Exhibit No. 18 marked for identification.)

17  Q.  I'm going to hand you what's been marked -- it's

18      been marked Plaintiff's Exhibit 18, but I'm marking

19      it.  Not that it matters.

20          MR. FRASIER:  It doesn't.

21  Q.  (By Mr. LeBlanc)  So can you just tell us what is

22      Exhibit 18?

23  A.  Nowata Fire & EMS Building Policy and Procedures

24      from August 28th of 2012.

25  Q.  Okay.  And it's double-sided.  It's not two pages

16a95b2a-1ba2-4c84-a4fe-864430408f4f

Page 34

1    A.   Not the last couple of years because of the fact

2         that, like I said, I quit seeing him responding to

3         calls.

4    Q.   By March of 2019 and in the months leading up to

5         March of 2019, when you went out to the fire

6         department and were visiting with these

7         firefighters, did you observe what the mood was,

8         what the morale was, what the attitude was of the

9         firefighters?

10   A.   Low.

11   Q.   Low.   Low morale?

12   A.   Yes.

13   Q.   Did you ever hear Chief Parmenter -- when he was

14        still employed, did you ever hear him threaten to

15        sue the City?

16   A.   I did not personally, no.

17   Q.   Are you aware that other people claimed --

18   A.   I had been told that he had made that comment.

19             MR. FRASIER:   Objection.

20   Q.   (By Mr. LeBlanc)   Chief, how many shifts do you

21        work?   Is it by week or by month?   How does that --

22   A.   I work four shifts a week, sir.

23   Q.   And how many shifts do your other officers work per

24        week?

25   A.   Every officer is on the same schedule.   They work

**EXHIBIT 13**

3afdce2e-835d-4268-825f-adf88ca2dc95

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| STEPHEN PARMENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF NOWATA, OKLAHOMA, | ) | Case No. 19-CV-431-TCK-JFJ |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the Court is the Motion for Summary Judgment filed by the defendant City of Nowata, Oklahoma ("City"). Doc. 23. Plaintiff Stephen Parmenter opposes the motion. Doc. 32.

### I. Introduction

This lawsuit arises from the City's April 8, 2019 termination of Parmenter as the Nowata Fire Chief. Parmenter filed suit against the City on August 5, 2019, alleging violation of his rights under 42 U.S.C. 1983 and 11 O.S. §29-104 and seeking, *inter alia*, damages of $500,000 and reinstatement to his job position. Doc. 2

Parmenter contends that pursuant to 11 O.S. §29-104, he was entitled to due process. In its summary judgment motion, the City asserts that (1) Parmenter did not have a protected property interest in his position as Fire Chief, and therefore was not entitled to due process and that (2) even though he was not entitled to due process, he in fact received adequate due process.

### II.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant bears the burden of showing that no genuine issue of material fact

exists.  *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006).  The Court

resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party.

*Id.*  However, the party opposing a motion for summary judgment may not "rest on mere

allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue

for trial."  Fed. R. Civ. P. 56(e).  The party opposing a motion for summary judgment must also

make a showing sufficient to establish the existence of those elements essential to that party's case.

*See Celotex Corp. v.  Catrett*, 477 U.S. 317, 323-33 (1986).

A movant that "will not bear the burden of persuasion at trial need not negate the

nonmovant's claim, "but may "simply . . . point[] out to the court a lack of evidence for the

nonmovant on an essential element of the nonmovant's claim."  *Adler v. Wal-Mart Stores, Inc.*,

144 F.3d 664, 671 (10th Cir. 1998) (internal citations omitted).  If the movant makes this prima

facie showing, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth

specific facts' that would be admissible in evidence in the event of trial from which a rational trier

of fact could find for the nonmovant."  *Id.* (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968

F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).  "In a response to a motion for

summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and

may not escape summary judgment in the mere hope that something will turn up at trial.  The mere

possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing

presentation by the moving party."  *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (internal

citations omitted).

### III.  Material Facts

Plaintiff is the former Fire Chief for the City of Nowata. Doc. 2, ¶4.  Melanie Carrick

("Carrick") is the City Manager of Nowata.  Ex. 1.  The City of Nowata's City Charter provides

that the City Manager has the power and duty "to appoint and remove all Heads of Departments,

and all subordinate officers and employees of the City."  Doc. 23, Ex. 9, City Charter Section

Twenty-Six; Ex. 10, City Code Section 2-302.

The City of Nowata's Personnel Manual states that all City employees are "at will," and

can be fired with or without notice.  *Id.*, Ex. 11, Personnel Manual, §§1-1, 1-3, 2-5, 9-1, 9-2).

On August 31, 2017, Carrick gave Plaintiff an Employee Warning Notice for:

> Altering of employee time sheets, falsification of [his]own time sheet, Interfered
> with the   City's relationship with the Harmon Foundation, providing false
> information to supervisor, hindering the accounting process by holding checks that
> need to be deposited and not turning them in for deposit in a timely manner,
> allowing multiple employees to take comp time that they had not accrued, issuance
> of comp time not in accordance with City personnel manual, fostering and allowing
> to continue an environment of low morale in department, creating feelings of fear
> and retribution or retaliation in employees in the department creating a harassing,
> hostile and threatening work environment for employees, non-compliance with
> hiring policy, holding volunteer pay until dues are paid, scheduling part-time
> workers more than part time hours.

*Id.*, Ex. 1.  The same day, Carrick also instructed Plaintiff that he was to work at least one regular

shift per week as a firefighter.  *Id.*, Ex. 1; Ex. 2, Parmenter Dep. at 87:20-23.  As of August 31,

2017, Plaintiff was aware that any further infractions could result in disciplinary action against

him, including termination.  *Id.*, Ex. 1; Ex. 2, Parmenter Dep. at 94:13-24.

Carrick continued to communicate with Plaintiff about the issues noted in the reprimand

"throughout a year or a year and a half" before his termination.  *Id.*, Ex. 2, Parmenter Dep. at

95:11-96:3.  Beginning in March 2018, Carrick and Plaintiff had at least two discussions about

Plaintiff's job, and even discussed changes to the job description to accommodate Plaintiff.  *Id.*,

Ex. 2, Parmenter Dep. at 97:2-101:24; Ex. 3, Fire Chief Job Description Annotated.

In May 2018, Plaintiff, Carrick and City Attorney John Heskett met for an hour-and-a-half or longer to discuss the fire chief job description and Plaintiff's duties. *Id.*, Ex. 2, Parmenter Dep. at 105:1-106:25l; Ex. 3, Fire Chief Job Description, Annotated.

At no time from August 2017 to the date he was terminated did Plaintiff fulfill his duty to work one fire shift a week. *Id.*, Ex. 2, Parmenter Dep. at 87:20-88:1; 116:18-22.

In March 2019, the issues about which Plaintiff had previously been counseled resurfaced. Exs. 4-5, 7, Carrick Memoranda of Reference; Ex. 6, McElhaney Statement. Specifically, EMS employees complained to Carrick that Plaintiff ignored their requests about scheduling accommodations and gave special privileges, including excessive overtime, to the single paramedic employed by the department. Ex. 4. Carrick also learned from employees that, in contravention of fire department policy, they were allowed to cover shifts for each other without documenting the hours on their time sheets, and were paid for those hours by the employee they covered for. *Id.* at 2; Exs. 5, 7.

On April 8, 2019, Carrick terminated Plaintiff's employment. *Id.*, Ex. 8, Termination Letter.

**IV. Analysis**

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, §1. "The Due Process Clause of the Fourteenth Amendment ensures that one cannot be deprived of a property right absent due process of law." *Potts v. Davis County*, 551 F.3d 1188, 1192 (10th Cir. 2009). A plaintiff cannot allege a violation of either procedural or substantive due process if he does not first show that he had a protected property right. *Id.*

The Supreme Court has stated that property interests "are not created by the Constitution," but rather "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). The determination of whether a property interest exists is based on "whether the terms of employment created by contract, federal statute, city charter, or an employee manual create a sufficient expectancy of continued employment to constitute a property interest, which must be afforded constitutionally guaranteed due process." *Vinyard v. King*, 728 F.2d 428, 432 (10th Cir. 1984).

The Tenth Circuit has recognized that "if state statutes or regulations place substantive restrictions on a government actor's ability to make personnel decisions, then the employee has a property interest protected by the procedural due process clause. *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998). "To determine whether a plaintiff was denied procedural due process, [courts] engage in a two-step inquiry: (1) Did the individual possess a protected interest to which due process protection is applicable? (2) Was the individual afforded an appropriate level of process?" *Id.*

### A. Whether Parmenter Possesses a Protected Interest

The Supreme Court has stated:

The Fourteenth Amendment's procedural protection of property is a safeguard of the security interests that a person has already acquired in specific benefits. These interests—property interests—may take many forms.

* * *

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

* * *

5

Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

Parmenter contends that pursuant to 11 O.S. §29-104, he possessed a property interest in his position as Fire Chief. That statute provides:

The chief and members of all paid municipal fire departments shall hold their respective positions unless removed for a good and sufficient cause as provided by applicable law or ordinance.

However, Oklahoma law further provides:

Whenever a charter is in conflict with any law relating to municipalities in force at the time of the adoption and approval of the charter, the provisions of the charter shall prevail and shall operate as a repeal or suspension of the state law or laws to the extent of any conflict.

11 O.S. §13-109. Accordingly, because the Nowata's City Charter provides that all City employees are at will and may be fired with or without notice, its provision prevails over 11 O.S. §19-104.

Nor is the Court persuaded by Parmenter's claim that *In re City of Durant v. Cicio*, 50 P.3d 218 (Okla. 2002) is applicable to this case. In *Cicio*, the Oklahoma Supreme Court—in the context of analyzing Oklahoma's statutory police pension system—stated in *dicta* that police and fire protection were not matters of purely municipal concern, but were "unquestionably a matter of statewide interest" and therefore, under 11 O.S. §50-123—which prohibits discharge "except for cause"—the plaintiff, a fired police officer, was entitled to continued employment in the absence of a showing of cause. *Id.* at 223. Importantly, in *Cicio*, Durant—in contrast to Nowata—was not a chartered, home-rule city, but rather was organized and run pursuant to state statutes. *Id.* at 220.

Because Nowata's City Charter is controlling over 11 O.S. §29-104, the City Charter controls resolution of this employment dispute.

### B. Adequacy of Due Process

Moreover, even assuming 11 O.S. §19-104 applies to Parmenter's claim, the undisputed record establishes that he was fired for "good and sufficient cause." On August 31, 2017, he received a formal, documented reprimand listing numerous issues and also ordering him to work at least one regular shift per week as a firefighter. Accordingly, he was aware that any further infractions could lead to disciplinary action—including termination—against him. For well over a year after the written reprimand, Carrick continued to address items listed in the written reprimand. During that time, and in contravention of the reprimand, he failed to work a single fire shift. Moreover, after meeting with fire department employees, Carrick learned of other issues— including that department morale was abysmal due to favoritism of one employee over the others, and that employees were trading shifts without documenting the trades, and then directly compensating each other for covered shifts.

The undisputed record supports the City's position that Parmenter's termination was for "good and sufficient cause."

### V. Conclusion

For the foregoing reasons, the City of Nowata's Motion for Summary Judgment (Doc. 23) is hereby granted.

ENTERED this 4th day of November, 2020.

TERENCE C. KERN
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

STEPHEN PARMENTER,         )
                            )
       Plaintiff,           )
                            )
v.                           )
                            )
CITY OF NOWATA, OKLAHOMA,    )     Case No. 19-CV-431-TCK-JFJ
                            )
       Defendant.       )

## JUDGMENT

Pursuant to the Court's Opinion and Order of November 4, 2020, judgment is hereby entered in favor of the defendant City of Nowata, Oklahoma, and against the plaintiff, Stephen Parmenter.

ENTERED this 4th day of November, 2020.

_TERENCE C. KERN_
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1) STEPHEN PARMENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 19-CV-431-TCK-JFJ |
| | ) | |
| 1) CITY OF NOWATA, OKLAHOMA, | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF APPEAL

Notice is hereby given that Stephen Parmenter, Plaintiff in the above named case, hereby appeals to the United States Court of Appeals for the Tenth Circuit from the Order and Opinion filed November 4, 2020 [Dkt. No. 37] and the Judgment filed November 4, 2020 [Dkt. No. 38].

Respectfully submitted,

FRASIER, FRASIER & HICKMAN, LLP

By:    */s/Frank W Frasier*
Frank W Frasier, OBA #17864
Steven R. Hickman, OBA #4172
1700 Southwest Blvd.
Tulsa, OK 74107
Phone: (918) 584-4724
Fax: (918) 583-5637
E-mail: frasier@tulsa.com
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on 4 December, 2020, a true, correct, and exact copy of the foregoing document was served *via* electronic notice by the CM/ECF filing system to all parties on their list of parties to be served in effect this date.

By:    */s/Frank W Frasier*
Frank W Frasier

2020-12-04 9:28 am
\\Ffh-vm-dc\company\Clients\OPEN\Vicki\@aashley clients\PARMENTER, Stephen 19-0034\TENTH CIRCUIT\notice of appeal.wpd/vs

Page 1

142